**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **AFFINITY LABS OF TEXAS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. 1:12-CV-00205-LY** |
| | ) | |
| **CLEAR CHANNEL BROADCASTING,** | ) | |
| **INC.; CUMULUS MEDIA, INC.; AND** | ) | |
| **UNIVISION INTERACTIVE MEDIA, INC.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF AFFINITY LABS OF TEXAS LLC'S
<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................................1

    A.  The Technology ............................................................................................ 1

    B.  The Plaintiff ................................................................................................. 2

    C.  The Defendants ............................................................................................ 3

II.  CLAIM CONSTRUCTION STANDARD OF REVIEW .................................................4

III.  THE DISPUTED CLAIM TERMS .............................................................................6

    A.  Overview ...................................................................................................... 6

    B.  Specific Terms ............................................................................................. 7

        1.  "a non-transitory storage medium including an application configured for execution by the wireless cellular telephone device"   (Claim 1 of '379 Patent)................................7

        2.  "to receive a streaming media signal in the wireless cellular telephone device corresponding to the regional broadcasting channel" (Claim 1) .............................................10

        3.  "on-demand audio information selectable by a user" (Claim 5) ....................................................................................15

        4.  "log in" (Claim 7) .............................................................................17

        5.  "advertisements are targeted to a specific demographic" (Claim 21) ...................................................................................18

        6.  Previously-Construed Terms ...........................................................20

            a.  "graphical user interface" (Claim 1) ...............................20

            b.  "soft buttons" (Claim 14)................................................20

C:\Users\vajackson\Desktop\4047546_1.DOCX.docx

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Affinity Labs of Texas, LLC v. BMW N. Am., LLC*, et al., Civ. No. 9:08-cv-164 (E.D. Texas.)................................................................................................16, 20

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264 (Fed. Cir. 2011).....................................13

*Alexam, Inc. v. Bes Buy Co., 2012 U.S. Dist. LEXIS 49511, at \*22 (E.D. Tex. Apr. 9, 2012)* ...............................................................................................5-6

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249 (Fed. Cir. 2010)..........12

*C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858 (Fed. Cir. 2004) .........................13

*Encyclopedia Britannica, Inc. v. Alpine Elecs. of Am., Inc.*, 2008 U.S. Dist. LEXIS 111989 (W.D. Tex. Sept. 30, 2008)................................................................5

*Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999) .................................4

*Lyons v. Nike, Inc.*, 2010 U.S. Dist. LEXIS 141265 (D. Or. Sept. 27, 2010)................................5

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)................................................................................4-5

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008)...................5

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......................................4-5, 20

*Phoenix Solutions, Inc. v. Pac. Gas & Elec. Co.*, 2009 U.S. Dist. LEXIS 130787 (C.D. Cal. Aug. 26, 2009)................................................................................5

*Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354 (Fed. Cir. 2006)....................................................13

*Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371 (Fed. Cir. 2002), *vacated* ..........13

*United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554 (Fed. Cir. 1997)............................5

*Watts v. XL Sys., L.P.*, 2008 U.S. Dist. LEXIS 108128 (W.D. Tex. July 1, 2008).........................4

## I.     INTRODUCTION

Plaintiff Affinity Labs of Texas, LLC ("Affinity") does not believe that any term of U.S. Patent No. 7,970,379 ("the '379 Patent" or "Patent-In-Suit") needs "interpretation."  In contrast, Defendants have attempted to re-write long phrases in the claims.  But the process of claim construction is not an opportunity for wholesale re-drafting of claim language.  When a defendant identifies long passages from a claim and calls those passages "a term" that needs construction, a red flag should appear because often in those instances the defendant is trying to re-write the claim to create a non-infringement defense.  Here, the words of the asserted claims are clear.  Those words were chosen by the patentees to describe the invention, they were approved by the Patent Office, and they do not need to be changed for litigation.

### A.     The Technology

While a given television or radio station may be able to blanket the entire Austin metropolitan area with a strong signal, reception often becomes poor in neighboring communities like Bastrop or Marble Falls, and then eventually disappears altogether.  The '379 Patent describes a solution that allows regional broadcasters to not only expand but to even "nationalize" their reach.  It allows broadcasters to offer their programming wherever and whenever the customer wants it. (*See generally* Ex. 1, the '379 Patent)[1]

More specifically, the '379 Patent covers streaming regional broadcasts to smartphones anywhere in the country by virtue of a downloadable application.  While this technology is now ubiquitous, Affinity founder Russell White and Affinity consultant Kevin Imes invented it back in the year 2000 - long before Clear Channel Broadcasting Inc. ("Clear Channel"), Cumulus Media, Inc. ("Cumulus"), and Univision Interactive Media, Inc. ("Univision", collectively

---

[1]  The '379 Patent along with other exhibits referred to herein are identified as "Ex.___" and are attached as exhibits to the Declaration of Brian McQuillen filed herewith.

"Defendants") began making regional broadcasts available over the Internet, and even longer before they began making broadcasts available anywhere in the country over smartphones.

In 2000 there was no iPod, no iPhone, and no App Store. These and similar technologies are now licensed under Affinity's patents for nearly $100 million, from leading technology companies, including Apple, Panasonic, Pioneer, Alpine, and JVC/Kenwood, and numerous automobile manufacturers, including Hyundai/Kia, Volkswagen, BMW, and Mercedes-Benz.

### B.    The Plaintiff

Mr. White, an engineer who attended Texas A&M University on a full academic scholarship, first worked at the Lincoln Electric Company designing robotic work cells during the day and attending law school at night. Mr. White is named as an inventor on over 20 patents, including several patents held by AT&T and Apple. Mr. Imes served for over ten years in the United States Air Force and the Texas Air National Guard, and graduated from the University of Texas as a Texas Veteran with a degree in engineering. He first worked at Motorola Corporation, and is an inventor on over 15 patents including several related to smart energy management. Both men have graduate degrees as well. Mr. White has a law degree from Temple University, and Mr. Imes has an MBA from the University of Texas.

In the latter half of 1999, Messrs. White and Imes began working on ways to manage the emerging digital media, such as radio, television and music. They conceived of an entirely new way to distribute, use, and interact with digital services that placed a smart mobile device at the center of an entire "ecosystem," as opposed to the highly fragmented approach of the time. In essence, the inventors sought to make a user's favorite source of media – whether it be a local station or a collection of digital music – available wherever the user is located.

As explained by Mr. White, the initial spark for the invention was his wife's desire to

hear a nationally syndicated radio show that was not available in Austin.  Mr. White began developing new ways to facilitate access to rich media content from hand-held devices.  The resulting solution included network based services that worked with a multi-functional hand-held device that could make phone calls, download applications, store and play digital files, and stream broadcasts.  From this concept was born the digital ecosystem that has since become well-known.  Affinity's inventors filed a patent application on their inventions in March 2000, from which eight patents have now issued, including the Patent-In-Suit.

Around the filing date of the initial patent application, the inventors developed a plan for a business called "Celecast" to market this technology.  The Celecast Business Plan described how "Celecast's patent pending technology would allow online radio stations to wirelessly deliver their content to mobile listeners."  (Ex. 2, Celecast Business Plan, at AFLB-CC-0001378.)  A later version of the Celecast plan, dated in the mid-2000s and entitled "WiCast Business Plan," specifically identified Clear Channel as a potential partner in the content provider market. (Ex. 3, WiCast Business Plan at AFLB – CC – 0001313.)  As Mr. White pursued his goal of raising capital and bringing Celecast to market, he met with potential investors and refined the business plan.  Throughout these years of effort, Mr. White worked at major law firms like Baker Botts and Wilson Sonsini, which facilitated his ability to develop a good group of advisors.  Intelligent men like Scott Morris, Keith Witek, Alan Carlson, and Erin DeFosse gave Mr. White pointers for raising money and moving Celecast along.

### C.    The Defendants

As often happens, the inventors were never able to raise sufficient investment capital to turn their idea into a commercial reality.  The first commercial embodiments of the inventors' ecosystem were marketed by current Affinity licensees –  with BMW and Apple leading the way.

Shortly after Apple launched its App Store, the accused iHeartRadio mobile application was introduced.  By March 2009, the iHeartRadio mobile application had been downloaded more than one million times. (Ex. 4, March 16, 2009 Clear Channel press release.)  The iHeartRadio mobile application is now available on multiple platforms and has expanded to include regional broadcasts from all Defendants, and as of November 2012 has been downloaded 135 million times.[2] (Ex. 5, Nov. 20, 2012 Clear Channel press release.)  Affinity reached out to Clear Channel in August 2011, shortly after issuance of the '379 Patent. (Ex. 6, Aug. 10, 2011 letters.) Affinity later filed suit once it was became clear the parties could not agree to terms for a license.

## II.    CLAIM CONSTRUCTION STANDARD OF REVIEW

It is the duty of the Court to construe patent claims as a matter of law. Claim construction is the first step in the two-step process of deciding a patent infringement case. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  During claim construction, a court first looks at the words of the claims themselves to define the scope of the patented invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc)).  In determining the meaning of the claims, "there is a 'heavy presumption in favor of the ordinary meaning of claim language.'" *Watts v. XL Sys., L.P.*, 2008 U.S. Dist. LEXIS 108128, at *22 (W.D. Tex. July 1, 2008) (quoting *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999)). Ordinary meaning is defined as "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313.

---

[2]    The iHeartRadio mobile application initially was only available on the iPhone and hosted regional broadcast content only from defendant Clear Channel.  Eventually versions of the application were made available on the Blackberry and Android platforms, and regional broadcast content from defendants Cumulus and Univision was also made available for streaming through the iHeartRadio mobile application.  Defendants Cumulus and Univision also launched their own mobile applications for streaming regionally broadcasted audio and video content that are also accused of infringing the Patent-In-Suit.

Although claim construction is the Court's responsibility, "part of this duty is to determine the extent which to construction is even necessary." *Alexam, Inc. v. Best Buy Co.*, 2012 U.S. Dist. LEXIS 49511, at *22 (E.D. Tex. Apr. 9, 2012).  Furthermore, "[t]he *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. . . . It is not an obligatory exercise in redundancy." *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *see also Phoenix Solutions, Inc. v. Pac. Gas & Elec. Co.*, 2009 U.S. Dist. LEXIS 130787, at *2-3 (C.D. Cal. Aug. 26, 2009) ("[O]nly unclear terms must be construed, and only if necessary."); *Alexam*, 2012 U.S. Dist. LEXIS 49511, at *21-22 (explaining some claim terms do not need to be construed because "some terms . . . are commonplace terms that a juror could understand without further direction from the court."); *Lyons v. Nike, Inc.*, 2010 U.S. Dist. LEXIS 141265, at *29 (D. Or. Sept. 27, 2010) ("[A]ll claim language need not be construed and, furthermore, should not be construed where the dispute is not genuine and merely seeks to reconfigure claim language in [a] way that is not meaningful.").  As this Court has stated, "[t]his Court must construe claim language . . . but the Court must not rewrite the claims." *Encyclopedia Britannica, Inc. v. Alpine Elecs. of Am., Inc.*, 2008 U.S. Dist. LEXIS 111989, *14 (W.D. Tex. Sept. 30, 2008).  The Court has discretion to determine whether a claim needs construction. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims."); *Alexam*, 2012 U.S. Dist. LEXIS 49511, at *18 (explaining the Court "need not provide a new definition or rewrite a term, particularly when the Court finds the term's plain and ordinary meaning is sufficient.").  Here, all the claim phrases identified by Defendants for construction are well understood terms that do not require construction, as the terms' "plain

and ordinary meaning[s] . . . [are] sufficient." *Alexam*, 2012 U.S. Dist. LEXIS 49511, at *18.

## III.   THE DISPUTED CLAIM TERMS

### A.   Overview

Defendants have identified several multi-word phrases for construction.  When they first identified these long phrases, Affinity asked Defendants to identify the actual term or terms within the phrases for which they sought construction.  Defendants refused to make the identification until the parties exchanged proposed constructions.  Now that Defendants have proffered their proposed constructions, however, the words and concepts that Defendants seek to change can be identified within the longer phrases.

Affinity is asserting system claims 1, 2, 5-7, 10, 11 and 13 and method claims 14-17 and 19-21 of the Patent-In-Suit.  Because the structure of independent claim 1 is important to resolving the first claim construction dispute and sets the stage for the remaining disputes, it is provided below in its entirety.  We have bolded the language in claim 1 for which Defendants have requested a construction and inserted bracketed numbering for ease of reference:

1. A broadcast system, comprising:

[i]  a network based resource maintaining information associated with a network available representation of a regional broadcasting channel that can be selected by a user of a wireless cellular telephone device; and

[ii]  **a non-transitory storage medium including an application configured for execution by the wireless cellular telephone device** that when executed, enables the wireless cellular telephone device:

> [a] to present a graphical user interface comprising at least a partial listing of available media sources on a display associated with the wireless cellular telephone device, wherein the listing includes a selectable item that enables user selection of the regional broadcasting channel;

> [b] to transmit a request for the regional broadcasting channel from the wireless cellular telephone device; and

> [c]  **to receive a streaming media signal in the wireless cellular telephone device corresponding to the regional broadcasting channel**, wherein the wireless cellular telephone device is outside of a broadcast region of the regional broadcasting channel, wherein the wireless cellular telephone device is configured

to receive the application via an over the air download.

(Ex. 1, Col. 18:21-44.)  Claim 1 recites a system that facilitates the distribution of a media stream and a smartphone application that allows the smartphone to select and receive the media stream.  As evident from the  structure of the claim, independent claim 1 is directed to "**a broadcast system**" that includes two elements: [i] a "**network based resource**" maintaining information associated with a representation of a regional broadcast and [ii] "**a non-transitory storage medium** including an application, configured for . . . ."  The claim language in clauses [a] through [c] describes the capabilities of the application recited in element [ii] of the claim.

**B.      Specific Terms**

At the beginning of each section, Affinity has included a chart with the entire phrase Defendants seek to construe next to Defendants' proposed construction.  Affinity has highlighted the language in Defendants' proposed construction that is different than the claim language itself. In so doing, the to-be-construed term from within the very lengthy phrase becomes apparent.

**1.      "a non-transitory storage medium including an application configured for execution by the wireless cellular telephone device" (Claim 1 of '379 Patent)**

| Claim Language | Defendants' Proposal |
|---|---|
| a non-transitory storage medium including an application configured for execution by the wireless cellular telephone device | a non-transitory memory in the wireless cellular telephone device that stores an application which has been configured for execution by the wireless cellular telephone device |

Affinity contends the claim language does not need to be construed.  As can be seen from the chart, Defendants appear to be proposing three changes to the claim language:

1.   As shown in green, Defendants are asking the Court to construe "storage medium" as "memory"

2.   As shown in red, Defendants are asking the Court to lengthen the claim by adding the phrase "in the wireless cellular telephone device that stores"

7

3.  As shown in blue, Defendants are asking the Court to add the words "which has been" in front of the word "configured"

In order to crystallize the substantive issues, Affinity has no objection on points 1 (swapping the phrase "storage medium" for the synonym "memory") and 3 (inserting "which has been").  While Affinity believes the changes are unnecessary, Affinity defers to the Court as to whether these changes help a jury to better understand the claim.  With those two issues set aside, what remains is Defendants' effort to insert a new limitation, *i.e.*, that the storage medium or memory can only be "in the wireless cellular telephone device that stores [the application]".

Claim Language.  There is no basis to re-write the claim and insert this new requirement ("in the wireless cellular telephone device that stores").  While the issued claim requires that the broadcast system include a "non-transitory storage medium," and while this memory includes (i.e. stores) "an application" that is "configured for . . ." doing a number of things, the claim does not require that the storage medium/memory be located on the cellular telephone.  The claim is broad enough, for example, to cover a broadcast system that has a non-transitory storage medium located at a network-based server.  In practice, the network-based server could be part of an online store for applications (e.g. the Google Play Store) accessible over a wireless network.[3]  In fact, independent claim 1 requires that the application be capable of being received by a cell phone via an over the air download.  As such, consistent with the plain meaning of the claim language, the inventors claimed a system that stores a smartphone application in the network and allows a user to download the application directly to a cell phone.

---

[3]     Moreover, several dependent claims (which depend from claim 1) identify additional "instructions" that are included (i.e. stored) on the non-transitory storage medium that enable additional features on the cellular telephone.  (Ex. 1, claims 2, 4-7, 10-11.)  However, none of the dependent claims suggest the cellular telephone itself is a required structural component of the claimed broadcast system of claim 1.

8

Specification.  The specification fully supports the claim language as issued and does not require the addition of Defendants' new requirement.  The specification describes how the claimed broadcast system can make an application available over a wireless network.  For example, in the context of Figures 1 and 4 of the '379 Patent, the specification states:

> FIG. 1 depicts a general system for wirelessly communicating selective information to an electronic device in accordance with one aspect of the present invention. The system, illustrated generally at 100, includes a digital engine 101 coupled to a communications engine 102. Communications engine 102 is remotely coupled to an electronic device 103.  **Digital engine 101 may be directly or indirectly coupled to storage device 105 operable to store information**. ….

> System 100, utilizing communication engine 102, may wirelessly communicate data or information associated with the selected audio information to electronic device 103 thereby providing wireless communication of selected information to an electronic device 103 operable to receive wireless communications. …

> FIG. 4, described in greater detail below, illustrates one embodiment of providing an Internet website for displaying selectable audio information. . . .

> **Radio dial 412 may also be displayed as a separate user interface and in some embodiments, does not require a "browsing" environment to view radio dial 412.** For example, an electronic device, such as a PDA, having a display may graphically present radio dial 412 to a user . . . .**Therefore, radio dial 412 may be operable as an application for use with several different types of electronic devices (i.e.,** computer systems, portable computing devices, **cellular phones**, etc.) operable to display radio dial 412 **and in some embodiments may be wirelessly communicated to an electronic device**.

(Ex. 1, Col. 3:24-31, Col. 3:42 to Col. 4:3; Col. 1:16-31.)  As described above and shown in Figures 1 and 4, the specification for the '379 Patent describes and shows a system for wirelessly distributing broadcasted radio over the Internet and wirelessly distributing an application for accessing such audio on an electronic device such as cellular telephone.

Prosecution History.  The prosecution history is consistent with Affinity's position. Before a January 27, 2011 amendment, the language of claim 1 recited a broadcast system with two structural limitations:  (1) a network based resource; and (2) "a computer readable medium including instructions that when executed, enable the wireless telephone device."  The "computer readable medium" limitation was amended to become the now disputed claim phrase "non-

transitory storage medium including an application configured for execution by the wireless

cellular telephone device."  (Ex. 7, Reply to Office Action, dated January 27, 2011, at 3.)  The

amended claim phrase was distinguished from the prior art by noting that:

> [I]ndependent claim 1 describes in part that a storage medium includes an
> application that is configured for execution by a wireless cellular telephone
> device.  Leeke nowhere teaches such application.

*Id.*, at 7.  The distinction from the prior art relied on the presence of the claimed "application"

that can be executed on a wireless cellular device, which is exactly what the claim says. *Id.*  Both

before and after amendment, the claim identified what the instructions/application had to be

capable of when running on a telephone device, but nothing in the claim element before or after

amendment suggests the telephone device was intended to be a structural limitation of the claim.

Nothing in the specification or the prosecution history justifies a variance from the claim

language, let alone adding an entirely new clause to claim 1.  The identified phrase should

remain unchanged and without construction as the plain meaning of the phrase is sufficient.

    **2.**    **"to receive a streaming media signal in the wireless cellular telephone device corresponding to the regional broadcasting channel"  (Claim 1)**

              **"streaming media signal representing the regionally broadcasted content" (Claim 14)**

| Claim Language | Defendants' Position |
|---|---|
| to receive a streaming media signal in the wireless cellular telephone device corresponding to the regional broadcasting channel (Claim 1) | to receive in the wireless cellular telephone device as a streaming media signal a broadcast currently available on the regional broadcasting channel  (Claim 1) |
| "streaming media signal representing the regionally broadcasted content" (Claim 14) | streaming media signal delivering content currently available on the regional broadcast (Claim 14)" |

These two claim terms are grouped together because they present the same dispute.

10

1. The only substantive differences in language between the claims 1 and 14 as issued and Defendants' proposed constructions are shown in red:  Defendants insert a requirement that the streaming media signal be "currently available".

2. The other differences in claim 1 is organizational.  Defendants seek to alter the sequence of phrases within the claim.  As shown in blue, Defendants are asking the Court to move one phrase from one point in the claim to another.  However, there is no reason to alter the order in which the words are presented in the claim.

Point 1 appears to be the only substantive dispute, in which Defendants change the words "corresponding to" (claim 1) into "a broadcast currently available on", and they change "representing" (claim 14) into "delivering content currently available on."  There is no reason to change (or "interpret") the claims in the manner proposed by Defendants.

Claim Language.  The claims are clear on their face.  In claim 1, the required relationship between the "streaming media signal" and the "regional broadcast" is "corresponding to".  In claim 14, the relationship between those two nouns is "representing".  Nothing in the claim suggests that the streaming media signal must be of a broadcast (or content) that is "currently available," nor is that a natural interpretation of the terms "corresponding" or "representing."

As an initial matter, adding Defendants' proposal back into the claim yields a non-sensical result.  In both cases, Defendants seek to replace an intransitive verb with a noun phrase.  That just does not work.  "Corresponding," which is usually used with "to" or "with", is an intransitive verb that indicates a close comparative relationship between two distinct things.  (Ex. 8, Merriam-Webster's Collegiate Dictionary, 260 (10th ed 1994) ("to compare closely"); Ex. 9, American Heritage College Dictionary, 312 (3rd ed 1997) ("to be similar, parallel, equivalent, or equal in character, quantity, origin, structure or function").)  Likewise, the claim language "representing" is an intransitive verb that also indicates a close similarity between two distinct things.  (Ex. 8, Merriam-Webster's Collegiate Dictionary at 993 ("to correspond to in essence, constitute"); Ex. 9, American Heritage College Dictionary at 1158 ("to be the equivalent of").)

11

Defendants' constructions remove the comparative relationship between the media stream and the broadcast by making them one and the same.  Thus, Defendants' constructions replaces intransitive verbs with unsupported noun phrases, i.e., "broadcast currently available on" and "content currently available on."  In so doing, Defendants eliminate the concept of comparing the "streaming media signal" to the "regional broadcast."  When a construction eliminates the very concept conveyed by the claim term being construed, it is not a construction at all, but an attempt to change the claim.  Unsurprisingly, nothing in the intrinsic record supports Defendants' proposal; in fact, arguments made before the Patent Office specifically rejected such a construction in the context of similar claim language.[4]

<u>Specification</u>.  The specification does not support inserting a new restriction into the claims.  Instead, the specification describes how a broadcast can be saved and remotely accessed later.  *See*, *e.g.*, (Ex. 1, Col. 3:46-51 ("The maintained information may also be a reference to a network location when an audio file may be stored, a network location where a network broadcast of audio information may be located, etc. or other network locations having information associated with the selected audio information.").)  It also details how streaming media could be selected for "off-line broadcast," necessarily meaning that a streaming version is occurring later than the original, i.e., it is *not* a version of a "currently available" broadcast:

---

[4]      Defendants appear to be improperly attempting to set up a non-infringement argument by advocating the claimed streaming media signal must be a "currently available" regional broadcast.  Under Defendants' proposed construction, any streamed version of a local broadcast is inherently a delayed version of the broadcast and, therefore, never a currently available regional broadcast.  Of course, a construction that renders the claim meaningless and impossible to be satisfied is rarely if ever the correct construction.  *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) ("A claim construction that renders asserted claims facially nonsensical 'cannot be correct.'") (*quoting Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1357 (Fed. Cir. 2006)); *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1278 (Fed. Cir. 2011) ("While inoperability in itself does not doom [the accused infringer]'s construction,  "a construction that renders the claimed invention inoperable should be viewed with extreme skepticism.") (*quoting Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1376 (Fed. Cir. 2002), *vacated and remanded on other grounds*, 537 U.S. 802 (2002)).

> For example, a user may go "on-line" to access a website and select information and then go "off-line" or end the browsing session.  The wireless communication may then occur while the user is off-line thereby removing the confines of using an active or on-line browsing environment (*i.e.*, Internet radio broadcast, streaming audio, etc.) for accessing selected information.

(*Id.*, at Col. 7:4-12; *see also* Col 17:4 to 17:17 ("The present invention, by providing a medium for transmitting selectable audio information, enables the existence of on-line broadcasting with little or no overhead cost for a host. A user may select an on-line broadcast for on-line or off-line delivery.").)  Far from being required by the specification, Defendants' new restriction would exclude all of these embodiments, which is "rarely, if ever, correct."  *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004).

Moreover, the terms "streaming" and "broadcast" are used throughout the specification, but the specification never suggests, let alone mandates, the construction proposed by Defendants requiring a streaming media signal to be a currently available broadcast. (*See e.g.*, Ex. 1, Col. 2:55-59 ("In a particularized form, a user may select information from an Internet website operable to allow selectivity of audio information such as songs, on-line radio stations, on-line broadcasts, streaming audio, or other selectable information."); Col. 7:21-27 ("The information may include audio information such as MP3s, streaming audio, streaming, internet broadcasts, etc. are selectable by a user and operable to be wirelessly communicated to an electronic device."); Col 11:7-15 ("Radio dial 412 includes several stations that may be programmed using program interface 413. The preset stations may include several different types of user customized preset information such as user selected playlists, Internet broadcast stations, top lists, group playlists, artist-selected lists, Internet radio station, conventional radio stations, Internet phone, cellular phone, etc. and other functions, features, or information associated with audio information.").)  While the streaming media signal may provide the user with a simulcast

13

of a regional broadcast that is virtually indistinguishable from the regional broadcast, nothing in the claims require this identity or the new limitation that Defendants seek to insert.

Prosecution History.  During prosecution of patents related to the Patent-In-Suit, arguments made to distinguish the prior art made clear that the streaming media signal is not required to be a currently available or "real-time" regional broadcast.  During reexamination of the parent '595 Patent, and in the context of a claim requiring an application that "allows the device to request an audio stream that represents a local broadcast signal for a channel located remote from a then current location of the portable device," the applicant distinguished the claim from the prior art and "real-time broadcasts," stating "**nothing in the claims**, Abecassis or in Cooper anywhere **relates to this need for currency and companionship via a real-time broadcast.**"  (Ex. 10, Response to Office Action, dated February 16, 2012, at 7-8 (emphasis added).)  Further, although the applicant provided guidance during prosecution of the great-grand parent – the '947 Patent – on the meaning of streaming (as compared to downloading audio files), the applicant did not define or limit the meaning of "streaming" to currently available regional broadcasts.  Rather, it was stated:

> Applicants have provided a definition of streaming audio to clarify the difference between audio files and streaming audio. For example, '…streaming audio includes playing audio or video immediately as it is downloaded from the Internet, rather than storing it in a file on the receiving computer first." A second reference defines streaming audio as "…streaming audio is played as it arrives. The alternative is a sound recording that doesn't start playing until the entire file has arrived.'

(Ex. 11, Amendment, dated February 18, 2003, at 2.)  In contrasting streaming audio from downloading audio files, the applicants confirm that the streaming audio or video begins playing as it arrives and is sufficiently buffered compared to an audio file that must be completely downloaded before it can be played.  *Id.*  Nothing in this description of "streaming" suggests or requires the streaming audio to correspond to or represent a currently available broadcast.

14

**3.     "on-demand audio information selectable by a user" (Claim 5)**

Claim 5 of the '379 Patent is a dependent claim that states in its entirety:

5.   The system of claim 1, wherein the storage medium further comprises instructions to enable display of **on-demand audio information selectable by a user.**

Affinity contends the claim language in bold does not need to be construed.  The chart below

compares the claim language with Defendants' proposal.

| Claim Language | Defendants' Position |
|---|---|
| on-demand audio information selectable by a user | information identifying particular sound recordings playable over a communications link when selected by a user |

As can be seen on the chart, Defendants appear to seek to change two things in this claim phrase:

1.     As shown in green, Defendants propose combining "on-demand" and "selectable" into the phrase "when selected"

2.     As shown in red, Defendants are asking the Court to construe "audio information" as "information identifying particular sound recordings playable over a communications link."

In response to point 1, Affinity does not believe there is any reason to change the claim

language from "on-demand" and "selectable" into "when selected."  The claim language is clear

and unambiguous.  It is entitled to its plain meaning.  It appears that Defendants are only

proposing the changes in green to be grammatically consistent with Defendants' proposal in

point 2.  In point 2, Defendants seek to construe "audio information" as "sound recordings

playable over a communication link."  This proposal is at odds with the plain meaning and the

intrinsic record.  Moreover, had Affinity realized Defendants were merely trying to construe

"audio information," Affinity would have pointed to a construction of this term that is consistent

with the one adopted by the United States for the Eastern District of Texas when considering the

construction of "audio information sources" in the context of the related '833 Patent which has

15

the same specification as the '379 Patent.  That Court found that "audio information" meant:

> electronically transmitted information available for selection by a user such as songs, on-line radio stations, on-line broadcasts, streaming audio, video, text or other selectable information.

(Ex. 12, Order Construing Claim Terms of Patent No. 7,324,833, dated Dec. 18, 2009, at 18-20

in *Affinity Labs of Texas, LLC v. BMW N. Am., LLC*, et al., Civ. No. 9:08-cv-164 (E.D. Texas.)

    <u>Claim language</u>.  Noting about the claim language supports Defendants' proposal.  As

shown above, Defendants are re-writing the claim.

    <u>Specification</u>.  The written description provided in the '379 Patent makes clear that the

term "audio information" can take many forms and is not limited to "sound recordings" or

information "playable over a communications link."  Rather, the specification states:

> The present invention is not limited to communicating only audio information. One skilled in the art can appreciate that other types of information, such as video, textual, etc. may be communicated utilizing the systems and methods disclosed herein without departing from the spirit and scope of the present invention. Additionally, it will be understood that information may be formatted in a plurality of ways at different phases of communication without losing the underlying content of the selected information. For example, an audio file may be formatted, segmented, compressed, modified, etc. for the purpose of providing or communicating the audio invention. Therefore, the term "audio information" or "information" is used in a general sense to relate to audio information in all phases of communication.

(Ex. 1, Col 3:15-23.)  In short, "audio information" encompasses any information about audio,

including the audio itself.

    Based on the specification, Affinity contends that this term does not need to be construed

since the claim language itself is consistent with the broad meaning intended for the limitation as

explained in the specification.  If the Court is inclined to construe "audio information," Plaintiff

does not object to a construction that is consistent with the Eastern District of Texas's

construction above.  Affinity agreed to the Eastern District of Texas's construction since the

construction is consistent with the definition of audio information provided in the specification.

<u>Extrinsic Evidence</u>.  In lieu of support from the intrinsic record, Defendants, appear to base their

16

proposed construction on extrinsic evidence.  However, even the  extrinsic evidence cited by

Defendants in the JCCS recognizes that "on-demand" as a term of art has a broad meaning that

includes not just the ability to control the selection of video or audio, but includes, for example

"interactive devices, such as question and answer, chat rooms, product or service order forms…"

(See Ex. 13, The Internet Encyclopedia at 679 (description for "On-Demand").)  Defendants own

cited extrinsic sources recognize that the term "On-Demand" is broader and is not limited to

sound recordings.  The ambiguity emerging from the extrinsic evidence is precisely why the

Federal Circuit directs that the intrinsic record controls.  Affinity therefore submits that the Court

should reject Defendants' effort to re-write this claim through the construction process.

### 4.     "log in" (Claim 7)

Claim 7 of the '379 Patent is a dependent claim states in its entirety:

7.  The system of claim 1, wherein the storage medium further comprises
instructions to receive a **log in** from a user of the wireless cellular telephone
device and to display a preferred user environment associated with the user.

Affinity contends the claim language in bold is readily understood and does not need to be

construed.  The chart below compares the claim language with Defendants' proposal.

| Claim Language | Defendants' Position |
| --- | --- |
| log in | information identifying a user, such as a username or password |

The term "log in" is readily understood in the context of the claim and does not require

construction.  A "log in" is not limited to something that "identifies" someone or something.  A

"log-in" is typically information that is used by someone or something to gain access or entry

into a given environment.  Even the examples proposed by the Defendants (i.e., a username and

password) do not necessarily identify the user.  Many people have usernames that are nothing

like their own names; and it is known people share electronic devices, including cellular phones,

17

so again the use of a username and password to log in will not necessarily identify the user.  The individual is not actually identified.  The individual can access a preferred user environment if the person or system receiving the log-in is satisfied with it.  As claimed, the term "log in" could mean digital information associated with the user, the user's phone, phone model number and/or information that confirms the user has access rights to the application.

The intrinsic record does not limit the meaning of "log in" to information that identifies a particular user.  Instead, the specification describes a log in process that permits the user to access a homepage and display user-preferred environment (just as claimed), but does not suggest the log in information must "identify the user" as Defendants' propose:

> The present invention is not limited to any one specific type of software and may be realized in plurality of ways as can be appreciated by those skilled in the art. Homepage 401 may also include **login** region 410 **allowing a user to log into homepage 401** and display a user-preferred environment. For example, a user may want Radio Dial 412 to appear when a **user logs into** homepage 401.

(Ex. 1, Col. 10:6-12 (emphasis added); *see also* Col. 10:20-21.)

Finally, while Defendants use the open-ended phrase "such as" to refer to "username or password," there is no reason to call out an example that may or may not be relevant to the accused products.  Indeed, a jury could be confused by a construction that only referred to "username or password" even if prefaced by "such as," and could improperly conclude that the claimed "log in" must include a username or password when there is no such requirement.

### 5. "advertisements are targeted to a specific demographic" (Claim 21)

Claim 21 is a dependent claim of method claim 14 and states in its entirety:

> 21. The method of claim 14, further comprising transmitting advertisements to the electronic device, wherein the **advertisements are targeted to a specific demographic**.

Affinity contends the claim language in bold does not need to be construed.  The chart below compares the claim language with Defendants' proposal.

18

| Claim Language | Defendants' Position |
|---|---|
| advertisements are targeted to a specific demographic | advertisements are selected based on a population characteristic provided by the user, such as the user's race, gender, age, income, profession, or education level |

Defendants' construction would do three things to the claim:

1. As shown in green, Defendants propose changing "specific demographic" to "population characteristic." These appear to be synonyms. Affinity does not understand why "selected based on a population characteristic" is more readily understood  than "targeted to a specific demographic

2. As shown in red, Defendants are inserting the requirement that the specific demographic (or population characteristic) be "provided by the user." Affinity submits that there is no basis to add this new limitation to the claim.

3. As shown in blue, Defendants would insert an incomplete list of examples. Affinity objects to this approach.

The focus of the dispute appears to be the second and third issues. Taken in reverse order, the inclusion of an incomplete list is improper. Affinity objects to this type of list, because it could easily be mistaken for an exhaustive list by the jury and coming up with a complete list would be very difficult, very time-consuming, and very confusing.

Regarding issue two, Defendants again seek to re-write the claim by inserting a limitation of their choosing. However, Defendants are not construing any claim term by attempting to insert "provided by the user" and nothing in the intrinsic record mandates that the advertisements be based on information provided by the user. The only support proffered by Defendants is an *example* in the specification suggesting that targeted advertisements can be based on information provided to advertisers. (*See* Col. 10:20-22 ("Through providing demographic information to advertisers, when a user logs into homepage 401 selective advertising can be "targeted" for a group of users.").) The specification never suggests that the invention requires information to be provided by a user and Courts have repeatedly found that it is improper to limit claims to the

19

specific embodiments described in the specification.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.")  As such, the Court should reject Defendants' proposed construction.

### 6.      Previously-Construed Terms

In *Affinity Labs of Texas, LLC v. BMW N. Am., LLC*, et al., Civ. No. 9:08-cv-164 (E.D. Texas), the Eastern District of Texas construed certain terms of the related grandparent patent – the '833 Patent – that are also in the asserted claims of the Patent-In-Suit.  While Plaintiff does not believe these terms need to be construed, Plaintiff does not object to construing these terms as construed in the prior case.

### a.      "graphical user interface" (Claim 1)

If the Court is inclined to construe this claim term, Defendants propose:  "A presentation that contains selectable graphics, for example, text or icons."  (*See* Ex. 12, Order Construing Claim Terms of U.S. Patent No. 7,324,833, dated Dec. 18, 2009, at 15.)

### b.      "soft buttons" (Claim 14)

If the Court is inclined to construe this claim term, Defendants propose:  "Software rendered graphics that a user can select by pushing the screen display or by pushing an associated physical button."  (*See* Ex. 12, Order Construing Claim Terms of U.S. Patent No. 7,324,833, dated Dec. 18, 2009, at 17-18.)

Dated:  January 18, 2013                By:  _____ s/ Thomas W. Sankey _____

Thomas W. Sankey
TX Bar No. 17635670
twsankey@duanemorris.com
Diana M. Sangalli (*admitted pro hac vice*)
TX Bar No. 24033926
dmsangalli@duanemorris.com
Fiona A. Bell (*admitted pro hac vice*)

TX Bar No. 24052288
fbell@duanemorris.com
**Duane Morris LLP**
1330 Post Oak Blvd., Suite 800
Houston, TX  77056-3166
Tel.:    713.402.3900
Fax:    713.402.3901

*Of Counsel*:
Matt Gaudet (*admitted pro hac vice*)
GA Bar No. 287789
mcgaudet@duanemorris.com
David C. Dotson (*admitted pro hac vice*)
dcdotson@duanemorris.com
**Duane Morris LLP**
1075 Peachtree Street, NE
Suite 2000
Atlanta, GA 30309-3929
Tel: 404.253.6900
Fax: 404.253.6901

Brian McQuillen (*admitted pro hac vice*)
bmcquillen@duanemorris.com
**Duane Morris LLP**
1540 Broadway
New York, NY 10036-4086
Tel.:  212.692.1000
Fax:  212.692.1020

**ATTORNEYS FOR PLAINTIFF
AFFINITY LABS OF TEXAS, LLC**

C:\Users\vajackson\Desktop\4047546_1.DOCX.docx

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 18, 2013, the foregoing Plaintiff Affinity Labs of Texas, LLC's Opening Claim Construction Brief was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(A).


 s/  Thomas W. Sankey
Thomas W. Sankey

22