**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| AFFINITY LABS OF TEXAS, LLC, | ) | AU:12-CV-00205-LY |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | AUSTIN, TEXAS |
| | ) | |
| CLEAR CHANNEL BROADCASTING, INC., | ) | |
| UNIVISION INTERACTIVE MEDIA, INC., CLEAR | ) | |
| CHANNEL BROADCASTING, INC., UNIVISION | ) | |
| INTERACTIVE MEDIA, INC., CUMULUS MEDIA | ) | |
| INC., AFFINITY LABS OF TEXAS, LLC, CLEAR | ) | |
| CHANNEL BROADCASTING, INC., UNIVISION | ) | |
| INTERACTIVE MEDIA, INC., CUMULUS MEDIA INC. | ) | |
| | ) | |
| Defendants. | ) | FEBRUARY 22, 2013 |

*************************************************
TRANSCRIPT OF MARKMAN HEARING

BEFORE THE HONORABLE LEE YEAKEL
*************************************************

APPEARANCES:

FOR THE PLAINTIFF:          THOMAS W. SANKEY
                            DUANE MORRIS, LLP
                            1330 POST OAK BOULEVARD, SUITE 800
                            HOUSTON, TEXAS 77056

                            MATTHEW C. GAUDET
                            DUANE MORRIS LLP
                            1075 PEACHTREE ST. NE, SUITE 2000
                            ATLANTA, GEORGIA 30309

FOR THE DEFENDANTS:         GEORGE A. RILEY
                            O'MELVENY & MYERS LLP
                            TWO EMBARCADERO CENTER, 28TH FLOOR
                            SAN FRANCISCO, CALIFORNIA 94111

                            RYAN K YAGURA
                            NICHOLAS J. WHILT
                            BRIAN M. COOK
                            O'MELVENY & MYERS - LA
                            400 SOUTH HOPE STREET
                            LOS ANGELES, CALIFORNIA 90071

```
1                                    DONNA SCHNEIDER
                                     DUNCAN WILLIAMS
2                                    CLEAR CHANNEL CORPORATE COUNSEL

3   COURT REPORTER:                  ARLINDA RODRIGUEZ, CSR
                                     200 WEST 8TH STREET
4                                    AUSTIN, TEXAS 78701
                                     (512) 916-5143
5

6

7   Proceedings recorded by computerized stenography, transcript

8   produced by computer.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

10:28:57  1    (Open Court)

10:28:57  2        THE COURT:  I apologize for that delay.  I know some

10:28:59  3    of you sat in here, and now you got to see what happens if you

10:29:02  4    transgress.  So bear that in mind as we go through this Markman

10:29:06  5    hearing today.  So with that having been done, the plaintiff

10:29:15  6    may proceed with the claims construction hearing.

10:29:18  7        MR. SANKEY:  Your Honor, Tom Sankey on behalf of

10:29:21  8    Plaintiff Affinity Labs of Texas.  We have provided to the

10:29:24  9    Court and to counsel a copy of slides that we will be using in

10:29:27  10   our presentation today.  And as stated on Wednesday, my

10:29:33  11   colleague Matt Gaudet will present our Markman positions.

10:29:36  12       THE COURT:  Very good.  Mr. Gaudet, you may proceed.

10:29:40  13       MR. GAUDET:  Thank you, Your Honor.

10:29:41  14       Your Honor this morning it's our goal to spend the

10:29:45  15   time supporting our positions regarding the claim construction

10:29:49  16   issues that have been briefed before the Court.  To be clear

10:29:52  17   about what our positions are for each of these terms, what I

10:29:55  18   think you'll hear me say over and over again is that the claims

10:29:59  19   stand on their own; that these claims don't need to be

10:30:03  20   reinterpreted or re-construed.

10:30:06  21       And, interestingly, when you look at the defendants'

10:30:09  22   constructions, it's not that they're saying that there's a word

10:30:13  23   that's ambiguous or a word that the jury is not going to

10:30:15  24   understand or there's a phrase that's too technical and

10:30:19  25   inaccessible and needs to be put into lay terms.  Instead,

10:30:23 1  you'll see that the question is:  Should we insert completely

10:30:25 2  new words that aren't in there and aren't interpreting an

10:30:29 3  existing word or should we take a concept that's in there and

10:30:31 4  change it?

10:30:32 5          And our position, as I'll walk through, is that, no,

10:30:34 6  these claim terms mean exactly what they say.  The jury will

10:30:38 7  have no problem accessing them and, as a result -- there are

10:30:43 8  times when we wouldn't have an objection to swapping out a

10:30:48 9  synonym or something like that, but in terms of the meat of the

10:30:50 10 dispute here, there is no reason to change the words as the

10:30:54 11 patent office issued them.

10:30:55 12         If we go to the next slide, Your Honor, we understand

10:30:58 13 of course you've had quite a bit of experience with Markman

10:31:03 14 proceedings, so I won't go through the certain basic principles

10:31:07 15 about the use of different roles of the intrinsic record.  But

10:31:08 16 there is one point that I want to highlight because I think

10:31:10 17 it's particularly relevant in this case, which is, a threshold

10:31:14 18 question is whether a term needs to be construed at all.  And

10:31:18 19 merely because there's a process called Markman doesn't mean we

10:31:21 20 have to swap out every word in the claim for a synonym and some

10:31:25 21 other word.

10:31:26 22         And the question is, if you look at a word and the

10:31:27 23 jury understands it and nothing in the intrinsic record says

10:31:30 24 you need to change that and make it mean something different or

10:31:32 25 there's something in the claim that -- or there's something not

| | |
|---|---|
| 10:31:35 | 1 |

in the claim that should have been in there, one of these rare

exceptions, then the term doesn't need to be construed just

because in patent cases we all have these hearings and all come

together and all put up PowerPoints.  If the term is clear on

its face, it should stand on its own.

If we go to the next slide, the agenda for this

morning is I will first -- there are actually only five terms

that are in dispute.  One of the terms, and it's the second

term, "streaming media signal" appears in two different

claims.  So it's sort of the same dispute in two parts.  But

this morning I'm going to start by talking about the two terms

or issues that appear in the two independent claims.  And

that's claims 1 and 14.  Then, as I understand, I'll take a

break at that point, the defendants will respond, and then

we'll do the same process with respect to the three terms --

that's the bottom set of terms there -- that appear only in the

dependent claims.

If we could go to the next slide.

The first thing I wanted to do is just kind of take a

minute to give you an overview of the -- of the claims in this

case.  And I'm going to use claim 1 here instead of claim 14

just because the first claim construction dispute is a term

that only appears in claim 1.

What I've done here is we've added -- we've added

some things that are not in the claim; namely, the [a], the

10:32:57  1  [b], the Roman i, the Roman ii, the Roman iii.  We put those

10:33:01  2  things in orange for reference so that I can say element a,

10:33:05  3  element b, element i, ii, and iii.  But those don't actually

10:33:10  4  appear in the text of the claim.  That's just an aid that we've

10:33:13  5  inserted to make it easier to know what we're talking about.

10:33:15  6         So this is the entirety of claim 1.  The first

10:33:18  7  element -- the claim breaks into two elements two major

10:33:21  8  elements [a] and [b].  So it's a broadcast system that

10:33:27  9  fundamentally has two things.  It's got a network-based

10:33:29  10  resource, and then there's some other explanation of that.

10:33:31  11  That's [a].  And then there's [b], a non-transitory storage

10:33:36  12  medium.  And, for the record, this is on slide number 4.

10:33:39  13         [a] says, "A network-based resource maintaining

10:33:43  14  information associated with a network-available representation

10:33:47  15  of a regional broadcasting channel."

10:33:51  16         And just to stop and kind of give you an example of

10:33:54  17  that, a regional broadcasting channel could be, for example, an

10:33:58  18  FM radio station.  And a network-available representation would

10:34:01  19  be, for example, a representation of a radio signal that would

10:34:06  20  be sent as part of an FM broadcast but that is delivered

10:34:10  21  instead over the Internet.  For example, something like you'd

10:34:13  22  find on iHeartRadio.

10:34:15  23         It goes on to say, "that can be selected by a user of

10:34:19  24  a wireless cellular telephone device."  So the user of the

10:34:22  25  wireless cellular telephone device can select that

10:34:27  1  network-available representation.

10:34:28  2          And in terms of, to get back to the first word in

10:34:30  3  this phrase, "a network-based resource," that's effectively

10:34:33  4  talking about that system of servers and whatnot that actually

10:34:37  5  delivers the music.

10:34:39  6          So you've got to have -- you've got to have a

10:34:43  7  network-based resource that's kind of cloud -- for example, the

10:34:47  8  Akamai Cloud that will allow someone like a Clear Channel to

10:34:51  9  figure out, All right.  The user wants this song from -- from

10:34:55 10  Austin's 98.1 radio station -- wants this station, rather.

10:35:00 11  Let's get the right addresses, the right data, the right

10:35:04 12  information so that, ultimately, we can get the correct stream

10:35:07 13  over to the user.  That's [a].

10:35:09 14          [b] -- the element in [b] is a non-transitory storage

10:35:15 15  medium.  And that means just a memory.  It's just a storage.

10:35:21 16  So what [b] requires is memory that includes an application.

10:35:28 17  And the rest of [b] explains what that application is.

10:35:33 18          So the first six or seven words there of [b] give you

10:35:36 19  the substance in terms of a non-transitory storage medium -- so

10:35:41 20  some sort of a memory -- that holds an application.  And then

10:35:44 21  you get details about what the application is.  The application

10:35:48 22  is something configured for execution by a wireless cellular

10:35:52 23  telephone device.  So it's an application that has to actually

10:35:56 24  be executed by a cell phone.

10:35:58 25          And when it is executed, it allows the cell phone to

10:36:01 1 do three things: It presents the user with an ability to

10:36:06 2 select a radio station, for example; it transmits a request for

10:36:09 3 a particular representation of a radio station back -- back up

10:36:15 4 the network; and then it receives the streaming media signal.

10:36:19 5 I'm kind of paraphrasing, but the point is everything

10:36:23 6 in [b], including the i, ii, iii, are describing the

10:36:27 7 application. The only requirement is that that application be

10:36:30 8 stored somewhere. And as the parties agree, if you're going to

10:36:35 9 download an application wirelessly -- for example, from a

10:36:38 10 network server to a cell phone -- it has to be stored in two

10:36:42 11 places. It's got to be stored from the place where you get it;

10:36:45 12 namely, the network server, and it's got to be stored at the

10:36:49 13 place where you -- you know, where it comes from and where it

10:36:51 14 goes to, which would be the cell phone.

10:36:53 15 We'll now turn, if you go to the next slide, to this

10:36:58 16 non-transitory storage medium issue. Our position is that no

10:37:04 17 construction is necessary. But if we wanted to swap out this

10:37:09 18 phrase, "non-transitory storage medium including," to instead

10:37:13 19 say "a memory that stores," that would be fine.

10:37:15 20 But, Your Honor, what I want to do for a second is

10:37:17 21 compare the claim language with the defendants' proposed

10:37:20 22 construction to see where we're joining issue. And you see the

10:37:24 23 words "non-transitory" appear in both. There's obviously no

10:37:28 24 dispute there. "Storage medium" is in the claim language.

10:37:31 25 "Memory" is on the right side. And I underlined both of those

10:37:35  1  because those are roughly synonyms, and we're fine swapping out

10:37:37  2  "memory" for "storage medium."

10:37:39  3       And if you jump over the orange language in the

10:37:42  4  defendants' side, the next -- the next phrase is "that stores"

10:37:45  5  and the corresponding language over in the claim language is

10:37:48  6  "including." So "storage medium including," if they want to

10:37:52  7  say that should be construed as "memory that stores," that's

10:37:55  8  fine. That means the same thing. That's a synonym.

10:37:58  9       Then you move on, and the claim language says, "an

10:38:01  10  application," and I underlined "configured." On the right side

10:38:05  11  they say, "an application which has been configured." The

10:38:08  12  word's already in the past tense. We don't care if you add an

10:38:11  13  extra few words, but that seems unnecessary. And it picks up,

10:38:14  14  "for execution by the wireless cellular telephone device."

10:38:18  15  Both sides say that.

10:38:19  16       The issue is, why would we add this new phrase, "in

10:38:22  17  the wireless cellular telephone device," that doesn't

10:38:25  18  correspond to anything in the claim language? What the

10:38:29  19  defendants are saying is that the only place that the memory --

10:38:34  20  that this application can be stored is in the cell phone, which

10:38:38  21  would happen in the real world after its downloaded, that the

10:38:42  22  claim would not also cover the application before it's

10:38:44  23  downloaded.

10:38:45  24       I mean, it's the same application. It's the same

10:38:47  25  software. It's just in a different memory at that point. And

10:38:51 1  they're saying the claim would only cover it when it's in the

10:38:53 2  cell phone.  It wouldn't cover it when it's up on the network

10:38:57 3  server.

10:38:58 4          Now, I want to go back to the claim language -- if we

10:39:00 5  go to next slide -- to again look at the claim language.  The

10:39:04 6  claim language is indifferent to where the application is at

10:39:10 7  any time.  All the claim language says is you have to have a

10:39:16 8  memory -- a memory or a non-transitory storage medium -- that

10:39:20 9  includes an application.  That's the defining element.  And

10:39:23 10 then it tells you what that application has to be able to do.

10:39:27 11         And to give you another example of this, you might be

10:39:29 12 familiar with, for example, word processors like Microsoft Word

10:39:33 13 or something like that.  That's an example of an application --

10:39:35 14 a software application that can run on a computer and allow you

10:39:39 15 to do word processing.

10:39:41 16         Well, particularly before people were downloading

10:39:43 17 things like that, you could go to the store and buy a disc to

10:39:47 18 buy that application.  And it was most certainly the

10:39:51 19 application that was stored there on a CD.  It just didn't

10:39:53 20 happen to be loaded on your computer yet.  So that would have

10:39:56 21 been a memory holding that application.  And then you could

10:39:58 22 load a copy of it on your computer, and now you have two

10:40:01 23 memories that held that application.

10:40:03 24         The defendants are saying that you should read into

10:40:05 25 this the fact that this is limited only to the -- this -- the

10:40:10  1  memory on the cell phone and wouldn't include the memory back

10:40:13  2  when you're on the network server.  And there's nothing like

10:40:16  3  that in the claim language.  The claim language is indifferent

10:40:19  4  as to where the memory is so long as the application is an

10:40:22  5  application that, whenever it is -- gets to the cell phone, can

10:40:26  6  do certain things.

10:40:27  7      And one other issue I want to address -- and I won't

10:40:31  8  say a whole lot about this, but this is again, kind of, What

10:40:34  9  are we fighting about?  Why are we joining issue on this?  As

10:40:38  10  best I can tell, this is not a question of infringement.  In

10:40:41  11  the real world, this application will exist both on the network

10:40:45  12  server and on the cell phone.  But it's -- I think this is more

10:40:50  13  a question maybe that they're going to argue on the damages

10:40:52  14  side, that because maybe Clear Channel has less to do with the

10:40:55  15  cell phones and this is more directed on the cell phones, it

10:40:59  16  shouldn't cost them quite as much.  I suppose that's where the

10:41:02  17  fight is.  But, in our view, no matter what the answer is here,

10:41:05  18  there is still infringement.  It's just that the claim covers

10:41:08  19  this application on both ends.  It doesn't limit it one way or

10:41:11  20  the other.

10:41:11  21      If we move to the next slide.

10:41:14  22      There's no disagreement from what I can tell that an

10:41:17  23  application is a software program that can be -- that can be

10:41:20  24  executed.  That's just -- that's what an application is.

10:41:23  25  There's also no -- no disagreement that for an application to

10:41:26  1  be downloaded to a cell phone over the air, it's got to be

10:41:29  2  stored in at least two places.  It's got to be stored on the

10:41:33  3  network server -- for example, the App Store or the Google Play

10:41:36  4  Store -- and it's got to be stored at the -- at the cell

10:41:39  5  phone.

10:41:41  6          If you'll go to the next slide now.

10:41:43  7          Again, the claim's explanation of what the

10:41:50  8  application can do when it is executed is just that -- it's an

10:41:53  9  explanation of what the application can do when it's executed.

10:41:56  10  But it's the same application whether it has been loaded on a

10:41:59  11  device that can execute it or whether it hasn't yet.  If it's

10:42:02  12  up on the network server or, for that matter, if it's on a CD

10:42:06  13  on a storage shelf somewhere, it's still the same -- the same

10:42:08  14  application.

10:42:09  15          If we can go to the next slide.

10:42:11  16          I want to now talk about the specification a little

10:42:13  17  bit.  And, again, kind of the -- I know the Court's very

10:42:16  18  familiar with the claim construction process.  When we go to

10:42:19  19  the specification on something like this, when a -- when a

10:42:23  20  party is trying to completely insert new words into a claim,

10:42:28  21  there would have to be a pretty unusual situation in the

10:42:31  22  specification, where, for example, the specification said,

10:42:34  23  Hey.  In every embodiment of this invention, this is the

10:42:37  24  invention.  You've got to include X.  It's got to be something

10:42:40  25  that would be very unmistakable.

10:42:42 1         If all you've got is a specific example in the

10:42:45 2  context of very long specification -- and this is pretty long

10:42:48 3  specification.  It's 17 or 18 columns, I believe.  If all

10:42:52 4  you've got is a specific example, that doesn't mean that's the

10:42:55 5  only example that's covered.  And so if the specification gives

10:42:58 6  you a lot of detail, for example, about how you might go about

10:43:01 7  storing this on the cell phone and only gives you a few lines

10:43:04 8  saying, of course, you've got a basic network server

10:43:07 9  architecture that everybody knows about, you don't read that

10:43:12 10 cell phone example into the claim.  Instead, you acknowledge,

10:43:15 11 true, that's of course one way that the claim can be

10:43:17 12 satisfied.  But it doesn't become a limitation.

10:43:19 13         If we go to the next slide.

10:43:21 14         Here this specification doesn't require these words.

10:43:24 15 In fact, the specification shows the very architecture that's

10:43:28 16 set forth in the claims.  It doesn't approach a standard that

10:43:31 17 would be necessary to insert this new phrase into the claim.

10:43:34 18         If we go to next slide.

10:43:35 19         What's up here, Your Honor, is figure 1.  It's the

10:43:39 20 first -- the left is the first figure in the patent, and on the

10:43:42 21 right is a little bit of language that describes that figure.

10:43:47 22 And I want to direct the Court's attention to the kind of wavy

10:43:50 23 lines that are at the upper right portion of that figure.  That

10:43:53 24 indicates a wireless LAN.  So the upper right of the figure is

10:43:58 25 an electronic device.  An example is a cell phone.  The

10:44:00 1  specification makes that clear.  It's wirelessly connected to

10:44:03 2  the stuff on the left side of that figure.  And that is, in

10:44:06 3  effect, as I think everyone agrees, a basic network server type

10:44:11 4  architecture.

10:44:12 5        And if you look over at the language that we

10:44:14 6  underlined on the right side, it explains it.  "Digital engine

10:44:18 7  101 may be directly or" -- and digital engine 101 is part of

10:44:24 8  that part over on the left -- "may be directly or indirectly

10:44:27 9  coupled to storage device 105 operable to store information."

10:44:31 10       And basic network architecture, you've got -- you've

10:44:34 11  got a memory that is part of something on a network that can

10:44:39 12  then wirelessly download information -- digital information to

10:44:44 13  a cell phone.  And, by definition, in order to do that, it's

10:44:48 14  got to be stored in both places.  It has to exist in the

10:44:52 15  network server over on the left in order to be able to download

10:44:55 16  it.  If it doesn't exist and it's not stored, it -- you know,

10:44:58 17  there is nothing to send -- or to download over the electronic

10:45:04 18  device.

10:45:04 19       If you go to the next slide.

10:45:06 20       There's also, then, the disclosure of downloading

10:45:11 21  such an application.  Now, this is a portion of figure 4.

10:45:15 22  Figure 4 is actually a larger -- a larger image than this.  I

10:45:19 23  wanted to focus in on the relevant portion of figure 4.  And

10:45:23 24  figure 4 has a box that's kind of the -- a lot of the right

10:45:27 25  side of the page called Radio Dial.  Radio Dial is an example,

| | | |
|--|--|--|
| 10:45:32 | 1 | among other things, of an application that can become -- that |
| 10:45:37 | 2 | can be sent over -- over the Internet -- or, rather, sent |
| 10:45:40 | 3 | wirelessly, downloaded onto a cellular phone, allow a user to |
| 10:45:45 | 4 | pull up something like that, and then select a particular |
| 10:45:48 | 5 | stream that they want to hear. |

10:45:32  1  among other things, of an application that can become -- that

10:45:37  2  can be sent over -- over the Internet -- or, rather, sent

10:45:40  3  wirelessly, downloaded onto a cellular phone, allow a user to

10:45:45  4  pull up something like that, and then select a particular

10:45:48  5  stream that they want to hear.

10:45:51  6          And the second button -- and they're called soft

10:45:54  7  buttons, but it's got a number 2 next to it sort of in the

10:45:57  8  middle of the page, almost dead center in the page, is

10:46:00  9  NetRadio.  That's an example of something that would be

10:46:03  10  selectable in this application.

10:46:05  11          If we look over to the right side of the page, the

10:46:07  12  text that we've quoted there from the specification explaining

10:46:11  13  this figure 4, it says "Therefore, radio dial 412 may be

10:46:15  14  operable as an application for use with several different types

10:46:18  15  of electronic devices -- for example, computer systems,

10:46:22  16  portable computing devices, cellular phones -- operable to

10:46:27  17  display radio dial 412" -- to display this application -- "and

10:46:31  18  in some embodiments, may be wirelessly communicated to an

10:46:35  19  electronic device."

10:46:36  20          That's frankly precisely how -- how the Clear Channel

10:46:42  21  systems that you've heard about work.  And that type of an

10:46:45  22  identity between a specification and an accused product is by

10:46:48  23  no means a requirement.  In fact, in patent cases, it's

10:46:52  24  probably the exception, not the rule.

10:46:53  25          But, in any event, the only way to download the

10:46:57  1  application wirelessly to the electronic device, as everybody

10:47:01  2  has agreed, is for it to be stored on a server.  And we just

10:47:05  3  looked at the architecture.  That's the figure 1 architecture.

10:47:09  4      The point of all that is the specification lays out

10:47:12  5  exactly what the claims say.  You have those things stored in

10:47:15  6  two places.  The claims are satisfied in each instance.

10:47:17  7      THE COURT:  And both sides agree that the word "come"

10:47:20  8  in the second line from the bottom is a a typo?  It should be

10:47:24  9  "some"?

10:47:25  10      MR. GAUDET:  Your Honor, it should be "some."

10:47:27  11      THE COURT:  Not some magic term of art for income

10:47:31  12  embodiments?

10:47:33  13      MR. GAUDET:  It is a typo, Your Honor.

10:47:35  14      THE COURT:  All right.

10:47:35  15      MR. GAUDET:  Thank you for pointing that out.  If we

10:47:38  16  turn to the next slide.

10:47:41  17      This is, just for what it's worth, how we get these

10:47:44  18  words "non-transitory storage medium."  It was an amendment in

10:47:48  19  the prosecution history.  It used to say "computer readable

10:47:53  20  medium."  The background on this is a couple of years ago, as

10:47:57  21  case law started developing about patentable subject matter

10:48:02  22  under 35 USC, Section 101, the patent office internally

10:48:07  23  circulated a memo saying, Hey, everybody.  You can no longer

10:48:10  24  claim things as "computer readable mediums."  Instead it's now

10:48:14  25  got to say "non-transitory storage mediums."  So pending claims

10:48:18 1  that had language like this immediately all got amended.  So

10:48:22 2  that's how we got to that phrase.

10:48:24 3          THE COURT:  Well, a person of ordinary skill in the

10:48:27 4  art is likely to know what "non-transitory" might mean.  I

10:48:29 5  suspect if this case gets to trial, both of you need to be

10:48:33 6  prepared to tell the jury what "non-transitory" is, because

10:48:36 7  this's not a word I think your average citizen uses when

10:48:40 8  referring to things that they encounter in their daily life.

10:48:46 9          MR. GAUDET:  And, Your Honor, I believe that, and I

10:48:52 10 think the general concept is, it's not something that's stored

10:48:56 11 literally instantaneously and then disappears.  It's not

10:48:57 12 fleeting.  It will preserve.  So --

10:48:59 13         THE COURT:  I just point that out, that we're dealing

10:49:03 14 with the whole phrase "non-transitory storage medium" and what

10:49:06 15 a person of ordinary skill in the art would think it would be,

10:49:11 16 and we're talking about "medium" and some sort of memory things

10:49:14 17 of that nature.  And I just point out that the jury may have a

10:49:17 18 question about what "non-transitory" means.

10:49:19 19         MR. GAUDET:  Thank, Your Honor.  And perhaps we could

10:49:21 20 work with the defendants and even come to some kind of an

10:49:24 21 agreed --

10:49:25 22         THE COURT:  I doubt that we're going to have persons

10:49:27 23 reasonably skilled in the art on our jury, although we get

10:49:30 24 smart juries in Central Texas.

10:49:32 25         MR. GAUDET:  Thank you, Your Honor.  The next slide

10:49:35 1 here, this was another place where this concept was discussed

10:49:40 2 in the prosecution history. There was a piece of prior art to

10:49:44 3 an inventor whose last name was Leeke. And as the defendant

10:49:49 4 distinguished that -- I'm sorry. As the patentee distinguished

10:49:53 5 that piece of prior art, he made the point that's underlined

10:49:56 6 here which just tracks the claim language, that part of this

10:49:59 7 claim is a storage medium that includes an application that's

10:50:03 8 configured for execution by a wireless cellular telephone

10:50:06 9 device. Leeke doesn't disclose any such application. And then

10:50:10 10 it goes further on and says that, in fact, nowhere in Leeke is

10:50:16 11 there any disclosure that the device be a cellular telephone.

10:50:20 12 The point is, the Leeke patent might have an

10:50:24 13 application, but that application isn't designed to run on a

10:50:27 14 cell phone. That certainly doesn't say that, therefore, every

10:50:29 15 time you see the word "memory" or "storage medium" in the

10:50:33 16 claim, that storage medium has to be on the cell phone. The

10:50:36 17 type of unambiguous disclaimer in the prosecution history that

10:50:41 18 would be required to write a whole new phrase into a claim is

10:50:46 19 pretty -- it's a pretty high threshold. This doesn't even

10:50:49 20 suggest anything other than precisely what the claims already

10:50:52 21 say.

10:50:53 22 And, Your Honor, with respect to that claim term,

10:50:57 23 that's everything that I had. And unless there are questions

10:51:00 24 from the Court, I was going to move on to next claim term.

10:51:03 25 THE COURT: You may move on.

10:51:04  1      MR. GAUDET:  Thank you, Your Honor.  The next claim

10:51:06  2  term -- and, actually, before I do that, let me just grab one

10:51:10  3  quick sip of water.  There's probably a Senator Rubio joke to

10:51:20  4  be had in there.

10:51:21  5      The next term, Your Honor, is "streaming media

10:51:23  6  signal."  And this language appears in two of the claims.  It

10:51:29  7  appears in claim 1 and claim 14.  And let me phrase that in a

10:51:33  8  more helpful way.  It appears in both of the independent claims

10:51:39  9  and, therefore, it appears -- it is a requirement in every

10:51:42 10  claim that's asserted in this case.

10:51:46 11      The question really is, What does the streaming media

10:51:50 12  signal have to be?  The claim language in claim 1 is:  "To

10:51:54 13  receive a streaming media signal in the wireless cellular

10:51:59 14  telephone device corresponding to the regional broadcasting

10:52:03 15  channel."  And the regional broadcasting channel would be, for

10:52:06 16  example, an FM radio station.  And the streaming media signal

10:52:10 17  would be that signal that gets -- that goes out over the

10:52:14 18  Internet and eventually gets wirelessly sent via a stream, and

10:52:18 19  it corresponds to the regional broadcasting channel.

10:52:22 20      Claim 14 uses similar language:  "Streaming media

10:52:25 21  signal representing the regionally broadcasted content."

10:52:27 22      So the question that -- that is going to be presented

10:52:31 23  here is, Does the streaming media signal have to be the actual

10:52:35 24  regional broadcast, the actual very same identical broadcast,

10:52:39 25  or does the streaming signal just have to, quote, represent or,

10:52:43 1 quote, correspond to the actual regional broadcast?

10:52:49 2 THE COURT: Tell me -- and I may be jumping ahead --

10:52:53 3 but if it is not the actual regional broadcast -- and you're

10:52:57 4 talking to me now, not a person of ordinary skill in the art --

10:53:02 5 what would it be? What would happen where it would represent

10:53:09 6 or correspond to the actual regional broadcast as opposed to

10:53:13 7 being the actual regional broadcast?

10:53:16 8 MR. GAUDET: Your Honor, that's a great question.

10:53:17 9 And let me tell you what we think would certainly qualify as at

10:53:21 10 least an actual -- at least a representation of a

10:53:24 11 correspondence to it. It would be, if you played an FM radio

10:53:28 12 such as this and you heard a song, you can go to an application

10:53:32 13 that called itself Live Radio and had the very same radio

10:53:35 14 station and said it was the very same radio station and you

10:53:39 15 would play that app and hear the same song with a few seconds

10:53:42 16 delay. And the same -- well, that's obviously the one thing

10:53:47 17 that's representing -- the one thing that's corresponding.

10:53:50 18 We took depositions in this case of some of the

10:53:54 19 engineers at the defendants'. And they told us over and over

10:53:58 20 again, Oh, they're completely different broadcasts. They're

10:54:01 21 not at all the same. And I think what they mean -- and to be

10:54:05 22 very blunt about it, we're obviously going to have a pretty

10:54:09 23 healthy cross-examination on that point based on this very

10:54:11 24 simple demonstration. But I think what they're driving at is,

10:54:15 25 somewhere in the guts of the Internet, we're chopping and

10:54:18  1  slicing and dicing, and we can put different commercials in one

10:54:21  2  than the other.  So if you're in Austin, you might hear one

10:54:24  3  commercial.

10:54:25  4        So you've got the identical radio station to the user

10:54:28  5  for a 10-minute block, and it would just have different

10:54:31  6  commercials and now it's something different.  And so they're

10:54:33  7  saying, I think, if we can make this language be the actual

10:54:36  8  radio station, we can build an non-infringement position.  Our

10:54:41  9  point is this claim language speaks for itself, and we don't

10:54:44  10  need to get into anything like that.  There is no doubt that

10:54:46  11  one represents the other.

10:54:47  12        THE COURT:  I know.  But I'm just trying -- I'm still

10:54:51  13  trying to get at -- so what you're saying is that

10:54:54  14  "representing" or "corresponding" means the actual regional

10:55:00  15  broadcast has been taken and stored somewhere and sliced and

10:55:04  16  diced and then played out of memory?  I'm just trying to --

10:55:10  17  just a simple example, to the extent anything is simple in

10:55:17  18  these cases, of just a concept of what the engineers mean, the

10:55:20  19  persons of ordinary skill in the art mean, if they draw a

10:55:24  20  distinction between the actual broadcast and representing or

10:55:29  21  corresponding to the actual broadcast, what would be a

10:55:34  22  streaming signal that represents or corresponds to the actual

10:55:39  23  regional broadcast?

10:55:41  24        MR. GAUDET:  Your Honor, let me sort of step back and

10:55:48  25  answer the question very directly.  We don't think that the

| | | |
|---|---|---|
| 10:55:51 | 1 | notion of an actual regional broadcast or current broadcast |
| 10:55:54 | 2 | should be any part of these claims.  So we don't think that |
| 10:55:57 | 3 | question should ever get answered. |
| 10:55:59 | 4 | THE COURT:  All right. |
| 10:56:00 | 5 | MR. GAUDET:  To answer your question, I'm not exactly |
| 10:56:02 | 6 | sure.  I think what's happening is the claim language is |
| 10:56:04 | 7 | perfectly understandable.  And if the defendants can build in |
| 10:56:08 | 8 | something like that, they would then have an expert opine, Oh, |
| 10:56:11 | 9 | this isn't the actual broadcast.  This is something different. |
| 10:56:14 | 10 | How they would go about doing that, I think ultimately they |
| 10:56:19 | 11 | wouldn't get very far. |
| 10:56:21 | 12 | THE COURT:  Well, claim 14 and claim 1 both use |
| 10:56:26 | 13 | qualifying words of corresponding or representing.  So I'm just |
| 10:56:30 | 14 | trying to figure out what could possibly be meant by that.  I'm |
| 10:56:34 | 15 | not going to hold you to a position on it.  Is it your position |
| 10:56:39 | 16 | that it means the actual broadcast? |
| 10:56:42 | 17 | MR. GAUDET:  Absolutely not. |
| 10:56:44 | 18 | THE COURT:  Then what would it be? |
| 10:56:46 | 19 | MR. GAUDET:  The -- if you start with the actual |
| 10:56:50 | 20 | broadcast, you start with it, and then you can slice it and you |
| 10:56:55 | 21 | can dice it and you can add things in. |
| 10:56:58 | 22 | THE COURT:  But what are you doing with it?  You turn |
| 10:56:58 | 23 | on that FM radio and you're getting a broadcast. |
| 10:57:02 | 24 | MR. GAUDET:  Yes, Your Honor. |
| 10:57:02 | 25 | THE COURT:  That's the actual broadcast. |

10:57:04  1          MR. GAUDET:  Yes, Your Honor.

10:57:05  2          THE COURT:  Now, we went through this in the

10:57:07  3  tutorial, but what does it do?  Does it go into a server?

10:57:09  4          MR. GAUDET:  From there what it will do is it --

10:57:11  5  exactly.  It will be uploaded to the Internet.  It will go into

10:57:15  6  a server.

10:57:16  7          THE COURT:  Right.

10:57:17  8          MR. GAUDET:  The server will do all sorts of things

10:57:20  9  to make it possible to then -- to then be sent out as a

10:57:24  10  stream.  And in the course of doing that, they could insert new

10:57:27  11  commercials, they could break it up differently.  It's a

10:57:30  12  fundamentally different technology to do something

10:57:33  13  streaming-wise, although to the user -- to the user it's

10:57:37  14  exactly the same experience.  What the --

10:57:39  15          THE COURT:  So are you saying that "representing" or

10:57:41  16  "corresponding to" means it's in some way been modified?

10:57:47  17          MR. GAUDET:  Absolutely.  It certainly includes

10:57:50  18  modifications.  Absolutely.

10:57:52  19          THE COURT:  All right.

10:57:52  20          MR. GAUDET:  And, you know, again, to kind of peek

10:57:55  21  forward to the evidence here, what we envision doing some day,

10:57:59  22  Your Honor, is doing a demonstration for the jury where we say,

10:58:02  23  Here is the application.  Here is where the defendants say it's

10:58:05  24  the very same radio station.  They call it live radio.  There's

10:58:08  25  only a three-second delay, and you can hear the very same song.

10:58:11 1  The only difference to the user is commercials.  That,

10:58:13 2  unquestionably, the one represents the other.  And it probably

10:58:17 3  would capture a lot more than that.

10:58:19 4       And let's go ahead and go to the next slide here

10:58:22 5  because I want to show you where we're joining issue,

10:58:25 6  Your Honor.  Let's go forward one more slide.

10:58:27 7       This is -- we don't think this needs to be

10:58:30 8  construed.  What the defendants have done is sort of twisted

10:58:34 9  things around a little bit to rewrite the claim basically.  If

10:58:37 10 you look on claim 1, the claim language is "to receive a

10:58:42 11 streaming media signal."  Okay?  Well, they -- "in the wireless

10:58:46 12 telephone device."

10:58:47 13      The defendants have "to receive."  Then they swap

10:58:50 14 those next two words, "to receive in the wireless cellular

10:58:54 15 telephone device as a streaming media signal."  And then they

10:58:57 16 add something totally new, "a broadcast currently available on

10:59:01 17 the regional broadcasting channel."  The language isn't that

10:59:06 18 you receive a broadcast currently available.  The language is

10:59:10 19 that you receive a stream that corresponds to the regional

10:59:14 20 broadcast channel.

10:59:15 21      And what we think is going to happen -- I think there

10:59:17 22 would be infringement anyway, but what we think is going to

10:59:20 23 happen is they would take that first step there and they get in

10:59:22 24 front of the jury and say, Well, because we sliced and diced it

10:59:25 25 and we added commercials or whatever else, it's no longer a

10:59:29  1  "broadcast currently available."

10:59:31  2  And our point is, why would we possibly add a filter

10:59:33  3  or an obstacle to that to the plain meaning?  Because even if

10:59:38  4  you've sliced and diced and added things, it is unquestionably

10:59:41  5  still a stream that corresponds to the regional broadcasting

10:59:45  6  channel.

10:59:45  7  THE COURT:  Meaning that it originally came off the

10:59:49  8  regional broadcasting channel?

10:59:51  9  MR. GAUDET:  Correct.  Correct.  Claim 14,

10:59:54  10  Your Honor, same point.  Claim 14 uses the language

10:59:59  11  "representing" and the same -- you know, the same issue

11:00:05  12  attaches here as well.

11:00:06  13  We go to the next -- the next slide here.

11:00:11  14  The claims are easily understood.  And, actually, I

11:00:14  15  do want to pause for a moment about this word "represents,"

11:00:17  16  because nothing in the specification suggests a special meaning

11:00:20  17  for the word "represent" or a special meaning for the word

11:00:24  18  "correspond."  They actually are not technical terms, unlike

11:00:28  19  "non-transitory."

11:00:29  20  And I think an example of this that is somewhat

11:00:31  21  humorous, perhaps, is I was sitting next to my client

11:00:34  22  Russell White yesterday.  I represent Mr. White.  I'm obviously

11:00:38  23  not Mr. White and likewise.  And Mr. Sankey tells the jury,

11:00:41  24  Ladies and gentlemen, I represent Affinity Labs of Texas.  No

11:00:45  25  one's -- you're not going to have to give the jury instruction

11:00:47 1    on what that means.

11:00:48 2           It's the same thing.  This is an easily understood

11:00:50 3    term about a correspondence that doesn't need to be taken apart

11:00:53 4    and rewritten and inserted something entirely new and it's

11:00:57 5    understandable.

11:00:58 6           Go to the next slide.  And, actually, I think we've

11:01:03 7    now covered this material.  I guess go on to the next slide.

11:01:07 8           Your Honor, turning to the specification, the only

11:01:09 9    reason that a clear language like this could be changed, where

11:01:16 10   you'd fundamentally change a concept, would be if the

11:01:19 11   specification had sort of an unambiguous disclaimer or said --

11:01:23 12   you know, said something that was unmistakable or the

11:01:27 13   prosecution history did something like that.  And this

11:01:30 14   specification just doesn't say anything of the sort.

11:01:32 15          Again, there might be some examples of doing it a

11:01:37 16   particular way, but it doesn't at all suggest that you would be

11:01:40 17   outside of the claim just because you changed the signal some,

11:01:42 18   you added some things to it, as long as there was a

11:01:45 19   representation and a correspondence.

11:01:47 20          This is -- again, this is the same bit of the

11:01:49 21   specification that I showed in connection with the earlier

11:01:52 22   claim element, which is figure 4, the Radio Dial application on

11:01:55 23   the left and the language explaining that on the right.

11:01:58 24          Go to the next slide.

11:02:00 25          The one other part -- I've been focusing on what I

11:02:04 1 think the end game is from the defendants, which is to try to

11:02:10 2 have a claim construction that would give their expert an

11:02:12 3 ability to say, If there's any difference, if they're not

11:02:15 4 perfectly identical, then we don't infringe. We think that's

11:02:19 5 just wrong.

11:02:19 6 But along the way of them doing that, they have this

11:02:22 7 concept of it being a currently available broadcast. And

11:02:26 8 while, you know, a broadcast would -- at one point it was

11:02:29 9 currently available, the claims don't say that it couldn't be

11:02:32 10 stored and then rebroadcast later, an hour later, or something

11:02:41 11 like that. And the specification -- I've underlined it here --

11:02:44 12 explains exactly how you would do that. That, of course, you

11:02:46 13 could store something, have a network address on where to get

11:02:49 14 it, and get it later. And so, again, it's not that I'm trying

11:02:54 15 to -- I'm certainly not trying to reinterpret or change the

11:02:57 16 claims based on the specification. My point is that not only

11:03:01 17 does the specification not require us to change anything about

11:03:04 18 the claims, it actually, again, it's about as close a match

11:03:08 19 between an accused product and a specification as you will

11:03:11 20 often see in patent cases.

11:03:13 21 If we go to the next the point here, this is in the

11:03:17 22 prosecution history. And this actually I think is pretty

11:03:19 23 helpful. This was in the great-grandparent application, which,

11:03:26 24 you know, you file an original application at the patent office

11:03:28 25 and you can file all sorts of follow-up applications and what

11:03:31  1    not.  Well, this was the very first one, or this application

11:03:33  2    issue was the very first patent.

11:03:34  3          And in it there was a discussion about what

11:03:36  4    "streaming" means.  And the applicant just had a very basic

11:03:40  5    definition, which is, you start in that third line,

11:03:43  6    "'... streaming audio includes playing audio or video

11:03:46  7    immediately as it is downloaded from the Internet, rather than

11:03:50  8    storing it in a file on the receiving computer.'  A second

11:03:54  9    reference defines it as "... streaming sound is played as it

11:03:59  10   arrives.  The alternative is a sound recording that doesn't

11:04:00  11   start playing until the entire file arrives."

11:04:03  12         That's it.  That's the concept in the claims.  If

11:04:06  13   it's a digital media signal that's streamed in and it

11:04:09  14   corresponds or represents to a local, for example, FM radio

11:04:13  15   station, that's all that claim element requires.  There are

11:04:16  16   other elements in the claims.  Don't get me wrong.  But that's

11:04:19  17   it.

11:04:20  18         Go to the next slide.

11:04:21  19         The last point I wanted to make was about the

11:04:24  20   extrinsic evidence, which is that it's completely unnecessary

11:04:27  21   to the go there.  The claim is clear on its face.  There is no

11:04:30  22   reason to redefine the words "corresponding" and

11:04:33  23   "representing."

11:04:34  24         I think as we got into this, we put some definitions

11:04:37  25   into our brief and I think the defendants looked and picked out

11:04:41 1 the most restrictive definition and said, Ah. In this list of

11:04:44 2 seven, here's kind of the one that we like. And the truth is,

11:04:49 3 as I went back and a read the briefs, that's exactly the

11:04:51 4 problem with extrinsic evidence. It's got nothing to do with

11:04:55 5 the context of the patent, and you can always find something

11:04:57 6 you like or don't like. The patent is clear on its face, as

11:05:01 7 are the claims.

11:05:02 8          Your Honor, I believe that is my last slide on this

11:05:04 9 topic. If there are no other questions from the Court, I will

11:05:07 10 sit down.

11:05:08 11          THE COURT: No. That's fine. Thank you.

11:05:21 12          MR. RILEY: May it please the Court, Your Honor,

11:05:23 13 George Riley. I represent Clear Channel. I'm joined at the

11:05:26 14 counsel table by Ryan Yagura, Nick Whilt, and Brian Cook. We

11:05:31 15 also have with us from Clear Channel two other attorneys,

11:05:34 16 Donna Schneider and Duncan Williams.

11:05:42 17          Your Honor in light of the Federal Circuit's

11:05:44 18 directions in *Markman* and in *Philips* where there is unclarity,

11:05:47 19 where there is ambiguity, where there is the possibility for

11:05:50 20 misunderstanding, then it is the Court's duty to construe terms

11:05:53 21 of a patent to ensure that the statutory monopoly does not

11:06:01 22 expand beyond the scope of the invention. And in this case it

11:06:05 23 is clear that Affinity is attempting in several critical

11:06:09 24 respects to expand the scope of the alleged invention.

11:06:12 25          I'd a like to turn immediately to the first issue in

11:06:17 1  dispute which relates to claim 1.  And we've provided the Court

11:06:21 2  with a binder.  Claim 1 refers to "a non-transitory storage

11:06:28 3  medium" -- and, again, these are terms, as the Court

11:06:31 4  recognized, that many jurors would not understand on their

11:06:34 5  face -- "a non-transitory storage medium including an

11:06:38 6  application configured for execution by the wireless cellular

11:06:43 7  telephone device."

11:06:44 8          The defendants' proposed construction -- and this is

11:06:47 9  consistent with the -- in fact, this is compelled by the

11:06:52 10 architecture that was presented to the patent office, is that

11:06:55 11 that non-transitory storage medium is in the wireless cellular

11:07:00 12 telephone device, and it is what stores an application that has

11:07:05 13 been configured for execution by the wireless cellular

11:07:10 14 telephone device.

11:07:11 15         And so the key language which we would like to focus

11:07:15 16 on today is the part of the construction that says "a

11:07:18 17 non-transitory memory in the wireless cellular telephone device

11:07:24 18 that stores an application."

11:07:26 19         In this case, the intrinsic evidence, all of the

11:07:31 20 intrinsic evidence, compels the defendants' construction.

11:07:36 21 First, the plain language of claim 1 requires the storage

11:07:41 22 medium to be in the wireless cellular telephone device.  And

11:07:45 23 we're going to go through each aspect of the claim.

11:07:47 24         Second, the specification -- and this is critical.

11:07:51 25 The only storage medium, the only place where the term "storage

11:07:56 1 medium" is used, is to describe the storage in the wireless

11:08:02 2 device. In other words, to describe what is used in the cell

11:08:06 3 phone to store an application. It's the only place that that

11:08:09 4 term is used.

11:08:11 5 And then, finally, in the prosecution history, in

11:08:14 6 order to overcome the prior art, Affinity argued that the

11:08:19 7 distinction between the prior art and what Affinity claims to

11:08:23 8 have invented related to the location of the application;

11:08:26 9 namely, one that could be used in a cell phone rather than

11:08:29 10 being used on the server.

11:08:31 11 Well, turning first to the claim language -- and

11:08:35 12 we've provided the Court in a separate slip sheet in the binder

11:08:38 13 which you can pull out a copy of claim 1 so that we can keep it

11:08:43 14 in front of us. I also have it on a poster board, because I

11:08:46 15 think the way in which the Patent and Trademark Office issued

11:08:49 16 this claim is quite revealing.

11:08:51 17 The first part of the claim, the first was

11:08:55 18 network-based resource, which Affinity used an [a] to

11:08:59 19 designate, but we used a Roman Numeral little i. So the first

11:09:05 20 part the claim relates to is what's on the network. The second

11:09:08 21 part of the claim relates to what's on the phone. Then it

11:09:12 22 describes the storage medium on the phone plus the application

11:09:16 23 that's stored in the storage medium.

11:09:19 24 And that application can be several things. We will

11:09:23 25 go through each of those. But, again, this is the actual

11:09:26  1  indentation in which the claim appears, and it's very clear

11:09:29  2  there's a distinction between the network-based resource, which

11:09:33  3  is little Roman numeral i and then what's in the phone, which

11:09:37  4  is little Roman numeral ii, and the application that's stored

11:09:41  5  in the storage medium in the phone, which can perform a, b, and

11:09:47  6  c.

11:09:47  7          So let's first look, then at the part that is little

11:09:54  8  Roman numeral i, the network-based resource.  And, again, there

11:09:59  9  is no dispute about this.  Figure 1 is the basic architecture

11:10:03  10  of the invention in the patent.  On the left-hand side, which

11:10:08  11  I've colored in, you've got a digital engine -- communication

11:10:13  12  engine and 105, which we will turn to.  That is what is the

11:10:16  13  network-based resource.  That is the network-based resource.

11:10:21  14  And they use a lot of language:  "a network-based resource

11:10:24  15  maintaining information associated with a network-available

11:10:27  16  representation of a regional broadcasting channel ..."

11:10:29  17          But what that comes down to is, on the network -- in

11:10:32  18  this case, on the Internet -- we will have a server or a group

11:10:36  19  of servers that will serve up the regional broadcasting

11:10:41  20  system.  So I've drawn a red line between what's on the server

11:10:45  21  and then on the other side what's the electronic device.  And,

11:10:49  22  again, those curved lines reflect a wireless transmission from

11:10:52  23  the server to the wireless device.

11:10:55  24          Well, what's in our network-based resource?  We have

11:11:00  25  a digital engine which communicates stored information to a

11:11:04 1 communication engine which then transmits it. And then we have

11:11:08 2 this transmission wirelessly to the wireless cellular telephone

11:11:13 3 device, which is 103.

11:11:17 4 So, again, a clear distinction which is mapped into

11:11:20 5 claim 1 between network-based resource, the server, Roman

11:11:23 6 numeral little i, and then the wireless cellular telephone

11:11:27 7 device, Roman numeral ii.

11:11:31 8 Now I'll direct the Court's attention to that

11:11:33 9 figure 105. Figure 105 -- and, again, this is part of the

11:11:37 10 server, is referred to as a "storage device." The

11:11:45 11 specification does not use the term "storage medium." "Storage

11:11:47 12 medium" is only used in connection with the wireless device.

11:11:51 13 And the storage device on the network-based resource, the

11:11:56 14 server, as the specification says, it stores songs or titles

11:12:01 15 configured as audio files and formatted in digital format such

11:12:05 16 as an .mp3 file.

11:12:08 17 So, again, storage device is what's on the network

11:12:10 18 which stores the content which will ultimately be transmitted

11:12:14 19 wirelessly to the wireless cellular telephone device -- a very

11:12:18 20 clear distinction in the patent specification which is

11:12:21 21 reflected in claim 1 that we are construing.

11:12:24 22 Well, now let's look at the wireless cellular

11:12:29 23 telephone device side of this architecture. What does it

11:12:34 24 consist of? Well, again, we look at ii, and it is "a

11:12:38 25 non-transitory storage medium, including an application

11:12:41  1  configured for execution by the wireless cellular

11:12:45  2  telephone ..."

11:12:46  3          Now, we have learned in this litigation that Affinity

11:12:48  4  wants to say the non-transitory storage medium could be

11:12:52  5  anywhere.  It could be anywhere.  Well, that's not the way in

11:12:55  6  which this claim is written.  This non-transitory storage

11:12:58  7  medium, or a memory, must be in the phone because it must

11:13:05  8  contain the application which is going to perform little a,

11:13:08  9  little b, and little c.

11:13:10  10         The patent gives us an illustration of what's in that

11:13:17  11  wireless cellular telephone device, and that's shown in

11:13:21  12  figure 3.  And note in figure 3 the term "storage medium"

11:13:25  13  appears.  The term "storage medium" only appears in the patent

11:13:29  14  in connection with the wireless cellular telephone device.

11:13:34  15         This is slide 12, and now we're on slide 13.

11:13:39  16         The patent tells us what is done with the storage

11:13:44  17  medium again in slide 14.  This is my phone.  I have a -- I

11:13:49  18  have an iPhone.  It includes a processor module, a processor

11:13:54  19  that runs the operations of the phone, a communication module

11:13:58  20  which communicates back and forth to the servers, and then the

11:14:02  21  term "storage medium" appears.

11:14:05  22         And this is the term that's in the claim that we're

11:14:08  23  attempting to construe.  The storage medium is in the wireless

11:14:12  24  device -- in this case, a cell phone.

11:14:16  25         The patent specification tells us the "processor may

11:14:19 1  be operable using software" -- the parties all agree the

11:14:22 2  application is a form of software -- "that may be stored within

11:14:26 3  storage medium 303."  Straight out of the patent.  Storage

11:14:32 4  medium is the memory in the wireless device which stores the

11:14:35 5  application.

11:14:37 6      Again, this is compelled by the plain language of the

11:14:41 7  claim as well as the specification which only uses the term

11:14:44 8  "storage medium" in connection with the phone.

11:14:50 9      Well, now we've got the storage medium in the phone

11:14:53 10 and an application in the storage medium.  Well, what can our

11:14:58 11 application do?  Again, I think we're in agreement with

11:15:01 12 Affinity.  That application is required to do three things:

11:15:05 13     To present a graphical user interface -- what we see

11:15:08 14 on our phone; to transmit a request for a regional broadcasting

11:15:12 15 channel -- I want to listen to 98.1; and then in response to

11:15:17 16 that command that I punch into my phone, I receive a streaming

11:15:20 17 media signal.

11:15:22 18     So, again, we've gone from the network-based resource

11:15:24 19 at the top of the claim to the phone, which is little Roman

11:15:26 20 numeral ii, and now we've got an application in the phone that

11:15:30 21 can do the following things.  And, again, this is clearly

11:15:33 22 illustrated in the patent.  The first one is that this

11:15:37 23 application stored in the storage medium in my phone presents a

11:15:41 24 graphical user interface comprising at least a partial listing

11:15:46 25 of available media sources on a display associated with the

11:15:50  1  wireless cellular telephone device.

11:15:54  2        So on the display of my phone, I've got a thing that
11:15:57  3  looks look a radio dial.  That's an application that's on my
11:16:00  4  phone that's stored in the storage medium.  I can use that to
11:16:04  5  direct a command to play songs that are stored on my phone or a
11:16:09  6  command that goes back to the network to download additional
11:16:12  7  information such as a streaming radio signal.

11:16:15  8        This application must transmit a request for a
11:16:21  9  regional broadcasting channel from the wireless telephone
11:16:24  10  device.

11:16:26  11        And then, finally, the application stored in the
11:16:29  12  storage medium on the phone must receive a streaming media
11:16:35  13  signal in the wireless cellular telephone device
11:16:38  14  corresponding -- and we'll turn to the word "corresponding" in
11:16:42  15  a minute -- corresponding to the regional broadcasting channel
11:16:45  16  wherein the wireless cellular telephone device is outside of a
11:16:49  17  broadcast region of the regional broadcasting channel.

11:16:53  18        So, again, very consistent.  The non-transitory
11:16:57  19  storage medium is the memory in the phone that stores the
11:17:00  20  application which performs these three functions.

11:17:03  21        Then there's one other reference to this, and that is
11:17:08  22  the end of the claim.  And this I believe finally nails the
11:17:15  23  issue.  "... wherein the wireless telephone device is
11:17:18  24  configured to receive the application via an over-the-air
11:17:22  25  download."

11:17:23 1    So, again, in the second half of the claim, we're

11:17:28 2    looking at the application, the storage medium, and, finally,

11:17:32 3    the phone itself is configured to receive wirelessly the

11:17:38 4    application.  In this case, the application is a radio dial.

11:17:43 5    So it all lines up.  The application in the storage medium in a

11:17:48 6    phone that is configured to receive the application wirelessly.

11:17:53 7    So, to summarize -- this is slide 21 -- the cell

11:18:05 8    phone includes a storage medium; the storage medium must

11:18:09 9    include an application; the application must present a

11:18:14 10   graphical user interface on the cell phone; it must transmit a

11:18:19 11   request from the cell phone to the server; it must receive a

11:18:23 12   streaming media signal at the cell phone; and then the cell

11:18:27 13   phone is configured to receive the application which is stored

11:18:32 14   in the storage medium over the air.

11:18:36 15   So turning from the claim language itself, which I've

11:18:42 16   been using the specification to illustrate, again, one aid in

11:18:49 17   our interpretation of this is to look at the dependent claims.

11:18:53 18   And the dependent claims carry forward this distinction between

11:18:56 19   the network -- what's on network and what's on the phone.

11:18:59 20   And claim 2 in its entirety states:  "The system of

11:19:03 21   claim 1 wherein the storage medium further comprises

11:19:09 22   instructions to further receive information about a song

11:19:14 23   included in the streaming media signal..."

11:19:21 24   Now, if that storage medium was located some place

11:19:24 25   else, it was located on a shop shelf or up on the resource or

| | | |
|---|---|---|
| 11:19:28 | 1 | the network, that storage medium wouldn't be capable of |
| 11:19:31 | 2 | receiving information about a song included in the streaming |
| 11:19:34 | 3 | media signal.  This clearly centers the storage medium in the |
| 11:19:42 | 4 | cell phone, because that's where we want the stream to end up. |
| 11:19:47 | 5 | So, again, not only the language of claim 1, but the |
| 11:19:50 | 6 | language of the dependent claims such as claim 2, all point to |
| 11:19:55 | 7 | the fact this storage medium is on the cell phone.  And, again, |
| 11:20:02 | 8 | as we discussed, the specification, the only use of the term |
| 11:20:06 | 9 | "storage medium" is shown in figure 3 and is referencing the |
| 11:20:11 | 10 | phone.  When you were talking about what's on the network, the |
| 11:20:15 | 11 | reference is to a storage device.  And that is a consistent |
| 11:20:20 | 12 | distinction that's made in this patent.  And because we're |
| 11:20:22 | 13 | interpreting the phrase "storage medium," we've referred to the |
| 11:20:26 | 14 | wireless cellular telephone device. |
| 11:20:29 | 15 | Now, we heard a little bit about the prosecution |
| 11:20:32 | 16 | history and counsel highlighted part of it, but didn't |
| 11:20:35 | 17 | highlight another part which I think is critical to our |
| 11:20:38 | 18 | understanding of what was prosecuted in the patent office. |
| 11:20:44 | 19 | When the claims were being prosecuted, there was a |
| 11:20:49 | 20 | patent called Leeke, and Leeke was very close to what the |
| 11:20:53 | 21 | patentees were trying to claim here.  Leeke had a network-based |
| 11:20:58 | 22 | resource, a server, and an apparatus.  And there was wireless |
| 11:21:03 | 23 | communication between the server and the wireless device.  The |
| 11:21:09 | 24 | server contained songs.  It contained radio stations.  It |
| 11:21:15 | 25 | contained a lot of the content which Affinity is claiming |

11:21:18 1 here.  And so the patent examiner rejected the claims because

11:21:25 2 of Leeke.

11:21:26 3          Affinity came in and said, No, no, no.  Leeke doesn't

11:21:30 4 invalidate our claims because Leeke has this system in which

11:21:33 5 the application is on the server.  Affinity wrote, "Here,

11:21:40 6 independent claim 1" -- referring to the claim we're

11:21:42 7 discussing -- "describes in part that a storage medium" --

11:21:45 8 again, the phrase we're construing -- "includes an application

11:21:48 9 that is configured for execution by a wireless cellular

11:21:53 10 telephone device.  Leeke nowhere discloses such application.

11:21:57 11 As contended support" -- and this is what the patent examiner

11:22:01 12 had pointed to -- "the Office Action appears to rely on a

11:22:04 13 player" -- that's the player in Leeke -- "that is executed in a

11:22:09 14 server rather than a wireless device."

11:22:11 15          So, again, the focus to distinguish Leeke was there

11:22:14 16 the application is in the server, here the application is in

11:22:18 17 the wireless device.  In light of this distinction, Affinity

11:22:26 18 received the patent.  The patent was issued.  And they should

11:22:31 19 be held to that claim.

11:22:33 20          Now, finally, Affinity points to this Web site which

11:22:39 21 is figure 4 of the patent.  And they say, Look at this Web

11:22:43 22 site, this Web site which a user can go to and can figure the

11:22:47 23 radio dial.  In the right-hand corner is the radio dial which

11:22:51 24 is ultimately transmitted to my phone and I can use that radio

11:22:55 25 dial on my phone to communicate with the server.

11:22:58 1    But in the patent specification they have this

11:23:05 2 feature in which I can go to a Web site and configure the radio

11:23:08 3 dial the way I want it -- I can add radio stations, I can add

11:23:12 4 content, and so forth. So on the right hand is the radio dial,

11:23:17 5 the graphical user interface is going to be transferred to my

11:23:20 6 phone, and then the rest of it is a familiar Web site.

11:23:22 7    Affinity says, Look at this Web site. This Web site

11:23:27 8 has got to be stored somewhere, and that Web site includes the

11:23:30 9 application. But, again, that argument really violates the

11:23:34 10 clear distinction between the network and the phone. This Web

11:23:40 11 site is on the network.

11:23:42 12    Again looking at claim 1, claims a broadcast system

11:23:47 13 little Roman numeral i is, "a network-based resource

11:23:51 14 maintaining information associated ..." and so forth. That

11:23:56 15 network-based resource, that's where the Web site is. And then

11:24:01 16 the rest of the claim deals with what's on the phone.

11:24:04 17    And I think the key point here is to look at one of

11:24:07 18 the dependent claims. I think this really nails the

11:24:10 19 distinction. Claim 13, which is a dependent claim from

11:24:14 20 claim 1, claim 13 says, "The system of claim 1, wherein the

11:24:19 21 network-based resource comprises an electronic device having a

11:24:25 22 network address."

11:24:26 23    Well, what has a network address? This Web site

11:24:33 24 does. And we've highlighted that. So, again, clear

11:24:36 25 distinction. When you're on the network, the network

presents -- has information that's stored in a storage device. You go to that network resource by typing in a web address, and that presents information that you can use to configure an application. The application is then transmitted to your telephone where it's stored in a storage medium.

So the Web site which they point to as an example of something that's stored, yes, it is stored. It's stored in the network resource on the server. And once the application is transmitted from the server to the phone, it's stored in the storage medium which is the term this patent uses to refer to storage on the cellular telephone.

So, again, the defendants' proposed construction here is really compelled by the intrinsic evidence, which is all I've discussed hear today -- the plain language of claim 1 and, in fact, the very structure of claim 1 which distinguishes the network-based resources from what's on the phone, the specification, which only discloses a storage medium in a wireless device, and then, finally, to get this patent, Affinity distinguished between inventions which the application was stored on the server versus their invention in which the application was executed and ran on a cell phone.

So that concludes my discussion of this part of claim 1, unless the Court has questions.

THE COURT: No.

MR. RILEY: So now I want to turn to issue of the

11:26:26 1  streaming media.  Claim 1 includes the phrase, "to receive a

11:26:31 2  streaming media signal in the wireless cellular telephone

11:26:35 3  device corresponding to the regional broadcasting channel."

11:26:40 4  And when we first looked at this claim and claim 14,

11:26:44 5  we scratched our head and said, What does it mean to correspond

11:26:48 6  to? much as the Court asked.  How close does that relationship

11:26:53 7  have to be to correspond?  That phrase, "corresponding to," is

11:26:58 8  not used in the specification.

11:27:00 9  And so we read that phrase in light of what their

11:27:03 10  claimed invention was, and we believe that it is appropriately

11:27:08 11  read as:  "To receive in the wireless cellular telephone device

11:27:12 12  as streaming media signal a broadcast currently available on

11:27:20 13  the regional broadcasting channel."

11:27:22 14  And I want to clear up some confusion that's been

11:27:25 15  suggested here.  By "currently," we don't mean simultaneous,

11:27:28 16  identical, bit by bit, second by second.  We use the term

11:27:33 17  "currently" the way it's often used, to mean that it's

11:27:36 18  generally currently available.

11:27:38 19  If I say, I'm going down the street to watch the

11:27:41 20  magnificent movie "Lincoln."  It's currently showing at the

11:27:46 21  theater on Main.  That doesn't mean at this instant that movie

11:27:50 22  is playing.  It means that it is currently available.  And we

11:27:55 23  believe that that's a critical distinction in light of the

11:27:58 24  patent specification.

11:28:01 25  Similarly, with regard to claim 14 where it says, a

11:28:04  1  "streaming media signal representing the regionally

11:28:07  2  broadcasting content," the proposed construction is:

11:28:11  3  "Streaming media signal delivering content currently available

11:28:15  4  on the regional broadcast."

11:28:18  5           I think if we step back and look at what the problem

11:28:22  6  was that was being addressed by this patent and why the

11:28:25  7  patentees believed that their invention was novel, it really

11:28:32  8  goes to this issue of being able to listen to the remote

11:28:36  9  station.  Not listen to part of it, not listening to an edited

11:28:39 10  version, but listening to the radio broadcast.

11:28:42 11           And recall that the patent discussed this problem.

11:28:47 12  Imagine I live in Seattle, and my wife and I moved to Houston,

11:28:50 13  Texas.  And my wife enjoys listening to a talk show in Seattle,

11:28:59 14  Washington.  She enjoys the local shows, the local news.  She

11:29:04 15  likes to keep up with what her neighbors are listening to.

11:29:07 16  That was the problem that this patent was devoted to solving.

11:29:13 17           And the way in which the patent proposes to do that

11:29:17 18  is -- and we're a looking at slide 37 -- "A user may select an

11:29:20 19  Online broadcast or radio station ...  The user may then

11:29:24 20  receive radio broadcasts" -- it doesn't say receive part of the

11:29:29 21  radio broadcast or receive an edited version of the

11:29:33 22  broadcast -- "without having to use a home computer or

11:29:38 23  conventional radio receiver."

11:29:39 24           So what it's giving us was the same experience.  Now,

11:29:43 25  it may be delayed by a few seconds.  Obviously, it's coming

11:29:48  1  over the Internet?

11:29:50  2          THE COURT:  So your position here -- I just want to

11:29:52  3  make sure where issue is joined -- that patent is restricted to

11:29:58  4  receiving -- or transmitting and receiving live radio

11:30:02  5  broadcasts as opposed to what Mr. Gaudet referred to as sliced

11:30:07  6  and diced radio broadcasts with other commercial zones.

11:30:11  7          MR. RILEY:  That's correct.  Once you begin to slice

11:30:13  8  and dice, my wife, for example, would not be happy if the show

11:30:18  9  that she liked to listen to, the talk show, was not available

11:30:20 10  anymore.

11:30:24 11          THE COURT:  Well, how would she know it's being

11:30:26 12  sliced and diced?

11:30:27 13          MR. RILEY:  She would listen to what was coming over

11:30:29 14  her computer, and at 12 o'clock, 10 o'clock back in Seattle,

11:30:33 15  she expected to hear that talk show and it's not available.

11:30:38 16  Some other content is being broadcast.  Or instead of the

11:30:41 17  Seattle news, they insert news about Austin.  That's no longer

11:30:46 18  the radio broadcast.

11:30:48 19          THE COURT:  Okay.

11:30:48 20          MR. RILEY:  That's no longer -- much as if I said --

11:30:51 21          THE COURT:  So you're saying it has to be the live

11:30:54 22  continuous radio broadcast?

11:30:55 23          MR. RILEY:  It has to correspond to --

11:30:58 24          THE COURT:  Because there might be the slight delay

11:30:59 25  in there due to the programming.

11:31:01  1          MR. RILEY:  That's correct.  This patent was intended

11:31:03  2  to give my wife the same experience as if she was living in

11:31:08  3  Seattle.  And, in fact, Your Honor, many of these technologies,

11:31:12  4  people who like to call in to radio stations, they can do so

11:31:15  5  when they're listening to it over the Internet.  There will be

11:31:18  6  a short delay, but they can continue to participate in the show

11:31:21  7  the way they did when they lived within the region.  So the

11:31:24  8  Court has put its finger right on the issue of the dispute.

11:31:31  9  And, again, it was this feature which led to the issuance of

11:31:33  10  the patent with regard to radio broadcasts.

11:31:39  11          And this is why we believe to avoid a construction

11:31:42  12  reading -- because I understand that Affinity will now argue to

11:31:47  13  the jury, Look.  It's got some of the content.  That's

11:31:51  14  sufficient to constitute corresponding.  It's got some of the

11:31:55  15  content.  That's sufficient to be a representation.  To avoid

11:31:58  16  that argument, and to hold Affinity to what they told the

11:32:02  17  patent office they were inventing, we used the word "currently

11:32:06  18  available," much like I would say, I'm going to watch the movie

11:32:10  19  "Lincoln" which is currently available at the theater across

11:32:13  20  the street.  It doesn't mean it's showing that instant.  It

11:32:16  21  might not show until that evening.  But it's currently

11:32:19  22  available.

11:32:20  23          Now, if I was to say, Join me to watch the movie

11:32:25  24  "Lincoln," and I took you -- instead of to a three-hour movie,

11:32:28  25  I took you to a one-hour documentary on Lincoln, that wouldn't

11:32:32  1  be the same content.  That wouldn't be the same experience.  I

11:32:36  2  wouldn't be showing you the movie that's currently available at

11:32:39  3  the theater across the street.  I'd be showing you something

11:32:43  4  different.  And it was that identity of experience which is

11:32:48  5  what Affinity told the patent office they were patenting.

11:32:55  6            So if we turn to 41 -- slide 41, we have been

11:33:03  7  criticized that our construction is not grammatically correct.

11:33:07  8  But I think one test is if you drop the construction into the

11:33:08  9  claim language, does it elucidate the scope of the invention?

11:33:13  10  And it clearly does here.

11:33:14  11           Claim 1 would read:  "To transmit a request for the

11:33:18  12  regional broadcasting channel" -- the 98.1 -- "from the

11:33:21  13  wireless cellular telephone device; and to receive in the

11:33:25  14  wireless cellular telephone device as streaming media signal a

11:33:30  15  broadcast currently available on the regional broadcasting

11:33:35  16  channel ..."

11:33:35  17           So, again, makes perfect sense in light of the

11:33:41  18  specification.  I get the experience of that broadcast just as

11:33:43  19  if I was living within the region.  That's what this patent

11:33:47  20  claims.  And, similarly, it works perfectly in claim 14 where

11:33:53  21  it says, "providing, via an over-the-air download, an

11:33:56  22  application to the electronic device for storage and execution

11:34:00  23  in the electronic device that, when executed in the electronic

11:34:05  24  device, allows the electronic device to request a streaming

11:34:10  25  media signal delivering content currently available on the

11:34:14  1  regional broadcast, even if the electronic device is located

11:34:18  2  outside of the region ..."

11:34:20  3      Now, again, as a test we look at the dependent claims

11:34:23  4  and how do they line up with regard to this construction which

11:34:26  5  we believe is compelled by the extrinsic evidence, and it lines

11:34:31  6  up very well.

11:34:32  7      Claim 5, which we will return to when we construe "on

11:34:35  8  demand," claim 5 says, "The system of claim 1, wherein the

11:34:40  9  storage medium further comprises instructions to enable display

11:34:44  10  of on-demand audio information selectable by a user."

11:34:48  11      Well, in this case, the "on-demand" is an additional

11:34:52  12  feature.  I can stream the radio signal as required by claim 1,

11:34:58  13  but I also have the ability to go to a server and select for

11:35:05  14  on-demand downloads -- say a particular song I want to hear or

11:35:09  15  a particular speech I want to listen to or a book that is a

11:35:15  16  spoken word book.  That's what claim 5 provides.

11:35:19  17      If claim 5 was construed -- if Affinity is correct,

11:35:27  18  then claim 5 would really add no meaning.  It would simply be

11:35:32  19  the regional broadcasting channel itself.

11:35:38  20      So that is all I have to say about that claim,

11:35:41  21  Your Honor.

11:35:44  22      THE COURT:  All right.

11:35:56  23      MR. GAUDET:  Your Honor, could both sides have a

11:35:58  24  brief rebuttal or ...

11:36:00  25      THE COURT:  Yeah.  I'll give both sides -- let's try

11:36:03  1  to finish -- that would actually be good because I want to

11:36:07  2  break a little bit before 12:00. And so with brief rebuttals,

11:36:12  3  I'd like to finish it within about 10 or 12 minutes. And that

11:36:17  4  way we can break for lunch and have the dependent claims after

11:36:21  5  lunch.

11:36:22  6       MR. GAUDET: That sounds good. Thank you,

11:36:24  7  Your Honor.

11:36:24  8       THE COURT: So don't overstay your welcome. I don't

11:36:26  9  want you to take all of his time and say, Well, it's noon.

11:36:30  10       MR. GAUDET: Mr. Sankey will make me be quiet again,

11:36:33  11  I think.

11:36:33  12       THE COURT: I doubt that.

11:36:34  13       MR. GAUDET: Your Honor, the first thing I'd want to

11:36:36  14  point out is that -- and I'll walk over to claim 1 that

11:36:40  15  Mr. Riley addressed. That if claim 1 was what he said it was,

11:36:44  16  that word "cell phone" would be right there. The patents are

11:36:48  17  about claims. The word "cell phone" is not there. It would

11:36:52  18  have said that this part is the server part and this part is

11:36:56  19  the cell phone part. It doesn't.

11:36:58  20       Instead, what Mr. Riley walked you through is one

11:37:01  21  application of the claim. Yes, you could -- the claim would

11:37:05  22  apply because you could walk through and check the box for

11:37:09  23  every element on item one, focusing on the network, and item

11:37:13  24  two, focusing on the cell phone. You could do the same thing,

11:37:17  25  however, focusing on item one as the part of the network that

11:37:20 1 provides the music.

11:37:22 2 That's why element 1 doesn't have the word

11:37:25 3 "application" in it. It maintains information. So element 1

11:37:29 4 could also be the part of the network that provides the music.

11:37:33 5 Element 2 is the part of the network that stores the

11:37:36 6 application so that it could be downloaded. And every single

11:37:41 7 time, whether we're looking at the specification, the

11:37:44 8 prosecution history, every time that the punch line was, "and,

11:37:47 9 therefore, the memory is on the cell phone," what the words

11:37:51 10 were, what the support was, "and, thus, the application must be

11:37:56 11 able to be executed on the cell phone without exception."

11:37:59 12 And, Your Honor, of course, that's the defining

11:38:04 13 element of the application, but the application is the same

11:38:07 14 whether it has been downloaded yet or not. And Mr. Riley made

11:38:11 15 the point that it must be on the cell phone in order to be

11:38:14 16 executed and do these things. I can make exactly the same

11:38:18 17 point about the network server. It must be on the network

11:38:21 18 server before it can get to the cell phone in the first place.

11:38:24 19 The location at any given moment is not the defining part of

11:38:29 20 these claims, first point.

11:38:31 21 Second point, it's actually particularly interesting

11:38:33 22 in that the very last phrase at the bottom of the claim says,

11:38:37 23 "... wherein the wireless cellular telephone device is

11:38:40 24 configured to receive ..."

11:38:42 25 If this structure he's talking about was correct, I

11:38:45 1  mean, I thought the thing already got there.  Why is it

11:38:48 2  receiving down at the bottom?  The point is, these claims do

11:38:51 3  not at all direct that -- that, you know, it be at a certain

11:38:55 4  point at a certain time.

11:38:56 5          Second point, in going through the specification,

11:38:59 6  there is heavy emphasis on the fact that the word "storage

11:39:03 7  medium" only appeared once.  Your Honor, there is absolutely no

11:39:07 8  magic to that.  As I told you, the word "storage medium" wasn't

11:39:11 9  even in the claims until the Patent Office had a memo that

11:39:14 10 said, Everybody who says "computer readable" now has to say

11:39:17 11 "storage medium" instead.  Nothing about that was intended to

11:39:21 12 alter or change the scope of the invention.

11:39:23 13         To do what they did was to say this word was defined

11:39:26 14 a certain way in the specification, the patentee needs to

11:39:30 15 unambiguously be a lexicographer and say that this word means

11:39:35 16 this.  Of course not.  And when he was talking about figure 1

11:39:38 17 and had the language about the server storing things, he used

11:39:42 18 the word that everyone understands, "storage."  But there's no

11:39:44 19 magic to when the word "storage medium" was used versus just

11:39:49 20 talking about something that can store data.

11:39:51 21         The last point I want to make on this is the

11:39:54 22 discussion of Leeke -- that prior art Leeke reference in the

11:39:58 23 prosecution history.  And, again, for a prosecution history to

11:40:01 24 change the meaning of the claim, it's got to be unambiguous.

11:40:05 25 Well, the -- in any event, that's not me doing that,

11:40:10 1 Your Honor. That's not part of my presentation.

11:40:13 2      For the prosecution history to change the meaning,

11:40:17 3 it's got to be unambiguous. All the prosecution said on Leeke

11:40:21 4 is that Leeke does not involve an application that can be

11:40:24 5 executed on a cell phone. Everyone agrees this application can

11:40:28 6 be executed on a cell phone, but it's got to be stored in two

11:40:31 7 places for the -- it's got to be stored first on the network

11:40:34 8 server, and then it gets downloaded and stored on the cell

11:40:37 9 phone.

11:40:38 10      That claim language is satisfied once you find an

11:40:41 11 instance where it is stored on the network server. You then

11:40:44 12 have a non-transitory storage medium, a storage, that includes

11:40:48 13 an application that is configured for execution with that --

11:40:52 14 and then this is the crucial language -- that "when executed."

11:40:56 15 So it's not that it already can do that. It is when it is

11:41:00 16 finally executed. That's the ultimate purpose. That doesn't

11:41:04 17 mean it's got to be stored anywhere at the moment in time.

11:41:07 18      A few quicker remarks on the streaming media issue.

11:41:10 19 And, you know, the English language, I think we all know, no

11:41:14 20 matter how hard you try, there's always some ambiguity. That's

11:41:18 21 invariable. But what Mr. Riley just said is, I don't like the

11:41:22 22 word "corresponding." We scratched our heads. We want to put

11:41:26 23 another word in that we'll have to scratch our heads over as

11:41:27 24 well. We want to put in "currently." And then he

11:41:28 25 acknowledged, well, "currently" really isn't this, but it's

11:41:30 1 kind of that.

11:41:30 2 There is no reason in the world to take one word out
11:41:33 3 and put another word in when it takes us away from what the
11:41:37 4 claim actually says. The claim says -- and again, let's peek
11:41:41 5 forward to the evidence here. This isn't a situation where
11:41:43 6 we're going to be testing the bounds of what "corresponding" or
11:41:46 7 "representing" means. The application calls itself Live
11:41:49 8 Radio. It advertises the very same radio station. There's a
11:41:52 9 three-second delay. This point about content, the only content
11:41:56 10 that we're aware of that's any different is commercials.
11:41:59 11 Nobody tunes in for commercials. Mr. White's wife wasn't
11:42:03 12 tuning in for a commercial. She was tuning in for a talk show
11:42:06 13 that would unquestionably be exactly the same.

11:42:09 14 And so what I think is happening is they're testing
11:42:11 15 the bounds of, you know, language. And any language, whether
11:42:14 16 it's a construction or claim language, will eventually yield
11:42:18 17 some absurd hypothetical. They're testing the bounds and
11:42:21 18 putting in new language that will also yield to the same absurd
11:42:25 19 hypothetical, rather than just saying the claim makes sense.

11:42:28 20 Everybody knows what "corresponding" means.
11:42:30 21 Everybody knows what "representing" means. That's the evidence
11:42:33 22 they're going to see. No juror is going to have a hard time
11:42:36 23 saying, you know, when the application says it's the same radio
11:42:39 24 station and calls it live radio and the songs are exactly the
11:42:42 25 same with a three-second delay, does that correspond or not?

| | | |
|---|---|---|
| 11:42:45 | 1 | Of course it corresponds. Of course it represents. |
| 11:42:48 | 2 | And the process of claim construction, putting in a |
| 11:42:50 | 3 | brand new phrase that is not required anywhere and is not used |
| 11:42:53 | 4 | in the specification anywhere based on sort of an abstract |
| 11:42:58 | 5 | "what somebody must have wanted to do" is completely |
| 11:43:01 | 6 | unjustified. And especially when the very premise that someone |
| 11:43:05 | 7 | would really want to hear a commercial from far away, that most |
| 11:43:08 | 8 | certainly is nowhere in the specification and, the most |
| 11:43:12 | 9 | important part, it's not in this claim. The claim doesn't say |
| 11:43:15 | 10 | it's the same broadcast. And they've acknowledged, and their |
| 11:43:18 | 11 | construction is for it to be the same broadcast, an identity. |
| 11:43:22 | 12 | Whatever "representing" and "corresponding" means, it |
| 11:43:25 | 13 | doesn't mean an identity. When I represent Russell White, I am |
| 11:43:29 | 14 | not Russell White. I correspond to his positions in court, but |
| 11:43:33 | 15 | I'm not him. |
| 11:43:34 | 16 | Thank you, Your Honor. |
| 11:43:35 | 17 | THE COURT: Thank you. Mr. Riley, do you want to |
| 11:43:37 | 18 | take a couple of minutes? |
| 11:43:38 | 19 | MR. RILEY: Yes. Thank you. |
| 11:43:39 | 20 | Returning to slide 28, which I think really points |
| 11:43:45 | 21 | out the issues here, the claim itself makes a distinction |
| 11:43:52 | 22 | between what is on the server, which it refers to as a |
| 11:43:56 | 23 | "network-based resource," and what is on the phone, which is |
| 11:44:00 | 24 | everything below that paragraph, "a non-transitory storage |
| 11:44:03 | 25 | medium including an application configured for execution by the |

11:44:07 1    wireless cellular telephone ..."

11:44:10 2            If they had intended to claim the application stored

11:44:16 3    on a storage device, they should have used that phrase because

11:44:20 4    that is the phrase that's in the patent.  When they -- when the

11:44:24 5    patentees intended to reach the issue of the location of an

11:44:29 6    application that's not on a storage medium, they used a

11:44:34 7    different phrase.

11:44:35 8            And that's in the claim language itself.  If we go to

11:44:38 9    the next slide, claim 13 says, "The system of claim 1 wherein

11:44:44 10   the network-based resource comprises an electronic device

11:44:50 11   having a network address."  And, again, if you want to go and

11:44:54 12   configure the application before it's on your phone, you go to

11:44:58 13   the network.  You go to some place that has a network address.

11:45:04 14   Clear distinction.

11:45:05 15           And then, finally, counsel never addressed the actual

11:45:15 16   architecture which is on slide 28 in which the term "storage

11:45:28 17   medium" -- there's nothing in the record that the Patent and

11:45:30 18   Trademark Office forced them to use the term "storage medium."

11:45:35 19   That is not in the record.  That's not true.  The patentees

11:45:38 20   chose to use the word "storage medium" which was in the patent

11:45:42 21   specification only as it related to the phone.

11:45:45 22           Finally, with regard to the concept of "representing"

11:45:52 23   and "corresponding," yes, I will concede that Mr. Gaudet is

11:45:56 24   Mr. Gaudet and not his client.  And that is a particular use of

11:45:59 25   word "represent."  The bit stream that comes over a streamed

| | | |
|---|---|---|
| 11:46:05 | 1 | radio broadcast, that bit stream is not the same as the |
| 11:46:08 | 2 | electronic magnetic waves that are propagated through the |
| 11:46:14 | 3 | atmosphere.  They are not the same.  So we don't start with |
| 11:46:18 | 4 | identity.  That's a straw man. |
| 11:46:20 | 5 | The question is, What did they invent?  And they |
| 11:46:24 | 6 | invented allowing streaming media -- live streaming media from |
| 11:46:27 | 7 | a broadcast to a listener.  It's in a different form.  Its bits |
| 11:46:32 | 8 | instead of a sound wave.  But it is still the broadcast.  And |
| 11:46:36 | 9 | they should be held to what they claimed to invent. |
| 11:46:38 | 10 | THE COURT:  Thank you. |
| 11:46:40 | 11 | MR. RILEY:  Thank you. |
| 11:46:41 | 12 | THE COURT:  All right.  Well, it's 11:47.  We can't |
| 11:46:44 | 13 | get deeply into the dependent claims, so we're going to go |
| 11:46:46 | 14 | ahead and break for lunch.  We'll be back at 2 o'clock and then |
| 11:46:50 | 15 | we'll do the dependent claims. |
| 11:46:51 | 16 | I appreciate the dispatch with the way you're |
| 11:46:54 | 17 | proceeding through here.  I think you're both doing an |
| 11:46:57 | 18 | excellent job in presenting your positions.  So don't eat too |
| 11:47:01 | 19 | much at lunch and get lazy and doze off.  Let's try to keep the |
| 11:47:05 | 20 | same energy up when we come back at 2 o'clock.  So we'll be in |
| 11:47:09 | 21 | recess. |
| 11:47:09 | 22 | (Recess) |
| 14:03:13 | 23 | (Open Court) |
| 14:03:13 | 24 | MR. SANKEY:  Judge, if I could, before we move to the |
| 14:03:16 | 25 | dependent claims, I would like to give to the Court -- and I |

14:03:18 1 will give opposing counsel a copy. But when we were talking on

14:03:23 2 slide 13 about one of the amendments made on the prosecution

14:03:26 3 history, we mentioned a memo from the PTO. And I just wanted

14:03:30 4 to give it to the Court so you can see what we're talking

14:03:34 5 about.

14:03:34 6           THE COURT: Okay. Thank you.

14:03:40 7           MR. GAUDET: And, Your Honor, with that, we will turn

14:03:42 8 to the dependent claims. Your Honor, the first dependent

14:03:46 9 claim -- and this is slide 25 that we're going to talk about --

14:03:49 10 is claim 5. Claim 5 depends from independent claim 1. It

14:03:58 11 means, of course, that in order to satisfy claim 5, you have to

14:04:02 12 satisfy everything in claim 1 and then the extra element in

14:04:09 13 claim 5.

14:04:10 14           The phrase relates to on-demand audio information,

14:04:15 15 but I think that the dispute is really, what is audio

14:04:17 16 information? What is encompassed by audio information? And,

14:04:21 17 frankly, consistent with our positions throughout the case

14:04:26 18 today, the claim means what it says, that audio information is

14:04:31 19 information about audio. It could be the audio itself. It

14:04:35 20 could be information described in the audio. It could be

14:04:38 21 related to the audio. It's very broad.

14:04:40 22           You'll see that our position in the left part of the

14:04:45 23 chart says, "No construction necessary." And then, "If 'audio

14:04:48 24 information' is construed, it should be construed as ..." And

14:04:52 25 then we've got a proposed definition there. That proposed

14:04:55  1  definition is because we've litigated this issue before in a

14:05:00  2  case that was in front of Judge Ron Clark in the Eastern

14:05:03  3  District on a patent that has the same specification. It's in

14:05:06  4  the same family. And one of the disputed issues in that case

14:05:10  5  is, what does "audio information" mean? And we've attached the

14:05:13  6  Markman order from that case.

14:05:15  7      What this definition here does is it tracks

14:05:19  8  Judge Clark's interpretation. And so our position is, if we're

14:05:22  9  going to have a construction here -- and as I'll explain, if

14:05:26  10  you're going to look at the specification and say, All right.

14:05:29  11  Let's find some words to put around "audio information" we

14:05:32  12  would say we resolve it the same way that Judge Clark resolved

14:05:38  13  it.

14:05:38  14      On the other side of the chart, the defendants'

14:05:40  15  proposed construction is, "Information identifying particular

14:05:43  16  sound recordings playable over a communications link when

14:05:52  17  selected by a user."

14:05:53  18      To sort of further refine where we're -- where we're

14:05:57  19  joining issue, it appears that the defendants agree that audio

14:06:00  20  information doesn't just have to be audio, that it can be

14:06:03  21  displayed. So it can be text. It can be something you can

14:06:06  22  see. And that's clear from the claim language itself, because

14:06:09  23  looking up at the top of the screen, we're talking about

14:06:13  24  enabling display of audio -- on-demand audio information. And

14:06:18  25  you can't see sound. You can only see text or video or

14:06:21 1  something else that can be displayed.

14:06:23 2          And, in fact, the defendants say "information

14:06:25 3  identifying." That's their interpretation. So I think we're

14:06:30 4  all on the same page, that at least in some context, audio

14:06:34 5  information includes displayed text or displayed information

14:06:38 6  that you see and not hear. But it's got to be about the

14:06:43 7  audio.

14:06:43 8          I think the -- at least a part of the big fight is

14:06:46 9  where this "sound recordings" language comes in. Whether or

14:06:50 10 not audio information is limited to information about

14:06:55 11 particular sound recordings as opposed to being about, you

14:06:58 12 know, Internet radio broadcasts or about something else. You

14:07:07 13 know, why this almost temporal restriction of the only type of

14:07:11 14 audio information that counts is if it's information about a

14:07:14 15 sound recording.

14:07:15 16         And if we advance -- actually, before I get there, if

14:07:18 17 we go back to that slide, there's a further gloss I think

14:07:22 18 they're putting on this, which is -- it's not just sound --

14:07:25 19 it's got to only be sound recordings. And it's not anything

14:07:27 20 about sound recordings. It's only the information

14:07:30 21 identifying -- identifying a sound recording.

14:07:33 22         I guess that would be like the title of it or the --

14:07:37 23 or the artist or something and not, for example, if you're

14:07:40 24 listening to a sound recording and said, Oh, I wonder what

14:07:43 25 album that was on, then that wouldn't count. I think that's

14:07:47  1  their view.  Our position, of course, is audio information is

14:07:50  2  just audio information.  There's no reason to have it so carved

14:07:53  3  up.

14:07:54  4         If we go to the next slide, this is the claim

14:07:57  5  language in its entirety.  It says, "The system of claim 1

14:08:00  6  wherein the storage medium further comprises instructions to

14:08:04  7  enable display of on-demand audio information selectable by a

14:08:08  8  user."

14:08:09  9         And we're focusing on the language "on-demand audio

14:08:21  10  information."  There's -- there's nothing in that language that

14:08:24  11  limits this to information even about sound recordings much

14:08:29  12  less identifying particular sound recordings.

14:08:32  13         Now, to be clear, it would certainly include that.

14:08:35  14  It would certainly include information identifying sound

14:08:38  15  recordings, but it's not limited to that.

14:08:40  16         If we go to the next slide.

14:08:43  17         When you look to the specification, audio information

14:08:48  18  is an inclusive term.  And I want to start -- and I have the

14:08:53  19  whole -- this whole paragraph up here.  I want to start at the

14:08:56  20  end of it, and then I'll work back up.  The end of it says,

14:09:00  21  "Therefore the term 'audio information' or 'information' is

14:09:02  22  used in a general sense to relate to audio information in all

14:09:06  23  phases of communication.

14:09:09  24         Okay.  So far from a disclaimer of when I say "audio

14:09:11  25  information," I only mean sound recordings, it's saying I mean

14:09:15 1  it generally.  I mean it as broadly as I can.  Again, this

14:09:19 2  language, you don't have to have language like this to get the

14:09:22 3  full breadth of a claim term.  But when you have it, it's

14:09:24 4  pretty clear that's what the patentee is driving at.

14:09:27 5       The defendants have taken the position that this

14:09:30 6  paragraph actually means the opposite.  That from the first

14:09:33 7  sentence, it says, "The present invention is not limited to

14:09:37 8  communicating only audio information."  Next sentence, "One

14:09:40 9  skilled in the art can appreciate that other types of

14:09:43 10 information such as video, textual, et cetera may be

14:09:47 11 communicated utilizing the systems and methods disclosed

14:09:49 12 herein."

14:09:50 13      And I think their position is that that means that

14:09:50 14 text or video, sort of, anything that could be seen, would not

14:09:54 15 be audio information.  And I think the response to that is,

14:09:58 16 sort of, just keep reading.  You get to the end of the

14:10:00 17 paragraph, and it's clear they're trying to be broad.  But

14:10:03 18 beyond that, if that were the case, the claim would be a

14:10:07 19 *non sequitur*, because the claim says you're displaying audio

14:10:10 20 information.

14:10:10 21      So if this meant that text doesn't count as audio

14:10:13 22 information, the claim -- the claim would make no sense.  And

14:10:16 23 they're not even suggesting that.  They are conceding, at least

14:10:20 24 as much that necessarily contradicts their interpretation of

14:10:25 25 this language; namely, of course audio information can include

14:10:28 1  text.  Otherwise, how do you display a name of a song or an

14:10:36 2  artist's name?

14:10:36 3          And beyond that -- let me see.  I'm going to try the

14:10:48 4  document camera for just one moment.  And I -- there are other

14:10:52 5  examples throughout the specification of where audio

14:10:55 6  information is displayed.  One example is the top of column 4

14:10:59 7  here.  Figure 4 described in greater detail below illustrates

14:11:03 8  one embodiment of providing an Internet Web site for displaying

14:11:08 9  selectable audio information.  Audio information can be

14:11:10 10  displayed.  By definition, something that can be displayed

14:11:14 11  isn't just sound.

14:11:15 12          If we go to the next slide, I had referenced the

14:11:30 13  decision by Judge Clark that was, I believe, in December of

14:11:34 14  2009.  This opinion is attached as Exhibit 12 to our opening

14:11:43 15  brief.  It's about a 31-page Markman order.  Some terms had

14:11:47 16  been stipulated, and some terms there were disputes.  And along

14:11:49 17  the way to interpreting one of the terms, Judge Clark noted on

14:11:53 18  page 18 that there was a disagreement amongst the parties about

14:11:53 19  what "audio information" would include.  And he resolved that

14:11:56 20  dispute by saying, This is what I think it means.

14:11:59 21          And, again, that's -- that's an, I think, equally

14:12:02 22  broad way of saying "anything about audio."  He chose to spell

14:12:04 23  it out in those words, and we have no objection of doing that

14:12:07 24  here as well.

14:12:08 25          He also took head-on the very argument that I think

14:12:11  1  is the centerpiece of the defendants' position, which is that

14:12:14  2  first sentence in the language in the specification we just

14:12:17  3  looked at somehow distinguishes audio information from text or

14:12:21  4  video.

14:12:22  5          And he said, "The Court finds that the

14:12:24  6  specification's discussion of audio information, as compared to

14:12:27  7  other types of information, such as visual, textual, et cetera,

14:12:30  8  does not amount to a restriction that would exclude the

14:12:33  9  possibility that an audio information source may maintain

14:12:36  10  textual information."

14:12:38  11          And that's consistent both with the language in that

14:12:40  12  paragraph itself and with the fact that in this claim we're

14:12:44  13  talking about displaying audio information.  So it's got to

14:12:47  14  include text.

14:12:48  15          If we go to the next slide.

14:12:51  16          If we then wrap in the word "on-demand," nothing

14:12:58  17  about the word "on-demand" is limited to just sound recordings

14:13:04  18  or just particular types of texts or no text at all.  Instead,

14:13:07  19  it's a broad disclosure.  It says, "The present invention may

14:13:10  20  be configured in a plurality of ways to communicate desirable

14:13:14  21  audio information to users by allowing users to select

14:13:17  22  desirable audio information and transmitting the desirable

14:13:21  23  audio information to a specified destination thereby allowing

14:13:24  24  the user to receive on-demand, customized audio information."

14:13:28  25  What the user wants the user gets.

14:13:30  1        There specific examples of this, as all patents must

14:13:33  2  have specific examples.  At least they've changed the law about

14:13:36  3  disclosing a best mode.  But at the time of this patent, you

14:13:41  4  had to say, Here is my very specific example.  And I think what

14:13:44  5  you've seen, sort of, repeatedly throughout the hearing is the

14:13:47  6  defendants take the very specific example and say, That's got

14:13:51  7  to be what the claims are limited to.

14:13:53  8        And while you hesitate to call anything an absolute

14:13:56  9  bright line in claim construction, I think this one's about as

14:13:59  10  close as you can come, which is, you cannot import the details

14:14:02  11  of an example in the specification and turn it into a

14:14:05  12  limitation in a claim unless the specification says, that

14:14:08  13  example right there, that's it.  That's all I have.  And it's

14:14:11  14  sort of, you know, a one-trick pony, so to speak, with clear

14:14:15  15  language saying exactly that.  And there's nothing of the sort

14:14:17  16  in the specification.  Of course there are examples.  But when

14:14:22  17  the claims are broader than the examples, the claims are what

14:14:25  18  control.

14:14:26  19        If we go to the next slide.

14:14:28  20        The last point here relates to extrinsic evidence.

14:14:33  21  The defendants had submitted some extrinsic evidence related to

14:14:37  22  video on demand or audio on demand, language like that.  None

14:14:40  23  of them were on-demand audio information.  We would submit the

14:14:43  24  extrinsic evidence is completely irrelevant.

14:14:46  25        If you do look at it, it's interesting that one of

14:14:49   1   the examples referred to on-demand in the context of -- it's a

14:14:54   2   little blurry, but I've underlined it here -- "interactive

14:14:56   3   devices such as question and answer, chat rooms, product or

14:15:00   4   service order forms."  Certainly those aren't -- those aren't

14:15:04   5   sound recordings.  Again, nothing about the claim language

14:15:07   6   limits this to sound recordings or specific types of text about

14:15:09   7   sound recordings.

14:15:10   8            And, Your Honor, that's everything that I've got on

14:15:15   9   that claim term.  So unless there are questions from the Court,

14:15:19   10  I'll move on to the next dependent claim.

14:15:21   11            THE COURT:  No.  That's fine.  Thank you.

14:15:23   12            MR. GAUDET:  Thank you, Your Honor.

14:15:34   13            Your Honor, the next claim that we'll talk about is

14:15:36   14  claim 7.  This is, again, a dependent claim that depends from

14:15:39   15  claim 1.  So everything in claim 1 plus claim 7 in order to

14:15:43   16  satisfy claim 7.  The term here is just "log-in."  We submit

14:15:48   17  that no construction is necessary of "log-in."  The defendants

14:15:54   18  propose, "Information identifying a user, such as a user name

14:15:57   19  or password."  But that it's got to identify the user.  That's,

14:16:00   20  I think, the essence of the dispute.

14:16:05   21            If we go to the next slide.

14:16:07   22            Again, claim 7 in its entirety states, "The system of

14:16:11   23  claim 1 wherein the storage medium further comprises

14:16:14   24  instructions to receive a log-in from a user of the wireless

14:16:17   25  cellular telephone device and to display a preferred user

14:16:21 1  environment associated with the user."

14:16:25 2          So there's some kind of a log-in that comes from a

14:16:28 3  user wireless device.  And then based on that, a preferred

14:16:31 4  environment is presented.  Nothing about that requires that the

14:16:37 5  information actually identify the user.

14:16:39 6          And I -- if we go to the next slide.  Go forward one

14:16:49 7  more slide.

14:16:50 8          The log-in, it comes from a user, but it doesn't have

14:16:53 9  to identify the user.  And I know one example that's very

14:16:56 10 familiar to practicing lawyers these days if when you go to

14:17:00 11 another law firm, they'll immediately ask, Can I get on your

14:17:04 12 Wi-Fi system?  And someone will say, Absolutely.  Here you go,

14:17:06 13 and they'll give you a password.  And you log in to the Wi-Fi

14:17:10 14 system there.  You are never identifying yourself.  You're

14:17:14 15 usually like guest number 1, plus some sort of a password.

14:17:18 16 That doesn't identify you at all.  Instead, it's a generic

14:17:22 17 credential that will allow you to log in.

14:17:24 18         Now, certainly, you could log in by identifying

14:17:27 19 yourself.  That's another way of doing it.  But the concept of

14:17:29 20 "log-in" does not inherently require that you identify

14:17:33 21 yourself.  Instead, you could simply provide a generic password

14:17:37 22 or your device could provide some generic information that

14:17:41 23 identifies itself to the system and allows access.  So "log-in"

14:17:46 24 is fundamentally about access credentials.  It's not about

14:17:51 25 identifying a specific user.

14:17:53  1    If we go back now, since I've taken these out of

14:17:55  2  order, the example in the specification of "log-in," the

14:18:00  3  language doesn't say anything about, you know, a specific

14:18:04  4  example or having to identify a user.  It says -- the second

14:18:08  5  sentence here -- well, actually, it starts by saying, "The

14:18:11  6  present invention is not limited to any one specific type of

14:18:14  7  software and may be realized in the plurality of ways as can be

14:18:19  8  appreciated by those skilled in the art."

14:18:23  9    And so you're starting the paragraph with the

14:18:23  10  sentence, hey, we're not trying to restrict anything here.

14:18:25  11    The next sentences is, "Homepage 401 may also include

14:18:29  12  log-in region 410, allowing a user to log in to homepage 401

14:18:32  13  and display a user-preferred environment."  Nothing about that

14:18:36  14  requires that the user identify itself.  It simply requires

14:18:40  15  that the user provide credentials that would then allow a

14:18:43  16  log-in.

14:18:49  17    And when you get into the specific example in

14:18:51  18  figure 4, there is an image that actually says -- I think it

14:18:55  19  says either user name or user ID and password.  And that user

14:19:00  20  ID might well be something that identifies someone.  It might

14:19:03  21  well be that you identify, in my case, myself is typically

14:19:08  22  MC Gaudet and then I put in a password.  That might be the

14:19:10  23  log-in system.

14:19:11  24    And in the specific example in the specification,

14:19:13  25  that is the log-in system.  But it's no more or less a log-in

14:19:17 1   system for doing it more generically or for logging in without

14:19:21 2   a manual input, but instead, doing it automatically based on

14:19:25 3   embedded data.  Any of those things would still constitute a

14:19:28 4   log-in from the cellular device.  And so the key again is,

14:19:35 5   given this concept of "log-in" and given examples in the

14:19:38 6   specification, there's nothing in the specification that says

14:19:41 7   every time I say "log-in" I mean identify a user.  The concept

14:19:45 8   itself is broader.  You go back to the claim, and nothing in

14:19:48 9   the claim says that either.

14:19:49 10          If we -- if we go forward one more slide -- and I've

14:20:02 11  covered this material already.  So that's the end of my

14:20:05 12  presentation with respect to "log-in" unless there are

14:20:07 13  questions from the Court.

14:20:08 14          THE COURT:  No.

14:20:09 15          MR. GAUDET:  Thank you, Your Honor.  The last term --

14:20:11 16  and at least as far as my prepared remarks, this is the last

14:20:14 17  thing that I have to say.  "Targeted Advertisements," that's

14:20:18 18  general topic.  This is now claim 21.  Claim 21 depends from

14:20:23 19  claim 14.  So claim 14 is the second independent claim in the

14:20:27 20  patent.  Claim 21 would be all the elements of claim 14 plus

14:20:31 21  the additional elements that are set forth here.

14:20:34 22          The claim language is on the left in the chart, which

14:20:39 23  is, "Advertisements are targeted to a specific demographic."

14:20:44 24  The language on the right is defendants' proposed construction,

14:20:48 25  which is, "Advertisements are selected based on a population

| | | |
|---|---|---|
| 14:20:53 | 1 | characteristic provided by the user, such as the user's race, |
| 14:20:56 | 2 | gender, age, income, profession, or education level." |
| 14:20:59 | 3 | I couldn't help but think to myself, if the claim |
| 14:21:03 | 4 | language read as defendants' construction did, I wonder if |
| 14:21:08 | 5 | they'd be proposing the language on the left as the |
| 14:21:11 | 6 | construction. They've taken something that's easy to |
| 14:21:13 | 7 | understand, that makes sense, that's accessible to anyone on a |
| 14:21:17 | 8 | jury, and turned it into three times the language, which, |
| 14:21:21 | 9 | Your Honor, as we've said, that's -- that ought to be a red |
| 14:21:25 | 10 | flag when something like that happens. And as we get into |
| 14:21:28 | 11 | this, I think the basis for the red flag will become more and |
| 14:21:32 | 12 | more apparent. |
| 14:21:33 | 13 | There's nothing ambiguous about "advertisements," |
| 14:21:36 | 14 | there's nothing ambiguous about "targeted," and there's nothing |
| 14:21:39 | 15 | ambiguous about "specific demographic" any more than there |
| 14:21:42 | 16 | would be about the language "population characteristic" on the |
| 14:21:45 | 17 | right side. And then there's very, very long list of examples |
| 14:21:48 | 18 | that you would imagine a jury would probably look at and say, |
| 14:21:52 | 19 | Well, this is a checklist. If it happens that what |
| 14:21:55 | 20 | Clear Channel uses is something that's not on that list of, I |
| 14:21:59 | 21 | believe, seven examples, then, surely, it must not infringe. |
| 14:22:02 | 22 | If we go to the next slide, the language itself -- so |
| 14:22:10 | 23 | now put in -- put in the context of the entire claim is, "The |
| 14:22:12 | 24 | method of claim 14, further comprising transmitting |
| 14:22:19 | 25 | advertisements to the electronic device, wherein the |

14:22:21 1  advertisements are targeted to a specific demographic."

14:22:24 2       The language readily understood, and it is

14:22:26 3  indifferent to where the demographic information comes from or

14:22:30 4  the bases used to determine it.  It only requires that

14:22:34 5  advertisements are transmitted, and the advertisements are

14:22:39 6  targeted to a specific demographic.  It doesn't matter where

14:22:43 7  the specific demographic information came from or how it was

14:22:47 8  generated.

14:22:47 9       If we go to the next slide.

14:22:50 10      It's interesting.  But, again, claim language does

14:22:52 11 not have to perfectly track language in the specification.  I

14:22:55 12 mean, a good example we talked about a lot this morning, you

14:22:59 13 know, a generic word like "storage medium" can be supported by

14:23:04 14 something like "a memory" or "a storage."  The words don't have

14:23:06 15 to match up.  They're easily understood.

14:23:08 16      Interestingly, here the claim language in the

14:23:11 17 specification is not a perfect match, but it's pretty close:

14:23:15 18 "Transmitting advertisements to the electronic device, wherein

14:23:18 19 the advertisements are targeted to a specific demographic."

14:23:24 20 The specification says, "Through providing demographic

14:23:24 21 information to advertisers, when a user logs in to homepage

14:23:26 22 401, selected advertising can be 'targeted' for a group of

14:23:30 23 users."

14:23:31 24      So it's the same language.  All that's happened is

14:23:33 25 some of the language has come out of the specification which

14:23:37 1 actually makes the claim language a little bit broader than the

14:23:40 2 example in the specification.  But it's not as if there's some

14:23:44 3 disconnect or the specification was talking about one thing and

14:23:46 4 the claim language is the polar opposite.

14:23:48 5 But there's something that's even more interesting

14:23:51 6 that's going on, if we go to the next slide, which is, again,

14:23:54 7 we can peek forward to the evidence and see what the jury is

14:23:58 8 going to see.  We've got up here the privacy policy on the

14:24:01 9 right of the slide that every user who initially logs in to

14:24:04 10 Clear Channel sees and has to click and agree to.

14:24:07 11 And the seventh word down -- or the sixth or seventh

14:24:10 12 line down says, "demographic information."  So the jury is

14:24:14 13 going to see the claim language, which is, "The method of claim

14:24:18 14 14, further comprising transmitting advertisements to the

14:24:22 15 electronic device, wherein the advertisements are targeted to a

14:24:26 16 specific demographic."  Okay.  They'll see the claim language.

14:24:29 17 And I've told you it's actually pretty close to the words in

14:24:32 18 the specification.

14:24:32 19 They'll see the evidence which is the information you

14:24:34 20 provide to us, demographic information such as ZIP code and

14:24:39 21 age.  There is no reason to put a further gloss on this and

14:24:42 22 tell the jury, actually, "specific demographic" means

14:24:47 23 "population characteristic" and this long list of seven things

14:24:49 24 that, coincidentally, doesn't even include the very first thing

14:24:53 25 on the Clear Channel example which is your location, such as

14:24:58  1  ZIP code.

14:24:58  2         And so the idea of taking clear claim language that

14:25:01  3  we know the jury will be able to see and understand and apply,

14:25:04  4  because it's just about verbatim, and putting another obstacle

14:25:08  5  or filter in it is certainly not the appropriate process for

14:25:12  6  claims construction.

14:25:13  7         And I would also submit, if this isn't their privacy

14:25:20  8  policy, they'd be hard pressed to argue that it's so confusing

14:25:23  9  to a layperson that they couldn't possibly process it because,

14:25:25  10  obviously, every user of their system has.

14:25:28  11         If we go to the next slide, the last point is just a

14:25:31  12  legal point, which is case law about long lists of examples.

14:25:35  13  And we've got four cases that are cited here, and I've

14:25:38  14  highlighted some of the language -- there are two here and two

14:25:40  15  on the next slide -- where courts in Texas, courts in

14:25:45  16  California, and I believe the last one is a court in Kansas,

14:25:48  17  have looked at this and said, Look.  Adding a long list will

14:25:53  18  just confuse the jury.  It's the jury's job to look at a term.

14:25:56  19  If they understand it, they'll figure out if the example counts

14:26:00  20  or doesn't count.

14:26:01  21         Now, there are some other cases that you could find

14:26:04  22  that would go the other way, that would say there are instances

14:26:06  23  where lists of examples are okay.  But in those cases, it's

14:26:10  24  because the word that you're giving examples of is confusing,

14:26:14  25  that you need to give examples so that the person could even

14:26:17 1 understand what the word means.  Or it's technical.

14:26:20 2          Nothing about "demographic characteristic" is

14:26:23 3 confusing.  And when the very list they've proposed includes

14:26:29 4 seven terms but not the first word in their own list on the Web

14:26:32 5 site, it's suspicious.  And the only -- again, we are concerned

14:26:36 6 that what this becomes is a long checklist.  And if the thing

14:26:40 7 that matters in the evidence isn't on the checklist -- and we

14:26:43 8 don't know what all the evidence is going to be at this

14:26:45 9 point -- the jury will get confused.

14:26:47 10          Your Honor, that's all that I have on that term.  And

14:26:49 11 if there are no questions from the Court, I will sit down.

14:26:51 12          THE COURT:  None at all.  Thank you.

14:26:53 13          MR. GAUDET:  Thank you.

14:27:06 14          MR. RILEY:  Good afternoon, Your Honor.  First,

14:27:08 15 before we turn to the claim construction in claim 5, with

14:27:13 16 regard to the document from David Kappos, we agree that the

14:27:18 17 Patent and Trademark Office changed some of its policies.  Our

14:27:22 18 point was the PTO never told Affinity that it needed to change

14:27:26 19 to the term "storage medium" which was used in the

14:27:32 20 specification that had been on file for 10 years before this

14:27:35 21 memorandum came out.

14:27:36 22          Turning to the claim, I think there is a profound

14:27:41 23 disagreement that we have with Affinity on this claim

14:27:46 24 construction.  Affinity, it is clear, reads this claim on any

14:27:51 25 type of information whatsoever.  It could cover text messages,

14:27:56　1　E-mail, photographs.  In Affinity's view, audio information is

14:28:02　2　anything.  And that's just not true.

14:28:06　3　　　　　If we look at slide 44, I want to go through our

14:28:11　4　construction -- the defendant's proposed construction and why

14:28:14　5　we believe this is clearly compelled by the intrinsic evidence.

14:28:18　6　　　　　The defendants' proposed construction, you have to

14:28:22　7　read it in the context of the full claim.  The full claim,

14:28:27　8　which doesn't relate simply to audio information says, "Wherein

14:28:30　9　the storage medium," -- again, the storage medium in the

14:28:34　10　phone -- "further comprises instructions" -- so in addition to

14:28:37　11　the application that's been downloaded, the storage medium

14:28:41　12　comprises instructions -- "to enable display of on-demand audio

14:28:46　13　information selectable by a user."

14:28:49　14　　　　　And, frankly, when I first read that, I thought

14:28:51　15　"audio information"?  What is that?  Is that information about

14:28:54　16　audio?  But when you read the specification, you'll see they

14:28:58　17　have a very specific definition for "audio information," which

14:29:01　18　is not what I believe a layperson would include for audio

14:29:05　19　information.  And so to make some sense of this and the very

14:29:10　20　vague term "audio information," we proposed a construction,

14:29:16　21　"Wherein the storage medium further comprises instructions to

14:29:21　22　enable display of information identifying particular sound

14:29:25　23　recordings playable over a communications link when selected by

14:29:28　24　a user."

14:29:29　25　　　　　Because this speaks to the issue, how do you display

14:29:33 1  audio, since, as counsel admits, you don't see a sound wave?

14:29:36 2  Well you display audio in the context of this patent by

14:29:39 3  displaying information about that audio, which is exactly why

14:29:43 4  the construction contains that point.

14:29:45 5         So to understand this, we have to start with three

14:29:49 6  different terms that are used:  "Audio information," the

14:29:53 7  meaning of "to display audio information," and the meaning of

14:29:57 8  "on-demand."

14:30:00 9         Well, turning to slide 45, "audio information," as

14:30:03 10  used in this patent, is what you play and listen to.  And

14:30:08 11  again, I think most lay people on the street, if you said,

14:30:11 12  Could you provide me some audio information? they might think

14:30:14 13  you're asking for information about the song that they're

14:30:17 14  listening to or the volume of the song.  That's audio

14:30:28 15  information.  But, in this patent, audio information means

14:30:28 16  audio content, what you play and listen to.

14:30:29 17         And this is just one example of the way it's used in

14:30:31 18  the patent:  "Upon receiving the selected audio information, a

14:30:35 19  user may access and play the received audio information ..."

14:30:39 20  You're actually playing it so you can listen to it.

14:30:43 21         And, in fact, if you look at the next slide, 46, it's

14:30:46 22  explicit.  A user listens to audio information.  "Audio

14:30:51 23  information communicated to electronic device 907 may be

14:30:55 24  transferred to audio system 902 such that a user may listen to

14:31:00 25  selected audio information."

14:31:02 1    So I'm playing the audio information; I'm listening

14:31:06 2 to it.  And in the context of this patent, this audio

14:31:11 3 information necessarily has to be recorded at some point.  It's

14:31:14 4 sitting on a server somewhere, and it's being streamed or

14:31:17 5 downloaded to the device.  So the audio information can be the

14:31:22 6 actual content or, as in these examples, the audio information

14:31:27 7 is the actual content which is stored on the server.

14:31:31 8    And then the point is made here -- and I want to go

14:31:38 9 through the provision in the spec in detail -- but "'audio

14:31:42 10 information' does not include other types of selectable

14:31:44 11 information, such as video and text."  Otherwise, they would

14:31:47 12 try to read this patent on all forms of information -- photos,

14:31:51 13 text messages, you name it.

14:31:53 14    Well, let's look at the very concluding paragraph of

14:31:56 15 the specification which counsel pointed to and which is in our

14:32:00 16 slide.  So this is sort of the wrap-up paragraph, and it says,

14:32:08 17 "The present invention is not limited to communicating only

14:32:12 18 audio information."  Then it makes this point -- because it's

14:32:17 19 only been talking about audio information.  Then it says, "One

14:32:20 20 skilled in the art can appreciate that other types of

14:32:24 21 information" -- it's contrasting audio information with other

14:32:30 22 types of information -- "such as video, textual, et cetera, may

14:32:34 23 be communicated utilizing the systems and methods disclosed

14:32:38 24 herein without departing from the spirit and scope of the

14:32:43 25 present invention."

14:32:43 1      And then it uses the term "information" clearly in
14:32:46 2  reference to audio information.  "Additionally, it will be
14:32:52 3  understood that information may be formatted in a plurality of
14:32:54 4  ways at different phases of communication without losing the
14:32:59 5  underlying content of the selected information.  For example,
14:33:02 6  an audio file may be formatted, segmented, compressed,
14:33:06 7  modified, et cetera, for the purpose of providing or
14:33:09 8  communicating the audio invention."
14:33:11 9      What this means is, particularly in a digital
14:33:15 10 transfer, I take my audio sound waves and I digitize it.  For
14:33:23 11 purposes of transfer, I usually compress it so there are not as
14:33:27 12 many bits.  So I've compressed it, I transfer it, and then it's
14:33:30 13 decompressed, and then it's played.  And so they're saying
14:33:35 14 audio information is used in this patent, or the shorthand
14:33:38 15 version, "information," in all forms -- the analog form, the
14:33:44 16 uncompressed digital form, the compressed digital form, the
14:33:49 17 uncompressed digital form, and then, finally, back to the
14:33:53 18 analog form.
14:33:54 19      Then it goes on and says, "Therefore, the term 'audio
14:33:58 20 information' or 'information'" -- and again, it's just referred
14:34:00 21 to information -- "is used in a general sense to relate to
14:34:03 22 audio information in all phases of communication."
14:34:09 23      So it's saying this patent is about audio
14:34:12 24 information.  Now, we think it could be used for other kinds of
14:34:15 25 information, such as video, textual, et cetera.  But when we

14:34:19 1  use the phrase "audio" or "audio information," we refer to it

14:34:21 2  in all of its forms and phases.  That's all it says.  This

14:34:25 3  patent does not include within its scope video and text.

14:34:29 4          Well if that's true, if as we've seen that audio

14:34:37 5  information is what you play and what you listen to, then what

14:34:42 6  does it mean to display audio information?

14:34:45 7          Well, to display audio information is to provide some

14:34:48 8  information about the audio information that you're listening

14:34:51 9  to.  And here's the example.  This is straight from figure 4 of

14:34:55 10 the patent.  Figure 4 illustrates a graphical user interface, a

14:35:04 11 graphical user interface, for displaying selectable audio

14:35:06 12 information.

14:35:07 13         So the way that you display audio information is you

14:35:10 14 don't try and display the sound wave, you instead display

14:35:15 15 something like the title that identifies the audio

14:35:19 16 information.  And, again, that's what's going on here.

14:35:26 17 Figure 4 illustrates a graphical user interface for displaying

14:35:26 18 selectable audio information.

14:35:28 19         And there is a -- a little display there that says

14:35:31 20 station 01.  So when you're listening to a station, it will

14:35:35 21 display the call signals or the call number for that station.

14:35:39 22 That's what displaying selectable audio information is.  That's

14:35:43 23 the way in which you display information in the context of this

14:35:51 24 patent.

14:35:52 25         So, again, we have audio information, information

14:35:54 1 that you listen to and play. You display audio information by

14:35:57 2 identifying information, such as the title, the name. That's

14:36:04 3 the way you display it.

14:36:06 4 Well, then the next part of construction, what does

14:36:08 5 it mean to be "on-demand"? And here "on-demand" is contrasted

14:36:15 6 with passive reception. I think we would all agree, when

14:36:18 7 you're listening to a radio station, you have no control over

14:36:21 8 content, except to turn it off or change the channel.

14:36:25 9 "On-demand", by contrast, is interactive. And in

14:36:28 10 on-demand, you can select particular tracks to play, you can

14:36:36 11 select particular albums, songs. There's some interaction

14:36:39 12 between the user and, as this patent calls it, the audio

14:36:43 13 information.

14:36:44 14 And this comes directly from the specification at

14:36:48 15 column 16, line 19. "The present invention may be configured

14:36:55 16 plurality of ways to communicate desirable audio information to

14:37:00 17 users by allowing users to select desirable audio information

14:37:04 18 and transmitting the desirable audio information to a specified

14:37:08 19 destination" -- and here's the key language -- "thereby

14:37:11 20 allowing a user to receive on-demand customized audio

14:37:16 21 information." And that's where "on-demand" appears in the

14:37:20 22 specification.

14:37:21 23 And here is a flowchart that is in the patent that

14:37:25 24 shows how this method proceeds. The user accesses a Web page

14:37:31 25 via the Internet. And, again, that's the network-based

14:37:35 1  resource that we talked about in claim 1.  The user selects the

14:37:39 2  audio information, I select particular songs I want to listen

14:37:41 3  to, I can create a customized playlist, and then that is

14:37:49 4  transmitted.

14:37:50 5       And the process of transmitting the desirable audio

14:37:52 6  information to a user destination specified -- I want it on my

14:37:57 7  cell phone -- allows a user to receive on-demand, and in this

14:38:02 8  case, on-demand customized audio information, because I've

14:38:05 9  customized it to my particular preferences.

14:38:08 10       Now, the definition of "on-demand" that is inherent

14:38:12 11  in the specification is also consistent with the way in which

14:38:16 12  it's used in the art.

14:38:19 13       In 1995, five years before the filing of this patent

14:38:24 14  application, the Congress passed a law, the Digital Performance

14:38:28 15  Right in Sound Recordings Act of 1995 which is shown here in

14:38:33 16  this House Report Number 104-274.  This established different

14:38:39 17  licensing protocols for on-demand services versus, say,

14:38:45 18  streaming services.  And the Congress adopted a definition

14:38:48 19  which fits perfectly with what the defendants are proposing

14:38:52 20  here, which is consistent and, in fact, compelled by the

14:38:55 21  specification.

14:38:57 22       "Audio-on-demand" -- or in the terms of this patent,

14:39:02 23  audio information on-demand -- "will be interactive services

14:39:06 24  that enable a member of the public to receive, on request, a

14:39:10 25  digital transmission of the particular recording that person

14:39:15  1  wants to hear." That's the nature of, as used in the patent,

14:39:20  2  on-demand audio information. Well, given what we've covered

14:39:28  3  through the patent, what does it not include? And it's clear

14:39:31  4  that on-demand information cannot include live streaming audio

14:39:35  5  broadcasts, because that's not on-demand. I tune in to station

14:39:39  6  98.1, and I am subject to their preferences, I'm subject to

14:39:43  7  their content, and all I can do is change the channel or turn

14:39:47  8  it off.

14:39:50  9        If claim 5 included live streaming of broadcasts,

14:39:55  10  then it would be superfluous. Claim 5, as we discussed

14:40:02  11  earlier, adds an additional feature to the claim device;

14:40:05  12  namely, the ability to display on-demand audio information

14:40:08  13  selected by the user.

14:40:12  14        So, to summarize, given the fact that audio

14:40:18  15  information in this patent means not just information about the

14:40:26  16  audio, but the content itself, the audio content itself, this

14:40:29  17  claim really should be construed and it should be construed so

14:40:33  18  that the patent doesn't reach many other kinds of content.

14:40:38  19        So the claim term should be construed to mean,

14:40:40  20  "wherein the storage medium further comprises instructions to

14:40:45  21  enable display of information identifying particular sound

14:40:49  22  recordings" -- that's how you display the information --

14:40:53  23  "identifying particular sound recordings playable over a

14:40:57  24  communications link when selected by a user." This includes

14:41:01  25  the concepts of on-demand and audio information and displaying

14:41:06 1  audio information.

14:41:12 2          And that concludes what I want to say about that

14:41:14 3  claim term, Your Honor.  So now moving to "log-in."

14:41:20 4          The defendants' proposed construction is,

14:41:23 5  "Information identifying a user such as a user name or

14:41:26 6  password."  Now, we heard from Affinity's counsel that when he

14:41:33 7  goes to a law firm or perhaps to a hotel, he logs in to the

14:41:38 8  Wi-Fi and he uses a guest ID -- Madison guest, Omni guest --

14:41:45 9  and that doesn't identify him as a person -- a particular

14:41:49 10 person.  And that's true.  But that's not the context of this

14:41:53 11 claim.  Again, we have to read these terms in the context of

14:41:56 12 the entire claim.

14:41:58 13         Look at the context of this claim.  It says, "The

14:42:00 14 system of claim 1, wherein the storage medium further comprises

14:42:04 15 instructions to receive a log-in from a user of the wireless

14:42:09 16 cellular telephone device" -- this is the key term -- "and to

14:42:12 17 display a preferred user environment associated with that

14:42:17 18 user."

14:42:19 19         When I logged in this morning to the hotel Wi-Fi and

14:42:24 20 I typed in the guest ID, it didn't give me anything that was

14:42:29 21 special to me.  It was just a generic page that came up.  But

14:42:33 22 what this patent is talking about is displaying a preferred

14:42:37 23 user environment associated with the user.

14:42:40 24         Therefore, when you log in, you've got to provide

14:42:43 25 some information that allows the system to identify you as

14:42:48  1  opposed to just being an anonymous guest.  That is why the

14:42:53  2  construction that's proposed by the defendants here is

14:42:55  3  correct.  And it's not only correct, it's what comes from the

14:42:59  4  specification.

14:43:00  5       The only log-in that's discussed in the specification

14:43:03  6  is one in which the user name is given a particular user and a

14:43:07  7  password.  And this is consistent with other forms of

14:43:11  8  personalized interaction such as with your bank account.  If I

14:43:18  9  loaned you my phone to go to your bank, you could use the

14:43:21  10  application that says Wells Fargo.  But you would have to type

14:43:25  11  in your user name and your password.  And when you did that,

14:43:30  12  you would get a response that was a personalized environment.

14:43:34  13  If I typed in my user name and my password, I would get an

14:43:38  14  environment that was personalized to me.  And that's the

14:43:42  15  critical context which Affinity would read out all of that

14:43:47  16  language about preferred user environment.

14:43:51  17       Now, Affinity criticizes the defendants for offering

14:43:55  18  a series of examples to specify this -- in this case, the user

14:44:01  19  name and the password.  But, in fact, courts routinely provide

14:44:07  20  that, particularly when you're dealing with a term like

14:44:09  21  "log-in."  And in this case, not just any log-in, but a log-in

14:44:13  22  that is connected with a personal environment.  Then it is

14:44:20  23  appropriate to give a list.

14:44:21  24       And we've cited here a couple of cases, the

14:44:25  25  *Walt Disney* case construing URL.  Some people know what URL

14:44:30  1  means; some people don't.  So the Court provided an example, "a

14:44:33  2  reference identifying the location of information segments,

14:44:37  3  such as Web pages, audio clips, images, and the like."

14:44:41  4          Similarly construing a "block" in that case.  Because

14:44:44  5  it dealt with data, "block" was construed to include "a group

14:44:48  6  of bits, such as a character, word, or other unit of data."

14:44:56  7          Finally, extrinsic evidence is consistent with what

14:45:04  8  we have proposed as the "log-in."  And we've provided

14:45:06  9  dictionary definitions where "log in" means to enter

14:45:10 10  identifying data as a name or password into a system.

14:45:14 11          So, in short, in this case, in the particular context

14:45:18 12  of the claim that we are construing, where the claim language

14:45:23 13  is "to log in and display a preferred user environment

14:45:28 14  associated with the user," the construction proposed by the

14:45:34 15  defendants is clearly correct.

14:45:38 16          Now turning to the question of "demographic."  Claim

14:45:46 17  21, the claim language is, "advertisements are targeted to a

14:45:55 18  specific demographic."  And this is a case in which the term

14:45:59 19  "demographic," I believe, is not familiar to many people.  Some

14:46:04 20  people use the term "demographic" correctly to refer to the

14:46:07 21  results of a demographic study.  Can you provide the

14:46:11 22  demographics for the population of Hattiesburg, Mississippi?

14:46:15 23  And I would say, well, the demographics are as following:

14:46:18 24  Thirty-four percent of the people fall below the poverty line.

14:46:22 25  That would be demographic.  But it's not in the sense of this

14:46:25 1  claim, where it's directed to a specific demographic related to

14:46:30 2  the user.

14:46:31 3          And so to make this clear, Your Honor, we had

14:46:34 4  proposed "advertisements are selected based on a population

14:46:38 5  characteristic provided by the user, such as the user's race,

14:46:44 6  gender, age, income, profession, or education level."

14:46:48 7          And if the plaintiffs want to add ZIP code, we're

14:46:52 8  fine with adding ZIP code -- adding the user's ZIP code.  We

14:46:57 9  think this would be helpful and illustrative, just like the

14:47:01 10 *Disney* case, to explain what we mean by a demographic.  We

14:47:05 11 don't mean the actual study of a population.  We mean

14:47:09 12 particular characteristics of a population.

14:47:15 13         And this use of "demographic" is clearly commanded by

14:47:17 14 the specification.  The specification talks about "transmitting

14:47:23 15 advertisements to the electronic device, wherein the

14:47:26 16 advertisements are targeted to a specific demographic."  And

14:47:30 17 there they don't mean a study.  They mean a specific population

14:47:33 18 characteristic.

14:47:34 19         And that's what's said.  It said, "A user may also

14:47:38 20 provide demographic information allowing advertisers to access

14:47:45 21 demographic information and provide the advertisements based

14:47:48 22 upon the demographic information" provided by the user.  And

14:47:53 23 one of the examples that is given here is a target -- is

14:47:58 24 targeted to a particular group of users.

14:48:01 25         And in this slide it says, "For example, an

14:48:06 1  advertiser may want to target Hispanic females in the 20- to

14:48:11 2  25-year-old age group." That particular user has identified

14:48:16 3  herself as Hispanic. That particular user has identified

14:48:20 4  herself as being in this age group. And, therefore, the

14:48:23 5  advertisers can target a particular ad to that individual.

14:48:32 6      The terms that we have proposed here for

14:48:34 7  "demographic" are also consistent with dictionary definitions

14:48:40 8  and, thus, consistent with extrinsic evidence.

14:48:43 9      In their presentation, Affinity criticizes this

14:48:48 10 particular use of examples, even as in another one of their

14:48:51 11 claim terms they provide examples, and cites four cases which

14:48:56 12 are all distinguishable, and I think in very important ways,

14:48:59 13 distinguishable.

14:49:00 14     Affinity cites the *Cybergym* case. And in that case

14:49:05 15 the Court rejected a claim construction that said, "The

14:49:12 16 preferred defining examples of computer network is the

14:49:17 17 TCP/IP protocol." We're not asking any sort of preferred

14:49:19 18 examples. We're asking for examples that are compelled by the

14:49:25 19 specification

14:49:26 20     In the *Orion* case it referred to specifications for

14:49:31 21 the parts. And the Court found that specification for the

14:49:34 22 parts require no further elaboration because specification

14:49:39 23 meant what size of the parts, part numbers, and so forth. No

14:49:44 24 reason to give examples -- again, not using a term like

14:49:48 25 "demographic" which can be ambiguous, confusing, and have

14:49:52 1 different meanings.

14:49:58 2          Finally, the plaintiffs cite two more cases, Storage

14:49:58 3 Technology, a case from the Northern District of California

14:50:02 4 which Judge Illston held.  And in that case, the party wanted

14:50:06 5 to put into the construction of the claim examples that were in

14:50:10 6 a dependent claim.  That couldn't be correct.

14:50:13 7          And then, finally, in the *P.A.T.* case, the plaintiff

14:50:19 8 proposed to give as an example of the term "vehicle" a police

14:50:22 9 car, even though it was clear from the specification that it

14:50:28 10 wasn't limited to either police cars or law enforcement or

14:50:32 11 anything of the nature.  It could apply to any kind of car, any

14:50:36 12 kind of vehicle.  In fact, as the Court said, any form of

14:50:39 13 conveyance or transport.

14:50:44 14          So that concludes our presentation, your Honor.

14:50:48 15          THE COURT:  Very good.

14:50:53 16          MR. GAUDET:  Your Honor, could we do brief responses

14:50:55 17 again?

14:50:55 18          THE COURT:  Yeah.  But don't take more than about

14:50:58 19 three minutes.  I think this is very clear, both what your

14:51:02 20 positions are in these dependent claims.  But go ahead if you

14:51:06 21 want to take a couple of minutes, but I don't think I need much

14:51:08 22 here.

14:51:10 23          MR. GAUDET:  Okay.  Your Honor, one point that I did

14:51:12 24 want to just be sure we're clear on and so the record is clear

14:51:15 25 on this important issue about what was said or wasn't said in

14:51:18  1  connection with the storage medium amendment and that

14:51:21  2  memorandum from the Patent Office.

14:51:23  3       I think the defendants' counsel suggested that their

14:51:27  4  point now was that there is no indication that the office --

14:51:32  5  the Patent Office discussed this or said anything to the

14:51:36  6  patentee about, Hey, you can't use that anymore.

14:51:39  7       Well, two pages after the amendment in the same

14:51:41  8  remark, there's a statement of the substance of the interview.

14:51:44  9  In other words, there was an interview between the applicant

14:51:47 10  and the examiner about this very issue.  And what's so

14:51:53 11  fascinating about it is let's look at what the remarks were

14:51:58 12  about why that was made.

14:52:00 13       Regarding -- and this is Exhibit 7.  I want to be

14:52:03 14  clear of this on the record.  This is Exhibit 7 to our opening

14:52:06 15  brief, page 7.  At this point now they've had added this

14:52:11 16  language "storage medium" and taken out is computer readable in

14:52:17 17  view of the 101 issues and then you had to have support for it.

14:52:21 18       And they said, "Regarding the 112 first paragraph

14:52:23 19  rejection, claim 1 has been amended to recite 'a non-transitory

14:52:29 20  storage medium.'"  Well, if the defendants were correct, you

14:52:32 21  would think he would say, Of course I mean the cell phone.

14:52:33 22  That's over there in figure 3, as you kept seeing over and over

14:52:36 23  again.

14:52:37 24       He says exactly the opposite:  "Support exists

14:52:40 25  throughout the specification for the storage medium.  For

14:52:43  1  example, reference can be made to figure 1," the network

14:52:47  2  server.  And then he goes on to say, I'm not saying that

14:52:52  3  "storage medium" means special and different than the other

14:52:57  4  words that I've use to describe "storage."  So he says,

14:53:00  5  "Furthermore, it must be remembered that there no *in haec*

14:53:04  6  *verba*" -- *i.e.,* exactly the same language -- "required that the

14:53:07  7  exact language appear in the claims as the specification."

14:53:11  8          He definitively rejects the entire premise of the

14:53:14  9  defendants' position that the mere use of that word somehow was

14:53:17  10  made as magical incantation that I'm only talking about the

14:53:22  11  cellular phone in figure 3.  Those are the facts and what

14:53:26  12  actually happened in the prosecution.

14:53:27  13          You know, Your Honor, with respect to other dependent

14:53:30  14  claims, as I'm going through my notes, I think we've covered

14:53:34  15  it.  And we very much appreciate your time today, Your Honor.

14:53:37  16          THE COURT:  Thank you.  Mr. Riley, anything further?

14:53:40  17          MR. RILEY:  I have nothing to add.  Thank you.

14:53:41  18          THE COURT:  All right.  Well, as I said this morning,

14:53:44  19  I want to thank you for what I think was a very good

14:53:47  20  presentation.  I think both of the presentations were pretty

14:53:54  21  straightforward, which I can tell you is a breath of fresh air

14:53:58  22  in this business.  I don't often get totally straightforward

14:54:04  23  presentations.  I think we know of what the issues are and

14:54:07  24  where the problems arise.

14:54:10  25          I would -- I generally used to always make the

14:54:14  1  comment that, unfortunately, in cases like this they're not as

14:54:18  2  clear to me as they are to each side, who thinks they're

14:54:22  3  perfectly clear and should go one way or the other.  But I made

14:54:25  4  that comment earlier this week and found it addressed in the

14:54:28  5  newspaper saying, "Judge finds case extremely difficult," or

14:54:32  6  something to that effect.  Just because it's difficult to

14:54:36  7  determine which one of you is right doesn't mean the case is

14:54:39  8  very difficult.  So your claims construction terms are

14:54:42  9  submitted, they're under advisement, and the Court will deal

14:54:46  10 with them.

14:54:46  11         I would like to tell you I would have something out

14:54:49  12 to you immediately, but we have large dockets here, and I don't

14:54:53  13 want you to get antsy.  We will produce something as quickly as

14:54:57  14 we can, but there's no promises on exactly how quickly it will

14:55:03  15 be.  In the interim, you need to just hold your powder dry

14:55:07  16 until I get a claims construction order out.

14:55:10  17         What will happen is, when I get the claims

14:55:12  18 construction order to you, it will schedule the next scheduling

14:55:16  19 conference in it.  And that will be about 45 to 60 days from

14:55:21  20 the date of the order.  And you will be instructed, and I'll

14:55:25  21 give you the heads-up now, to sit down once you see how the

14:55:27  22 Court intends to construe the disputed claims and see if you

14:55:32  23 can get the case settled.  If you can't get it settled, that's

14:55:35  24 fine, but I know often cases settle after claims construction.

14:55:39  25         You are to use that time to come up and to work

14:55:43  1  together to try to come up with a proposed schedule for the

14:55:48  2  rest of the case to get it then from claims construction to

14:55:52  3  trial.

14:55:52  4       Now, we do not have patent rules in the Western

14:55:55  5  District of Texas, and there's a whole variety of reasons for

14:55:59  6  that.  We will not have any patent rules by the time we get to

14:56:02  7  your case.  The big reason is the District is extremely large

14:56:06  8  and multicultural.  The Western District of Texas contains, for

14:56:10  9  instance, 4,000 more square miles than the State of Utah, if

14:56:15  10  you want to get an idea for the size of Texas.

14:56:18  11       None of our divisions are very much the same.

14:56:21  12  El Paso and its docket is totally different from Austin which

14:56:25  13  is totally different from Waco which is totally different from

14:56:29  14  Del Rio which is totally different from San Antonio.  Most of

14:56:33  15  the patent cases occur in Austin and San Antonio, and, of

14:56:38  16  those, the very large majority of the cases are in the Austin

14:56:42  17  Division.

14:56:43  18       We have two judges here.  We're each assigned half of

14:56:47  19  the cases, and we have large dockets other than patent cases.

14:56:52  20  So Judge Sparks and I have found it almost impossible to come

14:56:58  21  up with patent rules, even in this division, and it's really

14:57:03  22  difficult district-wide.  The problem in Austin is many of you

14:57:08  23  have partners who probably think their antitrust case and their

14:57:12  24  securities case are every bit as important as your patent case

14:57:16  25  is, and so with the size of our docket, we can't give you

14:57:19  1  priority on the docket.

14:57:21  2          As you think about scheduling, if you're unable to

14:57:25  3  settle this case, what I am willing to do, because I do

14:57:27  4  recognize that patent cases take more time than the average

14:57:31  5  bear and are more difficult to try, is when we discuss a trial

14:57:40  6  setting, we'll take you to an available trial month I have

14:57:44  7  where I haven't set anything.  And we'll be more than happy,

14:57:48  8  depending -- and I won't know how far out that is until we get

14:57:52  9  there -- to give you a number one setting in that month.

14:57:55  10         And then I would tell anybody who came up later, I

14:57:58  11 have a patent case set in front of you.  If you want to take

14:58:01  12 the chance on that month, you may.  Otherwise, you can select

14:58:04  13 another month, but you will not have priority over other cases

14:58:08  14 I have on the docket for that month.  You'll just have to take

14:58:12  15 your chance.

14:58:13  16         If you look at the average number of cases that get

14:58:17  17 tried in this country and all the federal courts and you look

14:58:20  18 at all of the talk on the so-called vanishing jury trial, where

14:58:26  19 that intersects with you here, we do not try a larger

14:58:32  20 percentage of civil cases in Austin than the average division.

14:58:37  21 The problem is we're getting almost 1200 cases a year filed in

14:58:42  22 Austin, civil cases alone.  So that's roughly 600, a little

14:58:46  23 less, for Judge Sparks and roughly 600 for me.  And that's

14:58:50  24 increasing.

14:58:51  25         The Chamber of Commerce says there are 136 people a

| | | |
|---|---|---|
| 14:58:54 | 1 | day moving to Austin. That means you put more people in an |
| 14:58:58 | 2 | area, you're going to get more litigation and you'll get more |
| 14:59:01 | 3 | criminal cases. So that's the long way of telling you that |
| 14:59:03 | 4 | when I apply the same nationwide percentage of number of cases |
| 14:59:09 | 5 | that get tried on an increasingly larger gross number of cases, |
| 14:59:13 | 6 | you get a larger net number of cases. So that's why it's |
| 14:59:16 | 7 | difficult to work you in. |
| 14:59:18 | 8 | So what would behoove you, if you cannot get the case |
| 14:59:22 | 9 | settled, is to spend a good amount of time talking about how |
| 14:59:25 | 10 | you can streamline discovery, how you can streamline |
| 14:59:28 | 11 | dispositive motion practice in order to get your case to trial, |
| 14:59:34 | 12 | if that's what you want to do with it. |
| 14:59:36 | 13 | I'm not going to try to talk you out of your trial. |
| 14:59:39 | 14 | I like to try cases. I would like to talk you out of your |
| 14:59:43 | 15 | dispositive motions. I dislike intensely dispositive motions. |
| 14:59:47 | 16 | I don't care anything for summary judgments. If I could pass |
| 14:59:50 | 17 | one law, it would be that we would do away with that altogether |
| 14:59:54 | 18 | and you would either settle your case or we would go to trial |
| 14:59:57 | 19 | in it. |
| 14:59:57 | 20 | But what that means to you is it doesn't mean that I |
| 15:00:01 | 21 | don't grant summary judgments. But that's going to delay your |
| 15:00:04 | 22 | trial more than any other aspect because I get dispositive |
| 15:00:07 | 23 | motions in 100 percent of my civil cases. We work hard around |
| 15:00:13 | 24 | here. But if you have a dispositive motion in every civil |
| 15:00:17 | 25 | case, and that means a lot -- a large number of them are |

15:00:21 1  frivolous, we still have to spend the time on not just your

15:00:26 2  case, but the 20 or 30 cases that are going to be moving along

15:00:29 3  on same time line, generally, your case is. And I don't get

15:00:33 4  the luxury my state colleagues get of just being able to say

15:00:37 5  "granted" or "denied." I have to write a reasoned opinion on

15:00:42 6  them.

15:00:42 7         So I will tell you that you don't need to even think

15:00:47 8  about getting a trial date until about 120 days after your

15:00:53 9  dispositive motions deadline, maybe even longer, because it

15:00:57 10  will take about a month to get in responses and replies. I

15:01:01 11  don't look at those until I get responses and replies so I can

15:01:05 12  look at the entire package. And then, because of all of the

15:01:10 13  other dispositive motions we have and the need to fit them in

15:01:13 14  to all of the other things that I'm doing, it takes a good long

15:01:17 15  time. So factor that in when you're thinking about how much

15:01:20 16  time you need.

15:01:21 17         I urge you to only file a dispositive motion if you

15:01:25 18  honestly, in your very best professional judgment, believe it

15:01:29 19  can be granted. Don't file it because your clients want you to

15:01:36 20  do everything you can do to win the case, which means filing

15:01:40 21  every motion known to man. Don't file it because you have a

15:01:43 22  pleadings checklist that says we always file a dispositive

15:01:46 23  motion.

15:01:47 24         Look at it. Use your judgment. If you're going to

15:01:50 25  file a dispositive motion, file it only if you think, as I

15:01:53  1  said, in your best professional judgment you think you can get

15:01:56  2  it granted, and then only on the issues that you think really

15:01:59  3  you can get it granted on.  Otherwise, it may even take longer

15:02:03  4  than what I've told you for me to get to it and get it worked

15:02:07  5  out.  That's the real problem here.

15:02:09  6       So those are things to be thinking about.  We will

15:02:15  7  get to this and get something out hopefully -- well, I won't

15:02:19  8  give you a prediction, but as quickly as we can on this.  So I

15:02:22  9  appreciate your efforts here this week.  I've enjoyed being

15:02:25  10 with you on both the tutorial and the claims construction

15:02:28  11 hearing and look forward to working with you in the future.

15:02:32  12       The case is in recess.

15:02:34  13    (End of transcript)

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1    **UNITED STATES DISTRICT COURT        )**

2    **WESTERN DISTRICT OF TEXAS           )**

3        I, Arlinda Rodriguez, Official Court Reporter, United

4    States District Court, Western District of Texas, do certify

5    that the foregoing is a correct transcript from the record of

6    proceedings in the above-entitled matter.

7        I certify that the transcript fees and format comply with

8    those prescribed by the Court and Judicial Conference of the

9    United States

10       WITNESS MY OFFICIAL HAND this the 8th day of April 2013.

11

12                              /S/ Arlinda Rodriguez
                                Arlinda Rodriguez, Texas CSR 7753
13                              Expiration Date:  12/31/2014
                                Official Court Reporter
14                              United States District Court
                                Austin Division
15                              501 West 5th Street, Suite 4152
                                Austin, Texas 78701
16                              (512) 391-8791

17

18

19

20

21

22

23

24

25