FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

2014 APR 29 PM 2: 18

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | | |
|---|---|---|
| AFFINITY LABS OF TEXAS, LLC, | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | |
| | § | |
| CLEAR CHANNEL BROADCASTING, | § | |
| INC.; CUMULUS MEDIA, INC.; AND | § | CIVIL ACTION NO. 1:12-CV-205-LY |
| UNIVISION INTERACTIVE MEDIA, INC. | § | |
| | § | |
| DEFENDANTS. | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER
## ON CLAIM CONSTRUCTION

Before the court are the parties' Joint Claim Construction Statement filed January 4, 2013 (Clerk's Doc. No. 84); Plaintiff Affinity Labs of Texas, LLC's Opening Claim Construction Brief filed January 18, 2013 (Clerk's Doc. No. 89); Defendants Clear Channel Broadcasting, Inc., Cumulus Media, Inc., and Univision Interactive Media, Inc.'s Opening Claim Construction Brief filed January 18, 2013 (Clerk's Doc. No. 90); Defendants' Reply Claim Construction Brief filed February 8, 2013 (Clerk's Doc. No. 93); Plaintiff's Reply Claim Construction Brief filed February 8, 2013 (Clerk's Doc. No. 94); and the parties' claim-construction presentations.

The court held a claim-construction hearing on February 22, 2013. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). After considering the patent and its prosecution history, the parties' claim-construction briefs, the applicable law regarding claim construction, and argument of counsel, the court now renders its order with regard to claim construction.

## I.  Introduction

The court renders this memorandum opinion and order to construe the claims of the patent-in-suit in this cause, U.S. Patent No. 7,970,379 ("the '379 patent").  Plaintiff Affinity Labs of Texas, LLC ("Affinity") asserts claims against Defendants[1] Clear Channel Broadcasting, Inc., Cumulus Media, Inc., and Univision Interactive Media, Inc. for infringement of the '379 Patent.  Clear Channel, by counterclaim, seeks declaratory judgments of both noninfringement and invalidity of the '379 Patent.  The asserted patent generally relates to systems and methods for wirelessly communicating selective broadcast information to an electronic device.

## II.  Legal Principles of Claim Construction

Determining infringement is a two-step process.  *See Markman,* 52 F.3d at 976 ("[There are] two elements of a simple patent case, construing the patent and determining whether infringement occurred . . . .").  First, the meaning and scope of the relevant claims must be ascertained.  *Id.* Second, the properly construed claims must be compared to the accused device.  *Id.*  Step one, claim construction, is the current issue before the court.

The court construes patent claims without the aid of a jury.  *See Markman* 52 F.3d at 979. The "words of a claim 'are generally given their ordinary and customary meaning.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Vitronics Corp v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.  *Id.* at 1313.  The person of ordinary skill in the art is deemed

---

[1]  Because the claim-construction arguments of Clear Channel, Cumulus, and Univision do not diverge, the court will refer to Defendants collectively as "Clear Channel."

2

to have read the claim term in the context of the entire patent. *Id.* Therefore, to ascertain the meaning of claims, courts must look to the claims, the specification, and the patent's prosecution history. *Id.* at 1314–17; *Markman*, 52 F.3d at 979.

Claim language guides the court's construction of claim terms. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

Claims must also be read "in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed.Cir.2002) (internal citations omitted). In the specification, a patentee may define a term to have a meaning that differs from the meaning that the term would otherwise possess. *Phillips*, 415 F.3d at 1316. In such cases, the patentee's lexicography governs. *Id.* The specification may also reveal a patentee's intent to disclaim or disavow claim scope. *Id.* Such intentions are dispositive for claim construction. *Id.* Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiment. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

The prosecution history is another tool to supply the proper context for claim construction because it demonstrates how the inventor understood the invention. *Phillips*, 415 F.3d at 1317. A patentee may serve as his own lexicographer and define a disputed term in prosecuting a patent.

*Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed.Cir.2004).   Similarly, distinguishing the claimed invention over the prior art during prosecution indicates what the claims do not cover.   *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed.Cir.1988).   The doctrine of prosecution disclaimer precludes patentees from recapturing specific meanings that were previously disclaimed during prosecution. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed.Cir.2003).   Disclaimers of claim scope must be clear and unambiguous.   *Middleton, Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed.Cir.2002).

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted).   Technical dictionaries and treatises may help the court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent.   *Id.* at 1318.   Similarly, expert testimony may aid the court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.*   Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*   Extrinsic evidence may be useful when considered in the context of the intrinsic evidence, *id.* at 1319, but it cannot "alter a claim construction dictated by a proper analysis of the intrinsic evidence." *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1139 (Fed. Cir. 2004).

## III.   Discussion

### A.   Disputed Terms

The parties dispute the construction of five terms.[2]  The following table summarizes the

parties' proposed constructions of the disputed terms.

| Claim Term/Phrase | Affinity's Proposed Construction | Clear Channel's Proposed Construction |
|---|---|---|
| 1.  "a non-transitory storage medium including an application configured for execution by the wireless cellular device"<br><br>(Claim 1) | [No construction necessary]<br><br>Or, if construed:<br>"a non-transitory memory including an application which has been configured for execution by the wireless cellular device" | "a non-transitory memory in the wireless cellular telephone device that stores an application which has been configured for execution by the wireless cellular device" |
| 2.  "to receive a streaming media signal in the wireless cellular device corresponding to the regional broadcasting channel"<br><br>(Claim 1)<br><br>"streaming media signal representing the regionally broadcasted content"<br><br>(Claim 14) | [No construction necessary] | "to receive in the wireless cellular telephone device as a streaming media signal a broadcast currently available on the regional broadcasting system"<br><br>(Claim 1)<br><br>"streaming media signal delivering content currently available on the regional broadcast"<br><br>(Claim 14) |

---

[2]     The parties present the same arguments about two phrases from Claim 1 and Claim 14 that contain similar language.  Thus, the court will consider and address both terms together.  Additionally, Affinity presents two terms from a "grandfather" patent that were previously construed by the United States District Court for the Eastern District of Texas.  Because Clear Channel does not seek construction of the terms, and Affinity concedes that it "does not believe these terms need to be construed," the court will not construe these terms or discuss them further.

| 3. "on-demand audio information selectable by a user" (Claim 5) | [No construction necessary] Or, if construed: "electronically transmitted information available for selection by a user such as songs, on-line radio stations, on-line broadcasts, streaming audio, video, text or other selectable information" | "information identifying particular sound recordings playable over a communications link when selected by a user" |
|---|---|---|
| 4. "log in" (Claim 7) | [No construction necessary] | "information identifying a user, such as a username or password" |
| 5. "advertisements are targeted to a specific demographic" (Claim 21) | [No construction necessary] Or, if construed: "advertisements are targeted to a population characteristic" | "advertisements are selected based on a population characteristic provided by the user, such as the user's race, gender, age, income, profession, or education level" |

1.  "a non-transitory storage medium including an application configured for execution by the wireless cellular device"

The parties' only dispute over this term centers on whether the nontransitory memory described in the claim must be located in the cellular telephone device or not. Clear Channel argues that the claims and specification require that the memory must be in the telephone device; Affinity counters that there is no support to so limit the claim. Primarily, Affinity asserts that no construction is necessary. However, Affinity also concedes that if construction is required, most of Clear Channel's proposal is acceptable, with the exception of the "in the wireless cellular telephone device that stores" clause.

Clear Channel first argues that the claim must be read as being divided into two separate clauses referencing first "a network based resource" and second a "a non-transitory storage medium . . . ." This plain reading, according to Clear Channel, shows that the storage medium must be

6

separate from the network-based resource and that the memory must be on the telephone device. Clear Channel further asserts that language of the claim itself requires the memory be in the telephone device.  Specifically, Clear Channel argues that the last line of Claim 1, reciting "the wireless cellular telephone device is configured to *receive the application* via an over the air download" (emphasis added), requires that the "application" be "include[ed]" in the device's "storage medium," which must, according to Clear Channel, be located in the cellular telephone device.

Clear Channel also argues that Claim 2's recital that "the storage medium further comprises instructions to further receive information about a song included in the streaming media signal" compels a reading that the memory must be in the phone.  Clear Channel reasons that if the "storage medium" were located outside the phone, the storage medium would not be able to receive information included in the streaming-media signal.  Additionally, Clear Channel argues that the "storage medium" is mentioned in the specification only in connection with the wireless device in FIG. 3 and that a "storage device" is described to explain what is stored on the network in FIG. 3. Finally, Clear Channel argues that the patentee, in traversing the Leeke reference during the patent's prosecution, disclaimed any possibility of the memory being located on the phone in order to obtain the grant of a patent.

Affinity argues that there is no basis to limit the claim in such a way as to require the memory to be located on the cellular telephone device.  Affinity asserts that the claim is broad enough, and is supported by the specification, to cover a broadcast system that has the nontransitory storage medium of Claim 1 located at a network-based server.  Affinity also argues that the language of Claim 1 requires that the application be capable of being received by a cell phone device via an over-

the-air download, consistent with its position that the memory is not required to be located on the phone.

Affinity further argues that Clear Channel's prosecution-disclaimer argument is incorrect. Specifically, Affinity asserts that the revision in response to the Leeke reference relied on a distinction in the claimed invention where the "application" can be executed on a wireless cellular device, which the patentee argues that the prior art lacks. Affinity adds that nothing in the specification or the prosecution history indicates that the telephone device was intended to be a structural limitation of the claim.

The court begins its inquiry by looking directly at the language of the claimed invention. *See Phillips*, 415 F.3d at 1314. A close parsing of the claim language simply does not support separating the clauses or importing Clear Channel's suggested limitation into the claim term. Although the language is broad and could be subject to a range of reasonable interpretations, Claim 1, read in light of the other claims and the specification, does not dictate that the memory where the application is stored must be located within the cellular telephone device. Where, as here, the claim language is broader than a disclosed embodiment, "it is well settled that claims are not to be confined to that embodiment." *DSW, Inc. v. Shoe Pavillion, Inc.,* 537 F.3d 1342, 1348 (Fed. Cir. 2008).

The court also finds unavailing Clear Channel's argument differentiating between the patent's use of "storage medium" and "storage device." There are several examples in the specification where the use of a storage medium and a storage device are not differentiated based on location. The court declines to accept such a narrow reading of the specification. Additionally, there is nothing in the patent or its prosecution history that indicates that the inventor intended the claimed invention to be limited to on-phone memory. To the contrary, the invention clearly contemplates

at least one embodiment with an over-the-air download of an application; to limit Claim 1 as Clear Channel seeks would impermissibly narrow the invention to exclude such an embodiment.

Finally, Clear Channel's prosecution-disclaimer argument involving the Leeke transversal fails. The patentee's statements distinguishing the invention from the prior art is neither clear nor unmistakable enough to convince the court that the patentee intended Claim 1 to be limited to only a memory device located in the cellular telephone device. *See Omega Eng'g*, 334 F.3d at 1325-26; *Schwing GmbH v. Putmzeister Aktiengesellschaft,* 305 F.3d 1318, 1324-35 (Fed. Cir. 2002) ("[P]rosecution history . . . cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter.").

The court concludes the term "a non-transitory storage medium including an application configured for execution by the wireless cellular device" means "**a non-transitory memory that stores an application which has been configured for execution by the wireless cellular device.**"[3]

2. "to receive a streaming media signal in the wireless cellular device corresponding to the regional broadcasting channel" and "streaming media signal representing the regionally broadcasted content"

The parties' arguments over this pair of claim terms may be reduced to a disagreement over the meaning of "corresponding" and "representing." Essentially, Clear Channel seeks an interpretation that the received streaming-media signal must be exactly the same as what is currently being broadcast by the regional broadcasting channel. Affinity, on the other hand, urges that no construction is necessary and that "corresponding" and "representing" are readily understood.

---

[3]       Throughout, the **bolded** terms indicate the court's adopted construction.

Clear Channel argues that Affinity is trying to enlarge the scope of the patent beyond what was actually invented, disclosed, and claimed. To aid in their argument, Clear Channel directs the court to examples from the specification where a user streams a radio broadcast over the Internet when the user is physically located outside of the radio coverage area. Clear Channel urges that the specification describes this happening essentially in real time, so that the user can hear the programming that is currently being broadcast in a distant location. Clear Channel argues that the specification, when read in the light of dependent Claim 3 and the prosecution history, dictates that the claim should be limited to "currently available" broadcast content. In sum, Clear Channel argues that the streaming-media signal, as defined in the patent, must be *exactly* what is being broadcast at any given time, without edits, cuts, or alteration. Moreover, although Clear Channel interprets "currently" as "generally currently available," it recognizes that there will be a slight delay from realtime and does not urge that "currently" means "simultaneous, identical, bit by bit, or second by second."

Affinity urges that the claim language is purposely broad and requires no construction. Affinity emphasizes that nowhere do the specification or claims require that the streaming signal be "the same as" or "identical to" the broadcast or that the regional broadcast be "currently available." Affinity points out that "currently available" is not described anywhere in the patent. Moreover, Affinity argues that the specification describes embodiments where broadcast content may be stored in a network location and selected by a user for delivery "off-line." Because an embodiment could feature content that is stored and delivered to a user "off-line," Affinity reasons, the broadcast cannot be limited to that which is "currently available" as Clear Channel suggests in its proposed construction. Further, Affinity argued at the claim-construction hearing that "representing" or

"corresponding" has an extremely broad meaning. In an example urged by Affinity, it is Affinity's position that a broadcast can be stored and edited and still "correspond to" the original broadcast upon which the new version is based.

The court believes that neither side presents a wholly appropriate construction for this pair of terms. On one hand, Clear Channel overreaches and urges too narrow of a construction. Neither the claim language, the specification, nor the prosecution history directly support narrowly construing the terms to encompass only "currently available" regional broadcasting content. The patent teaches more than just approximately real-time broadcasting of content over the Internet. However, the court believes that the terms require a construction beyond mere plain meaning, as Affinity urges. Although the words "corresponding" and "representing" are not so vague as to be unamenable to construction, their vagueness in the context of Claims 1 and 14 compels a definition. The court is concerned that the inherit ambiguity of "corresponding" and "representing," as used in these claims, will lead to an interpretation of the patent that reaches beyond what the patentee actually invented and disclosed to the Patent and Trademark Office.

The invention's purported purpose is to allow a user to consume "regionally broadcasted content" when the user is physically located outside of the range of that regionally broadcasted content. Although the specification never directly addresses this issue, it would be clearly understood by a person skilled in the art at the time of the invention that broadcasted content has some sort of temporal limitation to it. A broadcast occurs in realtime and to broadcast something implies content presentation that is happening during a specific time frame. A "broadcast" that originates in Seattle from 9:00 a.m. to 11:00 a.m. local time is a distinct unit of content that differs from a "broadcast" that occurs between 1:00 p.m. and 3:00 p.m. The contents of the "broadcast" are

the totality of what was made available to the regional listener on the regionally broadcasted channel. The difficulty with the terms "corresponding" and "representing" comes from the potential breadth of interpretation. Strictly speaking, a heavily edited and condensed 30-minute highlight segment derived from a two-hour broadcast segment may be said to "represent" or "correspond to" the two-hour live regional broadcast. Similarly, a stored radio broadcast that has been edited with different advertisements substituted for the regionally broadcast advertisements can fairly be said to "correspond to" or "represent" the original broadcast content. However, the claims of the patent, read in light of the specification and the prosecution history, simply do not support such a broad interpretation. The essence of the invention, discerned by a review of the specification and claims, is to allow a distant user the ability to consume broadcasted content that is the same as, or is essentially the same as, that which is broadcast in another geographical region. The patent does not require that the broadcast must be simultaneously happening and available to local listeners, just that the content that is streamed is essentially equivalent to what is broadcast regionally.

The court concludes that "to receive a streaming media signal in the wireless cellular device corresponding to the regional broadcasting channel" means: "**to receive a streaming media signal in the wireless cellular device that is the same as, essentially the same as, or equivalent to the content available on the regional broadcasting channel**." The court likewise concludes that "streaming media signal representing the regionally broadcasted content" means "**streaming media signal that is the same as, essentially the same as, or equivalent to the regionally broadcasted content**."

3.  "on-demand audio information selectable by a user"

Affinity primarily contends that this term does not require construction. However, if the term requires construction, Affinity urges the court to elect a construction similar to the definition of "audio information sources" adopted by the Eastern District of Texas after considering a related patent sharing the same specification. *See Affinity Labs of Tex., LLC v. BMW N. Am., LLC,* Civ. No. 9:08-cv-164 (E.D. Tex. Dec. 18, 2009).   Although the court's claim-construction order is well-reasoned and directed to related subject matter, this court does not find the construction urged by Affinity directly applicable to the disputed term in this case. The *BMW* court's construction was directed at the term "audio information *sources*." (Emphasis added).  The court concluded that the broad usage of "audio information" in the patent specification did not "amount to a restriction that would exclude the possibility that an 'audio information source' may maintain textual information." *Id.* at 19.  Parsing the order in context of the claims at issue in *BMW* and contrasting it with the currently disputed term, it is evident that the court was referring to the *sources* not being limited. Here, the disputed term is not an "audio information *source*," but rather is referring to the "audio information" itself.

Affinity also argues that the specification directly supports that audio information "encompasses *any information* about audio, including the audio itself." (Emphasis added).  In arguing that "audio information" can take multiple forms and is not limited to only "sound recordings," Affinity relies on the patent specification:

> The present invention is not limited to communicating only audio information. One skilled in the art can appreciate that other types of information, such as video, textual, etc. may be communicated utilizing the systems and methods disclosed herein without departing from the spirit and scope of the present invention. Additionally, it will be understood that information may be formatted in a plurality of

13

> ways at different phases of communication without loosing [sic] the underlying content of the selected information. For example, an audio file may be formatted, segmented, compressed, modified, etc. for the purpose of providing or communicating the audio invention. Therefore, the term "audio information" or "information" is used in a general sense to relate to audio information in all phases of communication.

('379 Patent, Col 3:15-23). This paragraph, Affinity contends, supports a broad reading of the claim language and therefore defeats the limitations Clear Channel seeks to impose. Further, Affinity argues that "audio information" is broad enough to encompass textual information about the audio content and is used in the context of displaying information about the audio content.

Clear Channel invokes the same passage from the specification and urges that the patentee distinguished "audio information" from other types of information, such as video and textual information. Clear Channel argues that audio information refers to an audio file, as distinguished from a video file or text file, and explicitly excludes other types of information that are not digital sound recordings. Further, Clear Channel argues that "audio information" cannot cover "any electronically transmitted information available for selection by a user."

Clear Channel also presents a definition of "on-demand" that is vigorously opposed by Affinity. Clear Channel directs the court to various extrinsic sources to define "on-demand" as content playable *over a communications link* when requested by a user. Clear Channel argues that it was well known in the art that "on-demand" content refers to a particular unit of content that a user can select and have played back when desired, as distinguished from "joining a program in progress or tuning into a radio station." Clear Channel also points to the only mention of "on-demand" within the specification. Clear Channel urges that the patent confirms that a user is said to receive on-demand audio when the user selects and receives "customized audio information." Although

14

Affinity does not present a distinct argument for "on-demand," it does assert that "on-demand" has broad meaning that extends beyond the narrow limitation proposed by Clear Channel.

At the outset, the court notes that the phrase "audio information" is used approximately 145 times throughout the '379 Patent. Moreover, "audio information" is used in various ways throughout the specification to refer to both the actual audio content this is being consumed, heard, or broadcast, and to refer to information *about* the content that is being consumed, heard, or broadcast. The court agrees with Clear Channel that the specification makes a clear distinction between "audio information" other types of "information" such as video information or textual information. The cited portion of the specification explains that the other types of information, for example, video information or textual information, may be communicated by methods described in the patent. However, the specification does not allow the inference that audio information is interchangeable with other types of information or that audio information subsumes all the other categories of information in the context of the patent. As plainly understood, the words "audio information" refer to a specific subset of information. Further, "on-demand audio information" is another, narrower subset of audio information.

The court next turns to the claim language itself for guidance on interpreting the disputed term. Claim 5 states, in its entirety: "The system of claim 1, wherein the storage medium further comprises instructions to enable display of on-demand audio information selectable by a user." In the context of the claim language, it is evident that the claim is using "audio information" to refer to information *about* the audio content that is being consumed, heard, or broadcast. Because one cannot "display" the actual audio content, the "audio information" must be referential in nature.

The court does not agree, however, with Clear Channel's assertion that the specification so limits the display of audio information to identification or labels referring to sound recordings. As used in the specification, "audio information" is extremely broad. The example in Figure 4, where radio-station labels are displayed as part of a "radio dial" application, is one type of audio information that is being displayed and is selectable. However, Figure 4 is a mere embodiment. The court will not construe the claim language to include only the example illustrated when the claim language does not support such an exclusive reading. *Electro Med.*, 34 F.3d at 1054.

The patent specification does little to directly define what the "on-demand" subset of audio information covers. The single reference contained in the specification details a user receiving on-demand customized audio information after having selected the desired audio information the user wishes to receive. Therefore, the patent supports that "on-demand" entails some sort of particularized and desired content that is playable after being selected by a user. This reading comports with much of the extrinsic evidence presented by Clear Channel to support what would have been understood by a person skilled in the art at the time of the invention. On-demand, in simple terms, can be distinguished from traditional "tuning-in," because a user is able to select the content desired and to receive or have played that specific content when the user demands it. In the context of this patent, the on-demand content, which is playable when selected, is audio content. However, it is important to note that Clear Channel's additional restriction that the content must be played over the communication link is not supported in the specification and claim language. As such, it will not be imported into the court's construction.

Finally, the court notes that, according to Claim 5, the "on-demand audio information" is what is selectable by the user. Thus, the information displayed is what is selectable by the user.

Although this is not an issue that the parties directly argued, there exists some ambiguity in the parties' arguments as to which phrase or portion of phrase "selectable" modifies. While a subtle point, the court finds that the ambiguity should be resolved in order to clarify the entirety of the claim.

Consequently, the court concludes that "on-demand audio information selectable by a user" means "**information, which is selectable by a user, that identifies or refers to particular audio content that is playable when selected by the user**."

4. "log in"

Affinity argues that the term "log in" requires no construction and is readily understood. Clear Channel responds that a "log in" is "information identifying a user, such as a username or password." Clear Channel argues that the claim language itself ties a "log in" received from a user to a preferred user environment. In order to do that, Clear Channel reasons, the user must be identified. Clear Channel argues that Affinity's infringement contentions indicate that Affinity seeks to tie "log in" to device identifiers, a definition beyond the scope of the invention. Further, Clear Channel notes the only mention of "log in" in the specification: the "login region 410 allowing a user to log into homepage 401 and display a user-preferred environment." Clear Channel argues that the log in must therefore identify the user in order to display that user's preferred environment.

The court concludes that Clear Channel's proposed limitation that the "log in" must identify the user is simply not supported in the specification or the language of the claim. That the "log in" is associated with the user is made clear from the claim itself. However, the claim does not require that the user be identified. Affinity's argument that log-in information might be shared by several

individuals or that such log-in information might be associated with a group of people is well taken. If log-in information is shared, a particular preferred user environment may be associated with a user without the necessity to identify that particular user.  Further, even Clear Channel's extrinsic sources state that while a log-in may be in the form of a username and password, or a username alone, a log-in is not always a username or a username and password combination.  In sum, providing the open-ended example of "such as a username or password" brings no additional clarity to the term.

However, given the disagreement over the meaning of "log in," as well as the term's potential ambiguity, the court finds it appropriate to define "log in."  Although the term may be open to differing interpretations, it is not so insolubly ambiguous as to preclude definition.  When reviewing arguments in the parties' briefs and those presented in the claim-construction hearing, the parties' underlying definition of "log in" was unified along one thread.  This thread, which comports with much of the extrinsic evidence provided by Clear Channel, suggests that a "log in," broadly speaking, would be understood by a person skilled in the art as a credential that allows access to a system in order to use that system.

The court concludes that the term "log in" means "**access credential**."

5.  "advertisements are targeted to a specific demographic"

Affinity argues that this term is clear and requires no construction by the court, although Affinity concedes that substituting "population characteristic" for "specific demographic" would be acceptable if construction is required.  Clear Channel seeks to define the claim term by (1) substituting "are selected based on" for "are targeted to"; (2) substituting "population characteristic" for "specific demographic"; (3) inserting that the population characteristic must be "provided by the

user"; and (4) inserting an open-ended list of examples of population characteristics. In support, Clear Channel references the specification's only mention of an embodiment where "targeting" of advertisements is discussed. The specification describes that "[t]hrough providing demographic information to advertisers, when a user logs into homepage 401 selective advertising can be 'targeted' for a group of users." Clear Channel argues that the user must provide the specific demographic information. Clear Channel also argues that "demographic" is unclear, and that the specification defines demographic as "population characteristic." Finally, Clear Channel argues that an open list of population characteristics will be helpful to the jury in deciphering the meaning of the claim.

The court finds Clear Channel's proposed construction problematic for several reasons. Although Clear Channel argues that the disclosed embodiment is the only embodiment described in the patent, it is not clear from the intrinsic record that the patentee intended to so narrow the claim. Without evidence of such an intent, it is inappropriate to limit the broader claim language. Additionally, the court finds that the inclusion of a list of possible population characteristics is not helpful in this instance. To the contrary, the meaning of population characteristics or demographic information is an easily understood concept. A list like Clear Channel proposes might ultimately prove confusing to the jury. Further, the court finds no support for Clear Channel's proposed substitution of "are selected" for "are targeted." However, the court does find that Clear Channel's suggestion of "based on" provides additional refinement to "are targeted," and such a modification would refine the jury's understanding of the claim.

Therefore, the court concludes "advertisements are targeted to a specific demographic" means "**advertisements are targeted based on a population characteristic**."

19

C.    *Summary Table of Adopted Constructions*

| Claim Term/Phrase | Court's Construction |
|---|---|
| 1. "a non-transitory storage medium including an application configured for execution by the wireless cellular device" <br><br>(Claim 1) | **"a non-transitory memory that stores an application which has been configured for execution by the wireless cellular device"** |
| 2. "to receive a streaming media signal in the wireless cellular device corresponding to the regional broadcasting channel" <br><br>(Claim 1) <br><br> "streaming media signal representing the regionally broadcasted content" <br><br>(Claim 14) | **"to receive a streaming media signal in the wireless cellular device that is the same as, essentially the same as, or equivalent to the content available on the regional broadcasting channel"** <br><br> **"streaming media signal that is the same as, essentially the same as, or equivalent to the regionally broadcasted content"** |
| 3. "on-demand audio information selectable by a user" <br><br>(Claim 5) | **"information, which is selectable by a user, that identifies or refers to particular audio content that is playable when selected by the user"** |
| 4. "log in" <br><br>(Claim 7) | **"access credential"** |
| 5. "advertisements are targeted to a specific demographic" <br><br>(Claim 21) | **"advertisements are targeted based on a population characteristic"** |

## IV.   Conclusion

For the above reasons, the court construes the disputed claims as noted and so **ORDERS**.

No further claim terms require construction.

**IT IS FURTHER ORDERED** that this case is set for a **Scheduling Conference** on **June 12, 2014, at 11:00 a.m.**, in Courtroom 7, Seventh Floor, United States Courthouse, 501 W. 5th Street, Austin, Texas 78701.  The parties shall meet and confer in advance of that date in an attempt to settle this case.  If the case is not settled, the parties shall confer in an attempt to reach agreement on a schedule to follow for the remainder of this case.  The court will render a Scheduling Order as a result of the June 12, 2014 conference.

SIGNED this **29th** day of April, 2014.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE